## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC, for and on behalf of investment funds for which it acts as investment manager, <br><br> 767 5th Avenue <br> New York, New York 10153 <br><br>             Plaintiff, <br><br>     v. <br><br> JACOB J. LEW, in his official capacity as the Secretary of the Department of the Treasury, <br><br> 1500 Pennsylvania Avenue, N.W. <br> Washington, D.C. 20220, <br><br> EDWARD DeMARCO, in his official capacity as Acting Director of the Federal Housing Finance Agency, <br><br> Constitution Center <br> 400 7th Street, S.W. <br> Washington, D.C. 20024, <br><br> THE DEPARTMENT OF THE TREASURY, <br><br> 1500 Pennsylvania Avenue, N.W. <br> Washington, D.C. 20220, <br><br> THE FEDERAL HOUSING FINANCE AGENCY, <br><br> Constitution Center <br> 400 7th Street, S.W. <br> Washington, D.C. 20024, <br><br>             Defendants. | Civil Action No. 13-1025 |

## COMPLAINT AND PRAYER FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Perry Capital LLC ("Perry Capital"), for and on behalf of investment funds for which it acts as investment manager, files this complaint against Defendants Jacob J. Lew, in his official capacity as Secretary of the Department of the Treasury ("Treasury"); Edward DeMarco, in his official capacity as Acting Director of the Federal Housing Finance Agency ("FHFA"); Treasury; and the FHFA.  The FHFA is the conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "Companies").  By this complaint, Perry Capital seeks to prevent Defendants from giving effect to or enforcing the so-called Third Amendment to preferred stock purchase agreements ("PSPAs") executed by Treasury and the FHFA, acting as conservator for the Companies.  The Third Amendment fundamentally and unfairly alters the structure and nature of the securities Treasury purchased under the PSPAs, impermissibly destroys value in all of the Companies' privately held securities, and illegally begins to liquidate the Companies.  This blatant overreach by the federal government to seize all of the Companies' profits at the expense of the Companies and all of their private investors is unlawful and must be stopped.

Perry Capital hereby alleges as follows:

# I.
## PRELIMINARY STATEMENT

1.    This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706 ("APA"), and the Housing and Economic Recovery Act of 2008, 12 U.S.C. §§ 1455, 1719, 4617 ("HERA"), challenging the action of Treasury and the FHFA to materially amend the PSPAs according to which Treasury purchased a new class of preferred stock in the Companies (the "Government Preferred Stock"), and to materially amend the stock certificates that created the Government Preferred Stock.  The challenged amendments to the PSPAs and stock

certificates, which Treasury and the FHFA executed on August 17, 2012, are set forth in documents collectively known as the Third Amendment.

2.      During the mortgage-related financial crisis that began in 2007, Congress created the FHFA to oversee the operations of the Companies and empowered the FHFA to serve as conservator to the Companies when necessary to preserve their financial health. When acting as conservator, the FHFA is obligated to manage the Companies with the goal of putting them in a sound and solvent financial condition while preserving and conserving their assets.

3.      Congress also authorized Treasury to provide limited financial assistance to the Companies. Treasury was authorized to provide this assistance by purchasing securities issued by the Companies if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

4.      On September 7, 2008, the Director of the FHFA placed Fannie Mae and Freddie Mac into conservatorship, committing to "operate the [Companies] until they are stabilized." Press Release, FHFA, Statement of FHFA Director James B. Lockhart, at 6 (Sept. 7, 2008), *available at* http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf. Shortly thereafter, Treasury and the FHFA executed the PSPAs, according to which Treasury purchased 1 million shares of the Government Preferred Stock from each company, in exchange for a funding commitment that allowed each company to draw up to $100 billion from Treasury as needed to ensure that they maintained a net worth of at least zero. As relevant here, the Government Preferred Stock for each company has a liquidation preference equal to $1 billion plus the sum of all draws by each company against Treasury's funding commitment and is entitled to a cumulative dividend equal to ten percent of the outstanding liquidation preference. The PSPAs

also grant Treasury warrants to purchase up to 79.9% of each company's common stock at a nominal price.

5.      Shortly after the commencement of the conservatorship, the Companies declared large non-cash losses, including write-downs of the value of significant tax assets—known as deferred tax assets—and large loss reserves, on their balance sheets.  These accounting adjustments reflected exceedingly pessimistic views about the Companies' future financial prospects and temporarily decreased the Companies' operating capital and their net worth by hundreds of billions of dollars.  Beginning in 2008, Treasury began purchasing Government Preferred Stock in large part to fill the holes in the Companies' balance sheets created by these accounting reserves.

6.      By 2012, however, it had become clear that the Companies' financial condition had recovered to the point that they were achieving profitability and that their actual condition, in fact, was never as bad as had been originally feared.  Among other things, between 2008 and 2012, the Companies' actual realized loan losses were far less—around $100 billion less—than their anticipated losses.  Because of their improved financial condition, the Companies have been able to reverse the write-downs of their deferred tax assets and loss reserves that had impaired their balance sheets for years and their true financial strength was revealed.

7.      The Companies posted sizable profits in the first two quarters of 2012 and announced that they expected to be profitable into the future.  The prospect that the Companies could both redeem the Government Preferred Stock and provide value to holders of the Companies' other preferred stock and common stock (including Treasury) was—or should have been—obvious to both Treasury and the FHFA.  Indeed, the stream of profits projected to continue in the coming years, coupled with the expected reversal of loss reserves and the write-

up in value of other assets, meant that the Companies' net worth was poised to increase by several hundred billion dollars.[1]

8.    Instead of exercising its right to purchase up to 79.9% of the Companies' common stock or taking steps to enable the Companies to redeem the Government Preferred Stock , the FHFA and Treasury—two entities in the Executive Branch—maneuvered to ensure that Treasury would be the sole beneficiary of the Companies' improved financial position.  The Third Amendment was their means to that end.

9.    The Third Amendment fundamentally altered the dividend structure of the Government Preferred Stock.  Under the original stock certificates, Treasury's dividend was paid quarterly in the amount equal to an annual ten percent of the Government Preferred Stock's outstanding liquidation preference.  In the Third Amendment, the FHFA and Treasury amended the dividend provision to require that every dollar of each company's net worth above a certain capital reserve amount be given to Treasury as a dividend.  The specified capital reserve amount steadily declines to zero in 2018.  The Third Amendment also requires that the Companies liquidate their portfolio of mortgages faster than required under the original PSPAs.

10.    Treasury's additional profits from the Third Amendment are enormous.  On or about June 30, 2013, Fannie and Freddie collectively paid Treasury the largest dividend in history:  $66.3 billion.  By contrast, without the Third Amendment, Treasury would have received $4.7 billion.

---

[1]  Indeed, by the end of 2012, Fannie Mae's profitability was such that it could not avoid writing-up its deferred tax assets.  Under Generally Accepted Accounting Principles and the rules of the Securities and Exchange Commission, Fannie Mae's management had to recognize that its expected continued profitability meant that it was likely that it was going to be able to use its deferred tax assets.  Notably, the original write-down of those assets is what caused Treasury to inject surplus funds into the company, and now under the Third Amendment, the write-up of those same assets has resulted in an immense infusion of cash to Treasury.

11.     At the time of the Third Amendment, the liquidation preference for the
Government Preferred Stock was approximately $189 billion, with approximately $117 billion
attributable to Fannie Mae and $72 billion attributable to Freddie Mac.  According to the
Companies' financial statements, at the time of the Third Amendment, they had each paid
dividends to Treasury equal to approximately 28% of the liquidation preference of their
respective outstanding Government Preferred Stock (more than $25 billion by Fannie Mae and
more than $20 billion by Freddie Mac).

12.     As to be expected, the Companies' continued profitability has accelerated their
payments to Treasury under the Third Amendment.  In addition, Fannie Mae recently announced
that it would write-up a portion of its deferred tax assets in the second quarter of 2013.  As a
result, Fannie Mae projected that by the end of the second quarter of 2013, it would have paid
$95 billion in dividends to Treasury, almost 81% of the Government Preferred Stock's
liquidation preference.  Freddie Mac has not yet announced a similar write-up of its deferred tax
assets.  Nevertheless, it did state that by the end of the second quarter of 2013, it would have paid
$36.5 billion in dividends to Treasury, or approximately 51% of the liquidation preference of the
Government Preferred Stock it sold to Treasury.  When it eventually does write-up its deferred
tax assets, the Third Amendment will require Freddie Mac to transfer an additional $30 billion to
Treasury.  In fact, under current projections, the Companies will have fully reimbursed Treasury,
with interest, by next year.

13.     Under the Third Amendment, however, the amount of cash the Companies
transfer to Treasury as a dividend does not reduce the amount of the Government Preferred Stock
outstanding.  Thus, regardless of how much money the Companies send to Treasury, all of the
Government Preferred Stock will remain outstanding, and Treasury will continue to take

substantially all of the Companies' net worth, as long as they remain in business.  Even before

these most recent quarterly earnings reports showing record profits for the Companies, the

President's proposed Fiscal Year 2014 budget estimated that by the end of the next 10 years,

Treasury will have collected more than $238 billion from the Companies, approximately $50

billion more than it cost Treasury to purchase the Government Preferred Stock.  *See* Office of

Management and Budget, Analytical Perspectives: Budget of the U.S. Government 30, 383

(2013), *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2014/assets/

spec.pdf.  Given the timing of the release of the President's budget, it does not appear to include

cash flow from the Companies' write-ups of the deferred tax assets, which would mean that the

budget *understates* the cash flow by more than $80 billion.  And, indeed, the Congressional

Budget Office's May 2013 report, "Updated Budget Projections:  Fiscal Years 2013 to 2023,"

shows that "certain accounting changes" are expected to add $95 billion in receipts to the

Treasury in 2013.

14.    The Third Amendment enriches the federal government through a self-dealing

pact, and destroys tens of billions of value in the Companies' preferred stock that is, as a result of

the PSPAs, now junior to the Government Preferred Stock (the "Private Sector Preferred

Stock").  The Third Amendment also destroys value in the Companies' publicly held common

stock.  Fannie Mae and Freddie Mac sold the Private Sector Preferred Stock to private investors

such as community banks and insurance companies before it sold the Government Preferred

Stock to Treasury.  Community banks, for example, invested large amounts in the Private Sector

Preferred Stock in no small part because their regulators—which considered such investments to

be low-risk—required banks to hold significantly lower reserves to back up investments in the

Private Sector Preferred Stock, as compared to other investments.

15.     As set forth more fully below, the funds managed by Perry Capital (the "Perry Funds") hold several series of Private Sector Preferred Stock. The Perry Funds have held Private Sector Preferred Stock since 2010 and purchased this stock in reliance on the terms of the Government Preferred Stock as it existed before the Third Amendment. The Private Sector Preferred Stock held by the Perry Funds is valuable for two reasons: First, it produces a non-cumulative annual dividend at a specified rate; second, it carries a liquidation preference—that is, upon liquidation, the holder of the stock is entitled to receive a defined amount per share, to the extent of available funds.

16.     The Third Amendment drains all cash and other net worth from the Companies, leaving no funds to pay dividends on the Companies' Private Sector Preferred Stock or common stock or to satisfy the Private Sector Preferred Stock's liquidation preference. The Third Amendment thus deprives the Companies' Private Sector Preferred Stock and common stock of substantial present and future value.

17.     After Fannie Mae and Freddie Mac transfer their net worth to Treasury, they will have no funds left over to pay dividends to holders of these securities. And as the FHFA recently acknowledged, the Third Amendment also deprives the Companies of funds to rebuild their capital reserves. *See* FHFA, *2012 Report to Congress*, June 13, 2013, at 13, *available at* http://www.fhfa.gov/webfiles/25320/FHFA2012_AnnualReport.pdf. Indeed, Treasury has explicitly stated that a primary purpose of the Third Amendment is to "expedite the wind down of Fannie Mae and Freddie Mac" as going concerns. *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx. As Treasury explained, as a result of the Third Amendment, the

Companies "will be wound down and will not be allowed to retain profits, rebuild capital, [or] return to the market in their prior form." *Id.* Thus, upon liquidation the Companies cannot possibly have funds left over after paying their creditors and Treasury as the holder of the Government Preferred Stock to satisfy the Private Sector Preferred Stocks' liquidation preference. This is true no matter how much money the Companies pay to Treasury, or how much that sum exceeds Treasury's commitment to the Companies. As the FHFA's inspector general recently observed, the PSPAs mean that "preferred and common shareholders of [the Companies] . . . effectively lost their investments." FHFA Office of Inspector General, *Fannie Mae and Freddie Mac: Where The Taxpayers' Money Went*, at 25 (May 24, 2012), *available at* http://www.fhfaoig.gov/Content/Files/ FannieMaeandFreddieMac-WheretheTaxpayersMoneyWent.pdf.

18.     Neither Treasury nor the FHFA had authority to enter into the Third Amendment. Even assuming such a one-sided agreement could ever be lawful, Treasury's temporary statutory authority to purchase securities issued by Fannie Mae and Freddie Mac expired at the end of 2009. The FHFA, as conservator of Fannie Mae and Freddie Mac, is statutorily required to operate the Companies so as to render them "sound and solvent" and to "conserve [their] assets and property." As a conservator, the FHFA lacks any authority to initiate the wind down of Fannie Mae and Freddie Mac.

19.     Moreover, Treasury acted arbitrarily and capriciously in entering into the Third Amendment. Even when Treasury had authority to purchase the Companies' securities, it could not exercise its authority unless it made statutorily required determinations upon consideration of statutorily defined criteria. Treasury did not make a public record reflecting the required determinations or its consideration of the required factors before executing the Third

Amendment.  Further, the Companies' financial positions at the time of the Third Amendment were such that the Third Amendment is not consistent with Treasury having considered the required factors or having made the necessary determinations in any reasoned manner.  In fact, reports prepared for each company by the FHFA and delivered to Treasury before and immediately after the Third Amendment show that they did not need further funds from Treasury and were in fact capable of repaying Treasury.  Treasury also failed to consider whether the Third Amendment was consistent with the duties it owes as the Companies' dominant shareholder to holders of the Companies' Private Sector Preferred Stock and common stock.

20.     The FHFA also acted arbitrarily and capriciously in agreeing to the Third Amendment.  The FHFA did not make any attempt to reconcile the Third Amendment, an explicitly acknowledged step towards liquidating Fannie Mae and Freddie Mac, with its obligation to preserve and protect the Companies' assets.  In fact, the FHFA now acknowledges that the Third Amendment prohibits the Companies from building capital, which is inherently inconsistent with the FHFA's statutory duties as conservator.  Indeed, the Companies' financial positions at the time of the Third Amendment were such that liquidating them could not be consistent with preserving and protecting the Companies' assets.  Nor did the FHFA consider whether the Third Amendment is consistent with duties it owes to holders of the Companies' Private Sector Preferred Stock and common stock.

21.     For the reasons set forth herein, the Court should declare the Third Amendment to be unlawful, set it aside, and enjoin the Defendants from acting according to its terms.

## II.
## JURISDICTION AND VENUE

22.     This action arises under the APA, 5 U.S.C. §§ 551-559, 701-706, and HERA, 12 U.S.C. §§ 1455, 1719, 4617.  The Court has subject-matter jurisdiction over this action under 28

U.S.C. § 1331.  The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

23.     Plaintiff has standing to file this complaint.  The Perry Funds own Private Sector Preferred Stock and common stock in both Fannie Mae and Freddie Mac.  They have owned stock in the Companies since long before the Third Amendment and purchased this stock in reliance on the terms of the Government Preferred Stock as it existed before the Third Amendment.  The Private Sector Preferred Stock owned by the Perry Funds has two principal features.  First, it entitles the Perry Funds to a contractually specified, non-cumulative dividend from the Companies to the extent a dividend is declared for common or preferred stock of less than or equal seniority.  Second, it entitles the Perry Funds to a priority claim to a contractually specified liquidation preference should the Companies liquidate.  These entitlements are junior to Treasury's lawful rights under the PSPAs.  Subject to a capital reserve requirement that is steadily phased out by 2018, the Third Amendment to the PSPAs sweeps all of Fannie Mae's and Freddie Mac's net worth to Treasury on a quarterly basis.  By depriving the Companies of substantially every dollar of net worth, the Third Amendment prevents them from ever paying dividends on the Private Sector Preferred Stock and from rebuilding their capital to benefit holders of their common stock.  As a result, the Third Amendment strips the Companies' Private Sector Preferred Stock and their common stock of substantially all value.  Invalidation of the Third Amendment would redress this substantial harm to the Perry Funds.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) and (B), because this is an action against officers and agencies of the United States, and Defendants all reside in this judicial district; Secretary Lew and Acting Director DeMarco both perform their official

duties in this judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## III.
## PARTIES

25.     Plaintiff Perry Capital LLC is an affiliate of Perry Corp., which is an investment advisor registered with the Securities and Exchange Commission under the Investment Advisor Act of 1940.  Perry Capital primarily manages pooled investment vehicles, the Perry Funds, for the benefit of pension funds, university endowments, foundations, and other institutional and private investors.  The Perry Funds invest in public equity, debt, real estate, and other markets, including private equity markets.  Perry Capital is a limited liability corporation duly organized and existing under the laws of Delaware, and its principal place of business is 767 5th Avenue, New York, New York 10153.

26.     Defendant Jacob J. Lew is the Secretary of the Department of the Treasury.  His official address is 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.  He is being sued in his official capacity.  In that capacity, Secretary Lew has overall responsibility for Treasury's management and operation.  Secretary Lew, in his official capacity, is responsible for Treasury's conduct that is the subject of this complaint and for the related acts and omissions alleged herein.

27.     Defendant Edward DeMarco is the Acting Director of the FHFA.  His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.  He is being sued in his official capacity.  In that capacity, Acting Director DeMarco has overall responsibility for the operation and management of the FHFA.  Acting Director DeMarco, in his official capacity, is responsible for the conduct of the FHFA that is the subject of this complaint and for the related acts and omissions alleged herein.

28.     Defendant Department of the Treasury is, and was at all times relevant hereto, an agency of the United States government subject to the APA.  *See* 5 U.S.C. §§ 101, 105, 551(1).  The Department is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

29.     Defendant Federal Housing Finance Agency is, and was at all relevant times, an agency of the United States government subject to the APA.  *See* 5 U.S.C. §§ 101, 105, 551(1).  Congress created the FHFA on July 30, 2008 in HERA.  The FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

## IV.
## FACTUAL ALLEGATIONS

30.     Fannie Mae is a federally chartered private stockholder-owned corporation organized and existing under the Federal National Mortgage Act, created to provide supplemental liquidity to the mortgage market.  Freddie Mac is a federally chartered private stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act, created to stabilize the nation's residential mortgage market and expand opportunities for homeownership and affordable rental housing.  Both Fannie Mae and Freddie Mac are Government-Sponsored Enterprises, private corporations created by Congress with the goal of increasing liquidity in the mortgage market.  The Companies endeavor to fulfill their goals by, among other things, purchasing mortgages originated by private banks, and bundling the mortgages into mortgage-related securities that can be sold to investors.  By creating this secondary mortgage market, Fannie Mae and Freddie Mac increase liquidity for private banks, allowing them to make additional loans to individuals to purchase homes.

31.     Notwithstanding their government pedigree, as of 2007, Fannie Mae and Freddie Mac were owned by private shareholders.  Before 2007, the Companies were consistently

profitable.  In fact, Fannie Mae had not reported a full-year loss since 1985, and Freddie Mac had

not reported a loss since 1989.

32.     In 2007, however, the nation's mortgage market began a precipitous decline as a

faltering economy led to an increasing number of delinquent and defaulted mortgages.  This

decline had a particularly severe effect on the market's confidence in the financial health of

Fannie Mae and Freddie Mac.  At the time, numerous government officials sought to allay these

concerns and affirm the continued financial strength of the Companies.  James B. Lockhart, then-

Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") and later Director of

the FHFA, said that the Companies were "adequately capitalized, holding capital well in excess

of [regulatory requirements]" and had "large liquidity portfolios, access to the debt market and

over $1.5 trillion in unpledged assets."  Press Release, OFHEO, Statement of OFHEO Director

James B. Lockhart (July 10, 2008), *available at* http://www.fhfa.gov/webfiles/1503/

71008statement.pdf.

33.     Nevertheless, given the importance of housing to the U.S. economy and the need

to provide confidence to the market, Congress intervened by passing HERA.  HERA created the

FHFA, which took over regulatory responsibility for the Companies from OFHEO.  HERA

authorized the FHFA to place the Companies in conservatorship or receivership under certain

statutorily defined circumstances.

34.     Soon after HERA's enactment, the FHFA placed the Companies into

conservatorship.  As the conservator for Fannie Mae and Freddie Mac, the FHFA became

responsible for "preserv[ing] and conserv[ing] [their] assets and property" and managing them so

as to restore them to a "sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  The FHFA

committed to "operate the Companies until they are stabilized."  Press Release, FHFA, Statement

of FHFA Director James B. Lockhart, at 6 (Sept. 7, 2008), *available at*

http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf.  Acting Director DeMarco

confirmed this operating framework, stating that the "statutory purpose of conservatorship is to

preserve and conserve each company's assets and put them in a sound and solvent condition . . .

to help restore confidence in the [C]ompanies, enhance their capacity to fulfill their mission, and

[to] mitigate the systemic risk that contributed directly to instability in the financial markets."

Statement of Edward J. DeMarco, Acting Director, FHFA, Before the U.S. House of

Representatives Subcomm. on Capital Markets, Insurance, and Government-Sponsored

Enterprises, at 2 (Sept. 15, 2010), *available at*

http://www.fhfa.gov/webfiles/16726/DeMarcoTestimony15Sept2010final.pdf.

     35.    HERA also authorized Treasury to strengthen the Companies' balance sheets by

purchasing their securities, within set time limits and consistent with certain statutory

requirements.  From the time of HERA's enactment in 2008 through the end of 2009, Congress

authorized Treasury to "purchase any obligations and other securities issued by the [Companies]

. . . on such terms and conditions as the Secretary may determine and in such amounts as the

Secretary may determine."  12 U.S.C. §§ 1455($l$)(1)(A), 1719(g)(1)(A).  In order to exercise that

authority, HERA required the Secretary to determine that purchasing the Companies' securities

was "necessary to . . . provide stability to the financial markets; prevent disruptions in the

availability of mortgage finance; and protect the taxpayer."  12 U.S.C. §§ 1455($l$)(1)(B),

1719(g)(1)(B).  And in making those determinations, the Secretary was required to consider

several factors:

    (i) [t]he need for preference or priorities regarding payments to the Government;
    (ii) [l]imits on maturity or disposition of obligations or securities to be purchased;
    (iii) [t]he [Companies'] plan[s] for the orderly resumption of private market
    funding or capital market access; (iv) [t]he probability of the [Companies]

15

fulfilling the terms of any such obligation or other security, including repayment; (v) [t]he need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]; [and] (vi) [r]estrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation or any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

36.     Using its temporary authority under HERA, Treasury entered into the PSPAs with the FHFA, which acted on behalf of both Companies.  The PSPAs are identical in all material respects.  Under the PSPAs, Treasury purchased 1 million shares of Government Preferred Stock from each of the Companies in exchange for allowing them to draw up to $100 billion each from Treasury.  The Government Preferred Stock has a liquidation preference equal to $1 billion plus the sum of all draws by each company against Treasury's funding commitment, and is entitled to a cumulative dividend equal to ten percent of the outstanding liquidation preference.  If the Companies pay a dividend, the PSPAs require payment in full to Treasury of dividends declared, but not paid, for prior dividend periods, before any privately held securities may receive a dividend.  Indeed, the PSPAs explicitly prohibit the payment of any dividend to any shareholder other than Treasury without Treasury's consent.  Further, if the Companies liquidate, Treasury must recover the full liquidation value of its shares before any other shareholder may recover anything.  The PSPAs also grants Treasury warrants to purchase up to 79.9% of the Companies' common stock at a nominal price.

37.     Treasury's statutory authority to purchase the Companies' securities, however, expired at the end of 2009.  To enable Treasury to provide liquidity to the Companies beyond 2009, Treasury and the FHFA amended the PSPAs twice before the end of 2009.  First, in May 2009, Treasury agreed to expand its funding commitment from $100 billion per company to $200 billion per company.  Then, on December 24, 2009, just before its temporary authority

under HERA expired, Treasury agreed to a funding commitment that would be sufficient to
enable the Companies to satisfy their capitalization requirements for 2010, 2011, and 2012 and to
a funding commitment in subsequent years up to a limit determined by an agreed-upon formula.

38.     Both Companies have issued several series of Private Sector Preferred Stock that
are, as a result of the PSPAs, subordinate to the Government Preferred Stock.  This stock, which
was sold prior to the issuance of the Government Preferred Stock, is held by private investors
such as community banks, insurance companies, and investors like the Perry Funds.  As of
March 31, 2013, the Companies' outstanding Private Sector Preferred Stock had an aggregate
liquidation preference of $33 billion.  Each class of Private Sector Preferred Stock has its own
contractual dividend rate and liquidation value.  The Perry Funds own multiple series of Private
Sector Preferred Stock issued by the Companies; the Perry Funds began purchasing these shares
in reliance on the terms of the Government Preferred Stock before the Third Amendment altered
those terms.

39.     Before the FHFA placed the Companies into conservatorship, Treasury and other
federal agencies encouraged private investors to purchase Private Sector Preferred Stock.  In
fact, before the conservatorship, banking regulators believed that investments in the Companies
were extraordinarily safe.  As a result, they encouraged banks to invest in the Companies'
preferred stock by allowing banks to carry it on their balance sheets at a 20 percent risk
weighting (versus a risk weighting of 100 percent for other companies' preferred stock).  The
federal regulatory regime thus encouraged banks to own the Private Sector Preferred Stock.

40.     When the Companies entered conservatorship, the FHFA suspended the payment
of dividends on all of the Private Sector Preferred Stock and the PSPAs explicitly prohibit the

payment of any such dividends without Treasury's consent.  Holders of the Companies' Private Sector Preferred Stock have not received any dividends on their investment since 2008.

41.     Once in conservatorship, the Companies incurred substantial impairments to their balance sheets.  The Companies, under the direction of the FHFA, expected to incur substantial loan losses in the coming years and did not expect to be profitable.  Thus, the Companies booked substantial reserves—recorded loan losses before actually incurring them—and under applicable accounting standards, eliminated the value of non-cash deferred tax assets from their balance sheets.

42.     These impairments set off a harmful feedback loop that required the Companies to draw increasing amounts against Treasury's funding commitment.  Because of the accounting adjustments, the Companies had less capital and therefore needed capital from Treasury to operate.  And because of their depleted operating capital, the Companies also sometimes lacked the funds necessary to pay Treasury the quarterly dividends due under the PSPAs.  This required the Companies to draw additional funds from Treasury's funding commitment in order to pay the dividends.  All of these draws increased the amount of Treasury's aggregate liquidation preference, and thus the amount of dividends payable to Treasury.  Under the PSPAs, as amended, Treasury infused approximately $187 billion into the Companies and received approximately $55 billion in return in the form of dividends and other fees between 2008 and 2012.

43.     During this timeframe, the FHFA continued to manage the Companies in conservatorship.  HERA empowered the FHFA to force the Companies into receivership and to liquidate their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but the FHFA apparently never considered that as a viable option, *see* FHFA, *A Strategic Plan For Enterprise*

*Conservatorships: The Next Chapter In A Story That Needs An Ending*, at 9 (Feb. 21, 2012),

*available at* http://www.fhfa.gov/webfiles/23344/StrategicPlanConservatorshipsFINAL.pdf

(asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing

statutory provisions that guide *the conservatorships*" (emphasis added)).

44.     In 2012, it became clear that the Companies' financial position was not as bad as

had been feared in 2008.  Among other things, their actual loan losses were far less than their

anticipated losses.  For example, between the beginning of 2007 and the second quarter of 2012,

the Companies had placed more than $234 billion in reserve to absorb anticipated loan losses.

But over that same time period, the Companies had realized loan losses of just over $125 billion.

In other words, the Companies had overstated their projected loan losses by $109 billion which

was artificially weighing down their net worth.

45.     In addition, in the first two quarters of 2012, the Companies posted sizable profits

totaling more than $10 billion.  The Companies' 10-Qs disclosed that they expected to be

consistently profitable for the foreseeable future.  These projected future profits meant that the

Companies would be able to remove the valuation allowance against their deferred tax assets,

worth approximately $100 billion, in future years.

46.     Together, these profits and facts regarding the Companies' balance sheets showed

that the Companies could both position themselves to redeem the Government Preferred Stock

and provide a financial return to holders of their Private Sector Preferred Stock and their

common stock.

47.     By 2012, the fact that the Companies were returning to financial health and would

soon be able to position themselves to redeem the Government Preferred Stock was—or at least

should have been—obvious to Treasury and the FHFA.  But instead of taking steps to aid that

19

process, Treasury and the FHFA entered into the Third Amendment, which ensured that

Treasury would be the only beneficiary of the Companies' profitability and that the Companies

would be wound down.

48.     Under the Third Amendment, rather than paying Treasury a ten percent dividend,

the Companies are required to pay every dollar of their quarterly net worth (above a nominal

capital reserve amount that steadily declines until it is eliminated in 2018) to Treasury as a

dividend.  In Treasury's words, under the Third Amendment, it is owed a full sweep of "every

dollar of profit that each firm earns going forward."  *See* Press Release, Treasury, Treasury

Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie

Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-

releases/Pages/tg1684.aspx.

49.     The dividends that will be paid under the Third Amendment are expected to result

in a torrent of cash to Treasury.  In 2012, the Companies made combined profits of more than

$28 billion.  In the first quarter of 2013, they posted combined profits of approximately

$15 billion.  Because of its profitability, Fannie Mae was able to add approximately $51 billion

to its net worth by recapturing some of the deferred tax assets it had written off in prior years.

Freddie Mac is expected to recognize deferred tax assets worth approximately $30 billion in the

near future, possibly as soon as this quarter.  In fact, at the end of the second quarter of 2013, the

Companies collectively paid $66.3 billion under the Third Amendment.  Such large payments

were not unexpected; shortly after the execution of the Third Amendment, the FHFA's Inspector

General recognized that the new arrangement could result in "an extraordinary payment to

Treasury."  FHFA Office of Inspector General, <u>*Analysis of the 2012 Amendments to the*</u>

<u>*Government Stock Purchase Agreements*</u>, at 15 (Mar. 20, 2013).

50.     Treasury expects to recoup every dollar of the $187 billion it infused into the Companies within the next year.  Indeed, over the next ten years, Treasury expects to collect $50 billion more from the Companies than it advanced to them.

51.     The dividend under the Government Preferred Stock must be paid to Treasury in cash, even though the net worth of the Companies may include non-cash assets, such as the deferred tax assets.  As a result, the Companies have had to sell non-liquid assets or issue debt to pay the dividend, which has had the foreseeable effect of preventing them from maximizing the value of their assets.  Further, the Companies can never accumulate capital under the Third Amendment and can never redeem the Government Preferred Stock.  The Companies' obligations to Treasury are thus converted into a sort of magic ATM:  So long as the Companies remain in operation, all of their net worth will be transferred to Treasury but the outstanding balance of the Government Preferred Stock will remain $189 billion.  Under the Third Amendment, none of the Companies' assets can be used to provide value to holders of their Private Sector Preferred Stock or common stock.

52.     Treasury announced the Third Amendment on August 17, 2012, less than two weeks after the Companies announced their substantial profits for the second quarter of that year. Treasury's primary justification for the Third Amendment was that it would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market." *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.  The FHFA paradoxically stated that the Third Amendment was part

of the process of both "building for the future" and "gradually contracting [the Companies'] operations." Press Release, FHFA, Statement of FHFA Acting Director Edward J. DeMarco On Changes To Fannie Mae And Freddie Mac Preferred Stock Purchase Agreements (Aug. 17, 2012), *available at* http://www.fhfa.gov/webfiles/24203/FINAL_FHFA_PSPA_8172012.pdf.

53.     Neither Treasury nor the FHFA made any public record of their decisionmaking processes in agreeing to the Third Amendment.

54.     Thus, there is no public record that Treasury made the determinations or considered the factors required by HERA before executing the Third Amendment.  In any event, Treasury's description of the Third Amendment as assisting an expedited winding down of the Companies' operations demonstrates that the Third Amendment is wholly inconsistent with consideration of required statutory factors, such as "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and the Companies' plans "for the orderly resumption of private market funding or capital market access."  *See* 12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).  There is also no evidence that Treasury considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Private Sector Preferred Stock and common stock, including refinancing the Government Preferred Stock or allowing the Companies to resume paying dividends to holders of their Private Sector Stock and common stock.

55.     There is also no public record that the FHFA considered whether the Third Amendment is consistent with its statutory obligations as the Companies' conservator. Treasury's stated purpose of winding down the Companies, which necessarily involves dissipating their assets and property, is incompatible on its face with FHFA's charge to put the Companies back into "a sound and solvent condition" and to "conserve [their] assets and

property."  Acting Director DeMarco's statement that the Third Amendment reflects the FHFA's

goal of "gradually contracting [the Companies'] operations" is also inconsistent with that

obligation.  Press Release, FHFA, *Statement of FHFA Acting Director Edward J. DeMarco On

Changes To Fannie Mae And Freddie Mac Preferred Stock Purchase Agreements* (Aug. 17,

2012), *available at* http://www.fhfa.gov/webfiles/24203/FINAL_FHFA_PSPA_8172012.pdf.;

*see also* Statement of Edward J. DeMarco, Acting Director, FHFA, Before the U.S. Senate

Comm. on Banking and Urban Affairs 3 (Apr. 18, 2013) (explaining that the Third Amendment

reinforces "the notion that the Companies will not be building capital as a potential step to

regaining their former corporate status"); FHFA, *2012 Report to Congress*, June 13, 2013, at 13,

*available at* http://www.fhfa.gov/webfiles/25320/FHFA2012_AnnualReport.pdf  (stating that the

FHFA's focus is on preparing the housing industry for a future "without Fannie Mae and Freddie

Mac").

56.     Further, there is no evidence that the FHFA considered alternatives to the Third

Amendment that would have been both consistent with its statutory obligations and less harmful

to holders of the Companies' Private Sector Preferred Stock and common stock, including

refinancing the Government Preferred Stock or allowing the Companies to resume paying

dividends to holders of their Private Sector Stock and common stock.

57.     Finally, there is no public record that either government agency—Treasury or the

FHFA—considered whether the Third Amendment is consistent with their duties to holders of

the Companies' Private Sector Preferred Stock and common stock.

**V.**

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation Of The Administrative Procedure Act:**
**Treasury's Conduct Exceeds Its Statutory Authority**
**Under The Housing And Economic Recovery Act**

58.     Perry Capital incorporates by reference the allegations of the preceding

paragraphs.

59.     The APA empowers the Court to "hold unlawful and set aside agency action,

findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations"

or that are "without observance of procedure required by law."  5 U.S.C. § 706(2)(C), (D).

60.     HERA limits Treasury's authority to make financial investments in the

Companies.  For example, Treasury's authority under HERA to purchase the Companies'

securities and to modify the terms and conditions of those securities expired on December 31,

2009.  12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4).

61.     The Third Amendment, which was executed on August 17, 2012, created new

securities, and Treasury's purchase of those securities violated that clearly demarcated limit on

its authority.

62.     Under the original PSPAs, Treasury purchased equity interests that entitled it to

Government Preferred Stock with certain characteristics:  a liquidation preference equal to the

Companies' draws against Treasury's funding commitment and an annual dividend worth ten

percent of the aggregate liquidation preference.  These interests were embodied by stock

certificates issued by the Companies.  The PSPAs also grant Treasury warrants to purchase up to

79.9% of the Companies' common stock at a nominal price.  The Third Amendment altered the

underlying stock certificates to create a new security that entitles Treasury to a complete sweep

24

of all of the Companies' net worth every quarter for as long as they remain in operation and that extinguishes all other equity rights.

63.    The Third Amendment thus effected a wholesale change to the nature of Treasury's securities after its authority to purchase new securities expired.  Notably, Treasury could have exercised its warrants to purchase 79.9% of the Companies' common stock under the existing terms of the PSPAs.  Doing so would have enabled both Treasury and private investors to share in the Companies' financial gains; instead, Treasury executed the Third Amendment, creating a new equity interest that seizes all of the Companies' gains for itself.

64.    Treasury also exceeded its authority by amending the PSPAs without making certain statutorily required findings or considering statutorily required factors.  Before exercising its temporary authority to purchase securities, HERA requires Treasury to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."  12 U.S.C. § 1719(g)(1)(B).  In making the statutorily required determinations, HERA requires Treasury to consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors.  12 U.S.C. § 1719(g)(1)(C).

65.    These statutory criteria apply to amendments of the PSPAs, in addition to the original execution of those agreements.  Otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired, without making the required determinations or considering the necessary factors.  This would turn HERA's grant of temporary authority to Treasury to purchase the Companies' securities under certain conditions into an unconstrained, permanent authority.

66.     As far as the public record discloses, Treasury has not made any of the required determinations or considered any of the necessary factors.  It therefore exceeded its statutory authority.

67.     In any event, the Third Amendment is not compatible with due consideration of the factors Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities.  The Third Amendment destroys value in all privately held securities, demonstrating that it is wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

68.     Treasury's conduct in entering into the Third Amendment was therefore "in excess of statutory . . . authority" and "without observance of procedure required by law," and Perry Capital is therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT II

### Violation Of The Administrative Procedure Act:
### Treasury's Conduct Was Arbitrary And Capricious

69.     Perry Capital incorporates by reference the allegations of the preceding paragraphs.

70.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This means, among other things, that agency action is unlawful unless it is the product of "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Decisionmaking that relies on

inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

71.     Before Treasury exercises its temporary authority to purchase the Companies' securities, HERA requires Treasury to determine that the financial support is necessary to "provide stability to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer."  12 U.S.C. §§ 1455(*l*)(1)(B)(i)-(iii), 1719(g)(1)(B)(i)-(iii). In making these determinations, HERA further requires Treasury to "take into consideration" several factors, including the "plan for the orderly resumption of private market funding or capital market access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private shareholder-owned compan[ies]."  *Id.* §§ 1455(*l*)(1)(C)(iii), (v), 1719(g)(1)(c)(iii), (v).

72.     These statutory criteria apply to all amendments of the PSPAs.  Otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired, without making the required determinations or considering the necessary factors.  This would turn HERA's grant of limited, temporary authority to Treasury, to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority.

73.     There is no public record that Treasury made the required determinations or considered the necessary factors before agreeing to the Third Amendment.  Thus, Treasury has failed to explain how its conduct is consistent with its statutory obligations.  Indeed, the available evidence reveals that it was not.  Further, Treasury also has not explained whether it considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to private investors in the Companies, including refinancing the Government Preferred Stock or allowing the Companies to resume paying dividends to holders

of their Private Sector Stock and common stock.  Treasury has thus arbitrarily and capriciously failed to provide a reasoned explanation for its conduct, which results in the government's appropriation of tens of billions in private shareholder value.

74.     Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Third Amendment is consistent with the fiduciary duties it owes as the Companies' dominant shareholder to holders of the Companies' Private Sector Preferred Stock and common stock.

75.     Under Delaware law, which governs shareholders' relationship with Fannie Mae, and Virginia law, which governs shareholders' relationship with Freddie Mac, a corporation's dominant shareholders owe fiduciary duties to minority shareholders.

76.     Treasury is the dominant shareholder and de facto controlling entity of the Companies:  Treasury is the Companies' only viable source of capital, and it must give its permission before the Companies issue debt or equity senior to the Government Preferred Stock.

77.     The Third Amendment expropriates the value from holders of the Private Sector Preferred Stock for the sole benefit of the Companies' dominant shareholder.  In fact, Treasury admits that the Third Amendment's purpose is to wind down the Companies' operations. Treasury's actions in preventing any dividends or value from reaching holders of Private Sector Preferred Stock, combined with Treasury's intent to liquidate the Companies, substantially diminishes the value of the Private Sector Preferred Stock.

78.     Treasury's conduct in entering into the Third Amendment was arbitrary and capricious, and Perry Capital is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## COUNT III

### Violation Of The Administrative Procedure Act:
### The FHFA's Conduct Exceeds Its Statutory Authority
### Under The Housing And Economic Recovery Act

79.     Perry Capital incorporates by reference the allegations of the preceding

paragraphs.

80.     The APA empowers the Court to "hold unlawful and set aside agency action,

findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations"

or that are "without observance of procedure required by law."  5 U.S.C. § 706(2)(C), (D).

81.     The FHFA's authority as the Companies' conservator is strictly limited by HERA.

When acting as a conservator, HERA requires the FHFA to take steps to put the Companies in "a

sound and solvent condition" and to work to "conserve [their] assets and property."  12 U.S.C.

§ 4617(b)(2)(D).

82.     The FHFA, as the Companies' conservator, is without authority to wind up the

Companies' operations.  FHFA may only undertake such actions in its capacity as the

Companies' receiver, but the FHFA has declined to put the Companies into receivership.

83.     As Treasury has acknowledged, the Third Amendment is designed to wind down

the Companies' operations.  The Third Amendment intentionally impairs the Companies' ability

to operate as going concerns, preventing them from ever rebuilding capital, achieving financial

health, or returning to private ownership.  In fact, the Third Amendment requires the Companies

to accelerate the dissolution of their holdings.

84.     The dissolution of the Companies is in direct contravention of HERA's statutory

command that the FHFA "conserve [their] property and assets" and undertake those actions

necessary to place the Companies in "a sound and solvent condition."  12 U.S.C.

§ 4617(b)(2)(D).

29

85.     Further, under HERA, even when acting as a receiver, the FHFA must wind down the Companies in accordance with specific claims-determination procedures.  Among other things, HERA requires the FHFA to "promptly publish a notice to the creditors of the regulated entity to present their claims," provide creditors with no fewer than ninety days in which to file a claim, and "establish such alternative dispute resolution processes as may be appropriate for the resolution of claims."  12 U.S.C. § 4617(b)(3)(B)(i), (b)(7)(A).

86.     The FHFA's decision, as a conservator, to transfer all of the Companies' net worth to Treasury is an end-run around the procedural requirements HERA imposes on the FHFA.  The Third Amendment allows Treasury to be paid amounts that exceed the value of its claims against the Companies, while making it impossible to satisfy claims of holders of the Companies' Private Sector Preferred Stock and common stock.  In short, the Third Amendment effectively nullifies the claims of holders of the Companies' Private Sector Preferred Stock and common stock and precludes such holders from availing themselves of statutory protections to contest that nullification.

87.     The FHFA's conduct in entering into the Third Amendment was therefore "in excess of statutory . . . authority" and "without observance of procedure required by law," and Perry Capital is therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT IV

### Violation Of The Administrative Procedure Act:
### The FHFA's Conduct Was Arbitrary And Capricious

88.     Perry Capital incorporates by reference the allegations of the preceding paragraphs.

89.    The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if it is not the product of "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This means, among other things, that an agency must provide an adequate evidentiary basis for its action, consider all important aspects of the problem before it, and rely upon consistent, logical reasoning in reaching its decision.

90.    In entering into the Third Amendment, the FHFA acted in an arbitrary and capricious manner.  The FHFA failed to engage in a reasoned decisionmaking process; to consider important aspects of the problem it believed it faced; to provide an adequate explanation for its decision; to consider alternatives; or to offer a reasoned justification of the Third Amendment.

91.    The FHFA has not offered any legitimate justification for the Third Amendment, which it has acknowledged prohibits the Companies from building capital and which Treasury has further acknowledged expedites their dissolution.  The FHFA has not explained how the Third Amendment is consistent with its statutory obligation to "conserve [the Companies'] assets and property" and to return the Companies to "a sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  The FHFA also has not explained whether it considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Private Sector Preferred Stock and common stock, including refinancing the Government Preferred Stock or allowing the Companies to resume paying dividends to holders of their Private Sector Stock and common stock.

92.     Moreover, the Private Sector Preferred Stock, such as that held by the Perry Funds, was issued under a regime that gave its holders the opportunity to receive a stream of dividend payments and certain protections in the event of liquidation.  The Third Amendment, however, creates an entirely new regime that deprives holders of the Private Sector Preferred Stock and common stock of any ability to realize the benefits of their bargains, no matter how well the Companies perform in the market or under what conditions they may eventually liquidate.

93.     The FHFA had an obligation to consider whether the Third Amendment was consistent with the duties it owes to holders of the Companies' Private Sector Preferred Stock and common stock.  The FHFA failed to do so.  The FHFA therefore failed to consider an important aspect of the issue addressed by its action, rendering the Third Amendment arbitrary and capricious.

94.     The FHFA's conduct in entering into the Third Amendment was arbitrary and capricious, and Perry Capital is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(C).

**PRAYER FOR RELIEF**

95.     WHEREFORE, Plaintiff prays for an order and judgment:

a.      Declaring that the Third Amendment, and its adoption, are not in accordance with HERA within the meaning of 5 U.S.C. § 706(2)(C); and that Treasury and the FHFA acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Third Amendment;

b.      Vacating and setting aside the Third Amendment, including its provisions that sweep the full amount of the Companies' net worth to Treasury, that prevent redemption of the Government Preferred Stock, and that accelerate the Companies' dissolution;

       c.      Enjoining Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment;

       d.      Enjoining the FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment;

       e.      Awarding Perry Capital its reasonable costs, including attorneys' fees, incurred in bringing this action; and

       f.      Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: July 7, 2013

/s/ Theodore B. Olson
THEODORE B. OLSON, SBN 367456
TOlson@gibsondunn.com
DOUGLAS R. COX, SBN 459668
DCox@gibsondunn.com
MATTHEW D. MCGILL, SBN 481430*
MMcGill@gibsondunn.com
NIKESH JINDAL, SBN 492008
Njindal@gibsondunn.com
DEREK S. LYONS, SBN 995720
Dlyons@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

JANET WEISS
JWeiss@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Telephone: 212.351.3988
Facsimile: 212.351.5234

*Attorneys for Plaintiff Perry Capital LLC*

* Application for admission to be submitted