**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PERRY CAPITAL LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1025-RLW |
| | ) | |
| **JACOB J. LEW**, in his official capacity as | ) | |
| Secretary of the Treasury, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **FAIRHOLME FUNDS, INC.**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1053-RLW |
| | ) | |
| **FEDERAL HOUSING FINANCE AGENCY**, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **ARROWOOD INDEMNITY COMPANY**, | ) | |
| *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01439-RLW |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE** | ) | |
| **ASSOCIATION**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **In re Fannie Mae/Freddie Mac Senior** | ) | |
| **Preferred Stock Purchase Agreement Class** | ) | |
| **Action Litigations** | ) | Misc. Action No. 1:13-mc-1288-RLW |
| _____ | ) | |
| | ) | |
| This document relates to: | ) | |
| ALL CASES | ) | |
| _____ | ) | |

**TREASURY DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**

Introduction ..................................................................................................................1

Background ...................................................................................................................6

I.      Fannie Mae and Freddie Mac ............................................................................6

II.     Treasury's Senior Preferred Stock Purchase Agreements with the GSEs .........10

III.    The Conservatorship of the GSEs....................................................................15

IV.    The Third Amendment to the Senior Preferred Stock Purchase Agreements ...18

V.     The Plaintiffs' Complaints ...............................................................................18

Standard of Review......................................................................................................20

Argument ....................................................................................................................21

I.      HERA Precludes the Plaintiffs From Challenging the Third Amendment.......21

       A.     HERA Bars the Relief Requested in the Complaints.............................22

       B.     HERA Prohibits the Plaintiffs from Bringing Claims Predicated on
              Their Status as Shareholders ...............................................................29

            1.   HERA Bars Direct and Derivative Shareholder Claims .................30

            2.   The Plaintiffs' Claims Concerning their Right to a Liquidation
               Preference are Not Ripe for Judicial Review...................................33

            3.   As Shareholders, the Plaintiffs Lack Prudential Standing to Sue
               for Injuries to the GSEs.................................................................34

II.     The Plaintiffs' APA and Fiduciary Duty Claims Fail as a Matter of Law .......36

       A.     The Third Amendment Was an Exercise of Rights Under the
              Original PSPAs and Not a Purchase of New Securities .......................37

i

| | | |
|---|---|---|
| | B. | Treasury Was Not Required to Make the Determinations Set Forth in HERA Prior to Exercising its Right to Amend the PSPAs .............................. 42 |
| | C. | Treasury Did Not Breach Any Fiduciary Duty to the Plaintiffs ........................... 43 |
| | D. | The Third Amendment Was the Result of Reasoned Decision Making .............................................................................................................. 49 |
| III. | | The Class Plaintiffs' Takings Claim Should Be Dismissed ............................................... 55 |
| | A. | This Court Lacks Jurisdiction Over the Takings Claim ........................................ 56 |
| | B. | Treasury Did Not Take the Plaintiffs' Property by Entering into the Third Amendment ........................................................................................... 57 |
| | | 1. The Plaintiffs Do Not Have Any Legally Cognizable Property Interest For Purposes Of A Takings Claim ....................................... 58 |
| | | 2. Treasury Has Not Taken Any of the Plaintiffs' Property Interests ................ 61 |
| | | 3. Treasury Cannot Be Subject To Takings Liability, Because It Entered into the Third Amendment as a Market Participant ........................... 64 |
| | C. | The Takings Claim Is Not Ripe For Judicial Review ........................................... 66 |
| Conclusion ........................................................................................................................................ 68 | | |

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Pages(s)**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967).............................................................................34, 66

*Abrahamson v. Fleschner,*
    568 F.2d 862 (2d Cir. 1977)...............................................................40

*Acceptance Ins. Cos. v. United States,*
    583 F.3d 849 (Fed. Cir. 2009)........................................................59, 60

*In re Aiken County,*
    645 F.3d 428 (D.C. Cir. 2011) ..........................................................66

*Alaska Airlines v. Johnson,*
    8 F.3d 791 (Fed. Cir. 1993) ...........................................................64, 65

*Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004)...............................................................44

*Allard v. Arthur Andersen & Co. (U.S.A.),*
    957 F. Supp. 409 (S.D.N.Y. 1997)......................................................42

*Allen v. Wright,*
    468 U.S. 737 (1984)...........................................................................66

*Am. Cont'l Corp. v. United States,*
    22 Cl. Ct. 692 (1991) ....................................................................59, 63

*Am. Pelagic Fishing Co, L.P. v. United States,*
    379 F.3d 1363 (Fed. Cir. 2004)...........................................................57

*Am. Petroleum Inst. v. EPA,*
    683 F.3d 382 (D.C. Cir. 2012)............................................................66

*American Airways Charters, Inc. v. Regan,*
    746 F.2d 865 (D.C. Cir. 1984)............................................................36

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................20

*Bliss v. England,*
  208 F.2d 2 (D.D.C. 2002) ................................................................56

*Bowie v. Maddox,*
  653 F.3d 45 (D.C. Cir. 2011) ..........................................................32

*Branch v. United States,*
  69 F.3d 1571 (Fed. Cir. 1995) ...........................................59, 61, 63

*Brown v. Scott County Tobacco Warehouses,*
  5 Va. Cir. 75, 79 (Scott County Cir. Ct. 1983) ..............................47

*Bruesewitz v. Wyeth,*
  131 S. Ct. 1068 (2011) ....................................................................41

*Building Owners & Mgrs. Ass'n In''l v. FCC,*
  254 F.3d 89 (D.C. Cir. 2001) ..........................................................62

*Cal. Hous. Sec., Inc. v. United States,*
  959 F.2d 955 (Fed. Cir. 1992) ................................................ *passim*

*Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.,*
  862 F.2d 597 (6th Cir. 1988) ..........................................................35

*Charter Commc'ns, Inc. v. FCC,*
  460 F.3d 31 (D.C. Cir. 2006) ..........................................................53

*Charter Operators of Alaska v. Blank,*
  844 F. Supp. 2d 122 (D.D.C. 2012) ................................................21

*Cienega Gardens v. United States,*
  331 F.3d 1319 (Fed. Cir. 2003) .......................................................62

*City of Portland, Oregon v. Envtl. Prot. Agency,*
  507 F.3d 706 (D.C. Cir. 2007) ........................................................49

*Commonwealth Edison Co. v. United States,*
  56 Fed. Cl. 652 (2003) ....................................................................68

*Courtney v. Halleran,*
  485 F.3d 942 (7th Cir. 2007) ..........................................................28

*Cox v. Kurt's Marine Diesel of Tampa, Inc.,*
  785 F.2d 935 (11th Cir. 1986) ........................................................64

*Deutsche Bank Nat. Trust Co. v. Fed. Deposit Ins. Corp.,*
    717 F.3d 189 (D.C. Cir. 2013) ....................................................................31

*Devia v. Nuclear Regulatory Comm'n,*
    492 F.3d 421 (D.C. Cir. 2007) ....................................................................33

*Disability Rights Council of Greater Washington v. WMATA,*
    239 F.R.D. 9 (D.D.C. 2006)........................................................................57

*EEOC v. St. Francis Xavier Parochial Sch.,*
    117 F.3d 621 (D.C. Cir. 1997) ....................................................................20

*Eagle v. American Tel. & Tel. Co.,*
    769 F.2d 541 (9th Cir. 1985) ......................................................................35

*Esther Sadowsky Testamentary Trust v. Syron,*
    639 F. Supp. 2d 347 (S.D.N.Y. 2009).........................................................46

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.,*
    643 F. Supp. 2d 790 (E.D. Va. 2009), *aff'd*, 434 Fed App'x 188 (4th Cir. 2011) ............31

*In re Fed. Nat'l Mortg. Ass'n Secs., Derivative & ERISA Litig.,*
    629 F. Supp. 2d 1 (D.D.C. 2009), *aff'd*, 674 F.3d 848 (D.C. Cir. 2012).........................32

*First Hartford v. United States,*
    194 F.3d 1279 (Fed. Cir. 1999)....................................................................31

*Fischer v. Resolution Trust Corp.,*
    59 F.3d 1344 (D.C. Cir. 1995) ......................................................................3

*Franchise Tax Bd. of California v. Alcan Aluminum Ltd.,*
    493 U.S. 331 (1990)....................................................................................35

*Freeman v. Fed. Deposit Ins. Corp.,*
    56 F.3d 1394 (D.C. Cir. 1995) ....................................................................23

*Gaff v. Fed. Deposit Ins. Corp.,*
    814 F.2d 311 (6th Cir. 1987) ......................................................................35

*Gibraltar Sav. v. Ryan,*
    No. 89-3207, 1990 WL 484155 (D.D.C. July 10, 1990) ...............................26

*Goble v. Marsh,*
    684 F.2d 12 (D.C. Cir. 1982) ......................................................................56

*Golden Pac. Bancorp v. United States,*
    15 F.3d 1066 (Fed. Cir. 1994).................................................................................. *passim*

*Gross v. Bell Sav. Bank PaSA,*
    974 F.2d 403 (3d Cir. 1992)...................................................................................23

*Hawkeye Commodity Promotions, Inc. v. Vilsack,*
    486 F.3d 430 (8th Cir. 2007) .................................................................................61

*Howe v. Bank for Int'l Settlements,*
    194 F. Supp. 2d 6 (D. Mass. 2002) .......................................................................41

*Huntleigh USA Corp. v. United States,*
    525 F.3d 1370 (Fed. Cir. 2008)..............................................................................57

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ..............................................................................53

*Isquith by Isquith v. Caremark Int'l, Inc.,*
    136 F.3d 531 (7th Cir. 1998) ............................................................................40, 41

*Jacobson v. AEG Capital Corp.,*
    50 F.3d 1493 (9th Cir. 1995) .................................................................................41

*In re Kaplan,*
    143 F.3d 807 (3d Cir. 1998)...................................................................................35

*Katz v. Gerardi,*
    655 F.3d 1212 (10th Cir. 2011) .............................................................................41

*Kellmer v. Raines,*
    674 F.3d 848 (D.C. Cir. 2012) ..........................................................................30, 31

*Kuriakose v. Fed. Home Loan Mortgage Co.,*
    674 F. Supp. 2d 483 (S.D.N.Y. 2009)....................................................................24

*Laclede Gas Co. v. F.E.R.C.,*
    873 F.2d 1494 (D.C. Cir. 1989) ............................................................................54

*Lingle v. Chevron USA, Inc.,*
    544 U.S. 528 (2005)...............................................................................................65

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982)...............................................................................................58

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992) ........................................................................................58, 61

*Maritrans, Inc. v. United States,*
    342 F.3d 1344 (Fed. Cir. 2003) ...................................................................60

*Martens v. Barrett,*
    245 F.2d 844 (5th Cir. 1956) .......................................................................35

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) .....................................................................44

*Melcher v. FCC,*
    134 F.3d 1143 (D.C. Cir. 1998) ...................................................................49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................................................49

*Nat'l Ass'n of Clean Air Agencies v. Envtl. Prot. Agency,*
    489 F.3d 1221 (D.C. Cir. 2007) ...................................................................49

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) .....................................................................................66

*National Trust for Historic Preservation v. Fed. Deposit Ins. Corp.,*
    995 F.2d 238 (D.C. Cir. 1993), *aff'd and reinstated on reh'g,*
    21 F.3d 469 (D.C. Cir. 1994) ..................................................................23, 24

*Nuvio Corp. v. FCC,*
    473 F.3d 302 (D.C. Cir. 2006) .....................................................................53

*OMYA, Inc. v. FERC,*
    111 F.3d 179 (D.C. Cir. 1997) .....................................................................67

*PBGC v. LTV Corp.,*
    496 U.S. 633 (1990) .....................................................................................45

*In re PNB Holding Co. Shareholders Litig.,*
    2006 WL 2403999 (Del. Ch. Aug. 18, 2006) ...............................................47

*Pa. Coal Co. v. Mahon,*
    260 U.S. 393 (1922) .....................................................................................58

*Papasan v. Allain,*
    478 U.S. 265 (1986) .....................................................................................20

*Penn Central Transportation Co. v. City of New York,*
  438 U.S. 104 (1978) ...................................................................................62

*Public Warehousing Co. K.S.C. v. Defense Supply Center Philadelphia,*
  489 F. Supp. 2d 30 (D.D.C. 2007) ...............................................................44

*Rattigan v. Gonzales,*
  503 F. Supp. 2d 56 (D.D.C. 2007) ...............................................................20

*Reliance Ins. Co. v. Eisner & Lubin,*
  685 F. Supp. 449 (D.N.J. 1988) ...................................................................42

*Res. Invs., Inc. v. United States,*
  85 Fed. Cl. 447 (2009) ..................................................................................62

*Rhinelander Paper Co. v. FERC,*
  405 F.3d 1 (D.C. Cir. 2005) ..........................................................................25

*Richard v. INS,*
  554 F.2d 1173 (D.C. Cir. 1977) ....................................................................21

*Rose Acre Farms, Inc. v. United States,*
  559 F.3d 1260 (Fed. Cir. 2009). "[I]t ...........................................................63

*Ruckelshaus v. Monsanto Co.,*
  467 U.S. 986 (1984) ......................................................................................65

*Schaffer v. Universal Rundle Corp.,*
  397 F.2d 893 (5th Cir. 1968) ........................................................................35

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
  131 S. Ct. 1885 (2011) ..................................................................................37

*Seiber v. United States,*
  364 F.3d 1356 (Fed. Cir. 2004) ....................................................................62

*St. Christopher Assocs., LP v. United States,*
  511 F.3d 1376 (Fed. Cir. 2008) ....................................................................65

*Starr Int'l Co. v. Fed. Reserve Bank of New York,*
  906 F. Supp. 2d 202 (S.D.N.Y. 2012) ..........................................................46

*Stone v. United States,*
  683 F.2d 449 (D.C. Cir. 1982) ......................................................................56

*Suitum v. Tahoe Reg'l Planning Agency,*
    520 U.S. 725 (1997)..................................................................................68

*Sun Oil Co. v. United States,*
    572 F.2d 786 (Ct. Cl. 1978) .............................................................64, 65

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002)..................................................................................61

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    132 S. Ct. 1997 (2012)..............................................................................37

*Texas v. United States,*
    523 U.S. 296 (1998)..................................................................33, 66, 67

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
    845 A.2d 1031 (Del. 2004) .......................................................................32

*Town of Babylon v. FHFA,*
    699 F.3d 221 (2d Cir. 2012)..........................................................22, 24, 29

*Transmission Access Policy Study Group v. FERC,*
    225 F.3d 667 (D.C. Cir. 2000) ................................................................56

*Transohio Sav. Bank v. Director, Office of Thrift Supervision,*
    967 F.2d 598 (D.C. Cir. 1992) ................................................................44

*United States v. Hohri,*
    482 U.S. 64 (1987)....................................................................................56

*United States v. Mullins,*
    613 F.3d 1273 (10th Cir. 2010) ..............................................................25

*Usery v. Turner Elkhorn Min. Co.,*
    428 U.S. 1 (1976)......................................................................................63

*Venetian Casino Resort, L.L.C. v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ................................................................45

*Ward v. D.C. Dep't of Youth Rehab. Servs.,*
    768 F. Supp. 2d 117 (D.D.C. 2011) ......................................................20

*Ward v. Resolution Trust Corp.,*
    996 F.2d 99 (5th Cir. 1993) .....................................................................23

*Waters v. Rumsfeld,*
    320 F.3d 265 (D.C. Cir. 2003) ........................................................................56

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007) ............................................................................................47

*Zimmerman v. Crothall*,
    62 A.3d 676 (Del. Ch. 2013) ..........................................................................47

**Statutes:**

5 U.S.C. § 706 ....................................................................................................19
12 U.S.C. § 1455(j) .............................................................................................48
12 U.S.C. § 1455(*l*) .................................................................................4, 8, 9, 24
12 U.S.C. § 1719(b) .............................................................................................48
12 U.S.C. § 1719(g) ..................................................................................... *passim*
12 U.S.C. § 1821(j) .............................................................................................23
12 U.S.C. § 4501 ..................................................................................................7
12 U.S.C. § 4617(a) ..................................................................................... *passim*
12 U.S.C. § 4617(b) ..................................................................................... *passim*
12 U.S.C. § 4617(d) .............................................................................................28
12 U.S.C. § 4617(e) .................................................................................28, 34, 62
12 U.S.C. § 4617(f) .................................................................................22, 23, 25
12 U.S.C. § 4619 ..................................................................................................59
28 U.S.C. § 1346(a) .............................................................................................56
28 U.S.C. § 1491 ..................................................................................................44
Pub. L. No. 102-550, §§ 1301-1395, 106 Stat. 3672, 3941-4012 (1992) .......8
Pub. L. No. 110-289, 122 Stat. 2654 (2008) .....................................................7

**Miscellaneous:**

Black's Law Dictionary (8th ed. 2004) ..........................................................25

Black's Law Dictionary (9th ed. 2009) .....................................................12, 38

H.R. Rep. No. 110-767 (2008) .........................................................................38

Oxford English Dictionary (2d ed. 1989) .......................................................25

Oxford English Dictionary (3d ed. Sept. 2007) .............................................37

Random House Dictionary of the English Language (2d ed. 1987) ...............38

Webster's Third New International Dictionary (2002) ....................................25

**Introduction**

These cases concern the extraordinary, and ongoing, efforts by the Treasury Department to save two key financial institutions – the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") – from becoming insolvent.  For decades, Fannie Mae and Freddie Mac, two government sponsored enterprises ("GSEs"), had performed an important function for the national housing market by purchasing home loans from lenders.  In 2008, however, Fannie Mae and Freddie Mac experienced overwhelming losses as a result of a dramatic increase in default rates on residential mortgages. By the late summer of 2008, the enterprises were at the brink of insolvency.  The default of those enterprises would have had devastating effects on the national economy.  Accordingly, on September 6, 2008, the Federal Housing Finance Agency ("FHFA"), as the regulator of the GSEs, exercised the power that Congress had granted to it in the Housing and Economic Recovery Act of 2008 ("HERA") to place Fannie Mae and Freddie Mac into conservatorship. FHFA, as the conservator, then entered into agreements with Treasury whereby Treasury committed a massive amount of public funds to the GSEs – ultimately providing more than $187 billion – in exchange for senior preferred stock in the enterprises and additional economic rights, which were designed to compensate it for the value of its commitment to the enterprises.

These senior preferred stock purchase agreements ("PSPAs") were intended to provide confidence to the market that the GSEs would remain solvent.  Under the PSPAs, Treasury committed to provide funds to each GSE for each calendar quarter in which the GSE's liabilities exceeded its assets, so as to maintain the solvency (*i.e.*, the positive net worth) of that enterprise. In return for these funds, Treasury received senior preferred stock in the GSEs, and the GSEs

agreed to pay a dividend to Treasury on that stock equal to 10 percent per year of the total amount of funds that Treasury had provided (plus $1 billion for each GSE).

By 2012, however, the amount of funds that Treasury had provided to the enterprises had grown so large that it was unlikely that the GSEs would earn enough net income – even in years when they were otherwise profitable – to pay Treasury its dividends without the need to take further draws from Treasury.  Because the amount of Treasury's commitment of funds would become fixed at the end of 2012, these dividend payments threatened to diminish the limited fixed draw capacity remaining and, ultimately, threaten the viability of Fannie Mae and Freddie Mac.  Treasury anticipated that the financial markets would pay close attention to this threat to the GSEs' viability.  FHFA and Treasury accordingly entered into a Third Amendment to the PSPAs to address this problem.  (The first two amendments had each increased Treasury's commitment of funds, after it had become apparent that the funds available under the original PSPAs would likely be insufficient to maintain the GSEs' financial health, given the enterprises' ongoing losses.)  Under the Third Amendment, the agreements' dividend structure was replaced with a formula under which the GSEs would draw funds from Treasury when they have negative net worth (*i.e.*, when the difference between assets and liabilities on their balance sheet, in accordance with GAAP, is negative).  Conversely, Treasury would receive dividends only when the enterprises have positive net worth, in an amount equal to the enterprises' positive net worth above a specified reserve amount.  This amendment ended the vicious circle of the GSEs' drawing funds from Treasury to pay Treasury, removed the threat of the GSEs' potential insolvency as a result of the exhaustion of the draw capacity in the PSPAs, and improved market confidence in those enterprises.

The plaintiffs in these related actions, however, object to this arrangement, asserting that Treasury has violated the Administrative Procedure Act ("APA") (either by violating statutory restrictions in HERA, or by acting arbitrarily and capriciously); has breached common-law fiduciary obligations that it purportedly owes to them; or has taken their property without just compensation.  The plaintiffs are holders of common stock or "junior" preferred stock in the GSEs (*i.e.*, stock that is junior in priority to the senior preferred stock that Treasury received in exchange for its provision of funds to the GSEs).  The plaintiffs' investments became essentially worthless as a result of the financial crisis of 2008 and the resulting credit losses on the GSEs' portfolios.  Indeed, both Fannie Mae and Freddie Mac exist today solely because Treasury provided them with billions of dollars of public funds, so as to cover the overwhelming losses that the GSEs experienced as a result of their investments and guarantee obligations in the years before the financial crisis.  The shareholders' claims thus "run[] afoul of this circuit's chutzpah doctrine." *Fischer v. Resolution Trust Corp.*, 59 F.3d 1344, 1350 (D.C. Cir. 1995).  More to the point, their claims are legally meritless.

As an initial matter, this Court lacks jurisdiction over the plaintiffs' claims.  In enacting HERA, Congress included two provisions that preclude the GSEs' shareholders from interfering with the conservatorship process.  First, HERA prohibits relief that would restrain the powers that FHFA exercises as the conservator of the GSEs, such as FHFA's decision to enter into the Third Amendment.  Second, HERA prohibits suits, such as those brought by the plaintiffs here, based on the plaintiffs' status as shareholders in the GSEs.  By statute, the conservator has succeeded to all of the rights of the shareholders in those institutions.  These two independent prohibitions bar judicial review of the conservators' actions and prohibit the plaintiffs from proceeding here.

3

In any event, the plaintiffs' claims lack merit.  The plaintiffs claim that Treasury violated HERA because the Third Amendment purportedly amounted to a "purchase" of new securities, and Treasury's statutory purchase authority had since expired.  Alternatively, they claim that Treasury acted arbitrarily and capriciously by failing to make findings, or consider factors, that had been required under HERA for such purchases.  The plaintiffs have failed to state a claim under HERA, however, because Treasury did not purchase any securities from the GSEs by entering into the Third Amendment.  Under the PSPAs, the GSEs have not issued to Treasury, nor has Treasury received, any additional securities of either GSE after September 2008.  The Third Amendment did not obligate any additional funds from Treasury to the GSEs, and did not change the amount of Treasury's investment.  Thus, the Third Amendment was in no sense a "purchase" of securities under the statute.  Accordingly, Treasury was not required to make the determination required for an exercise of its purchase authority.  The Third Amendment instead was an exercise of Treasury's rights under the existing purchase agreement, and HERA explicitly excluded the exercise of such rights from its sunset provision.  *See* 12 U.S.C. § 1719(g)(2)(A), (D); *id.*, § 1455(*l*)(2)(a), (D).

Nor did Treasury act arbitrarily and capriciously by failing to consider its purported fiduciary duties, as the individual plaintiffs contend, or by violating those fiduciary duties, as the plaintiffs in the putative class action assert.  As an initial matter, this claim is based on rights that the shareholders claim that they hold by virtue of Treasury's contractual relationship with the GSEs.  Because the claim sounds in contract, the Tucker Act vests jurisdiction over this claim in the Court of Federal Claims, not this Court.  Moreover, any attempt to subject Treasury to a state-law fiduciary obligation that would conflict with Treasury's responsibilities to taxpayers, as defined in HERA, would necessarily be preempted.  And, in fact, there is no state-law fiduciary

obligation that Treasury would owe to the shareholders.  The plaintiffs advert to Delaware law imposing fiduciary duties on "controlling shareholders," but Treasury does not control the GSEs; FHFA, not Treasury, succeeded to all powers of management.  That doctrine is irrelevant here, then.

Treasury's decision to enter into the Third Amendment was the product of reasoned decision making.  The purpose of the Third Amendment was to eliminate the downward spiral caused by the GSEs drawing on the limited funds available from Treasury in order to pay dividends to Treasury.  This was a highly salient concern at the time; the financial models that Treasury employed highlighted that, absent the Third Amendment, the GSEs would continue to draw funds from Treasury to pay increasing amounts of dividends to Treasury until the agency's commitment of funds had been exhausted.  This vicious circle threatened the GSEs' future viability, the equivalent of using a credit card to pay interest on credit card debt.  The Third Amendment solved this problem by assuring that the GSEs would never again draw funds from Treasury to pay dividends to Treasury.  As a result, Treasury reasonably projected that its overall investment in the GSEs and its ultimate expected return on that investment would remain materially the same, while improving investor confidence in the viability of the GSEs, thereby improving the long-term financial prospects for the enterprises.  Although the GSEs have subsequently enjoyed greater returns than expected, that does not negate the reasonableness of Treasury's decision making at the time that it entered into the Third Amendment.

The putative class also asserts a claim for compensation under the Takings Clause.  This claim fails as well, for three reasons.  First, under the Tucker Act, the Court of Federal Claims, and not this Court, holds exclusive jurisdiction over this claim.  Second, the takings claim fails as a matter of law.  The shareholders lack any property interest that would be legally cognizable

under the Takings Clause.  Nor could the shareholders assert a claim for a regulatory taking (the only form of a takings claim that is even implicated here), given that they have experienced no economic injury, they lack any reasonable investment-backed expectation that they should be entitled to a windfall from Treasury, and the nature of the government's action – that is, the commitment and provision of over $187 billion of public funds to rescue the corporations in which the plaintiffs hold stock – weighs heavily against any Takings Clause liability.  In any event, any takings claim remains unripe while the GSEs are in conservatorship.

Treasury acted reasonably to protect the national economy by entering into the Third Amendment to its stock purchase agreements with the GSEs.  The plaintiffs' challenge to the amendment should be dismissed for lack of jurisdiction or for failure to state a claim; alternatively, summary judgment should be awarded to Treasury based on the administrative record reflecting the reasonable basis for Treasury's actions.

## Background

### I.      Fannie Mae and Freddie Mac

Fannie Mae and Freddie Mac are government sponsored enterprises that provide liquidity to the mortgage market by purchasing whole loans from lenders, or by exchanging mortgage backed securities ("MBS") for whole loans, thereby freeing up lenders' capital to make additional loans.  These entities, which own or guarantee trillions of dollars of residential mortgages and MBS, have played a key role in housing finance and the U.S. economy.  Although they are private companies, the GSEs have benefitted from a public perception that the federal government had implicitly guaranteed the securities they issued; this perception allowed the GSEs to purchase more mortgages and MBS, at cheaper rates, than would otherwise prevail in the private market.  *See* Department of Treasury and Department of Housing and Urban

Development, Reforming America's Housing Finance Market: A Report to Congress

("Reforming America's Housing Finance Market") at 8 (Feb. 2011) (AR 213).[1]

      Throughout the first half of 2008, the GSEs suffered multi-billion dollar losses on their

mortgage portfolios and guarantees.  Fannie Mae lost $4.5 billion through the first half of 2008,

in addition to $5 billion that it lost in the second half of 2007; Freddie Mac lost $1 billion during

the first half of 2008, in addition to $3.7 billion that it lost in the second half of 2007.  FHFA

Office of Inspector General, Fannie Mae and Freddie Mac:  Where the Taxpayers' Money Went

("FHFA OIG Report") at 12 (May 24, 2012) (AR 3814).   By 2008, the GSEs were unable to

cover the credit and market losses tied to the significant increase in mortgage delinquencies,

defaults, and foreclosures.  By late summer 2008, the enterprises faced severe capital shortfalls

as a global credit crisis dried up the GSEs' ability to raise additional capital, and investors

questioned their ability to raise capital to offset credits and market losses.   Fannie Mae and

Freddie Mac's losses had become far too substantial for their diminishing capital buffers to

absorb, and it became clear they would be unable to fully honor their debts and guarantees.

Reforming America's Housing Finance Market at 7 (AR 212).

      In response to the developing financial crisis, in July 2008, Congress passed the Housing

and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008).

HERA created the Federal Housing Finance Agency ("FHFA"), an independent federal agency,

to supervise and regulate Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  12

U.S.C. § 4501 *et seq.*  (Previously, the GSEs had been regulated by the Office of Federal

Housing Enterprise Oversight ("OFHEO").  *See* Federal Housing Enterprises Financial Safety

---

[1]  Citations to the administrative record filed by the Treasury defendants are noted as "AR."
Citations to the documents filed by the FHFA defendants are noted as "FHFA."

and Soundness Act of 1992, Pub. L. No. 102-550, §§ 1301-1395, 106 Stat. 3672, 3941-4012.)

HERA also granted the Director of FHFA the authority to place Fannie Mae and Freddie Mac in

conservatorship or receivership.  *See* 12 U.S.C. § 4617(a).  FHFA could use this discretionary

authority to "be appointed conservator or receiver for the purpose of reorganizing, rehabilitating,

or winding up the affairs of a regulated entity."  12 U.S.C. § 4617(a)(2).

HERA also amended the statutory charters of the GSEs to grant the Secretary of the

Treasury the authority to purchase "any obligations and other securities" issued by the GSEs "on

such terms and conditions as the Secretary may determine and in such amounts as the Secretary

may determine," provided that Treasury and the GSEs reached a "mutual agreement" for such a

purchase.  *See* 12 U.S.C. § 1719(g)(1)(A) (Fannie Mae); *id.* § 1455(*l*)(1)(A) (Freddie Mac).

Treasury was required to determine, prior to exercising this purchase authority, that the purchase

was necessary to "provide stability to the financial markets," "prevent disruptions" in mortgage

financing, and "protect the taxpayer."  *Id.* § 1719(g)(1)(B) (Fannie Mae); *id.* § 1455(*l*)(1)(B)

(Freddie Mac).  Moreover, HERA set forth several factors related to the terms and conditions of

the securities to be purchased, and the possible impact of such purchases on the GSEs, that

Treasury was directed to consider when exercising this authority.  *Id.* § 1719(g)(1)(C) (Fannie

Mae); *id.* § 1455(*l*)(1)(C) (Freddie Mac).  These factors, in full, were: "the need for preferences

or priorities regarding payments to the government"; "limits on maturity or disposition of

obligations or securities to be purchased"; "the corporation's plan for the orderly resumption of

private market funding or capital market access"; "the probability of the corporation fulfilling the

terms of any such obligation or other security, including repayment"; "the need to maintain the

corporation's status as a private shareholder-owned company"; and "restrictions on the use of

corporation resources, including limitations on the payment of dividends and executive

compensation and any such other terms and conditions as appropriate for these purposes." *Id.*
HERA provided that this grant of purchase authority would expire at the end of 2009, 12 U.S.C.
§§ 1719(g)(4), 1455(*l*)(4), but clarified that, despite this sunset provision, Treasury "may, at any
time, exercise any rights received in connection with such purchases." *Id.* §§ 1719(g)(2)(A),
1455(*l*)(2)(A); *see also id.* §§ 1719(g)(2)(D); 1455(*l*)(2)(D).

By September 2008, both Fannie Mae and Freddie Mac faced the prospect of being
"unable to honor their debts and guarantees." Reforming America's Housing Finance Market at
7 (AR 212). In early September 2008, FHFA and Treasury determined that the GSEs had severe
capital deficiencies and were operating in an unsafe and unsound manner. Accordingly, on
September 6, 2008, the Director of FHFA placed them into conservatorship. Press Release,
Statement of FHFA Director James B. Lockhart at 5 (Sept. 7, 2008) (AR 89). At that time, the
GSEs' financial exposure on their combined guaranteed mortgage-backed securities (MBS) and
debt outstanding totaled more than $5.4 trillion, and their net worth and public stock prices had
fallen sharply. *Id.* at 1 (AR 85). Without Treasury's funding, both enterprises would have been
insolvent within weeks of the conservatorship decision, thereby triggering mandatory
receivership.[2] For all of 2008, the GSEs reported losses of $58.7 billion (Fannie Mae) and $50.1
billion (Freddie Mac); these losses amount to more than the GSEs had earned collectively in the
*thirty-seven* years before that. FHFA OIG Report at 12 (AR 3814).

---

[2] Indeed, Freddie Mac reported a net worth deficiency of $13.7 billion for the third quarter of
2008, and Fannie Mae reported a net worth deficiency of $15.2 billion for the fourth quarter of
2008. Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for
GSE and Mortgage-Related Securities (AR 4351).

**II.     Treasury's Senior Preferred Stock Purchase Agreements with the GSEs**

On September 7, 2008, one day after the GSEs entered conservatorship, Treasury used its authority to rescue the GSEs from impending insolvency and mandatory receivership, providing them with access to a lifeline of billions of dollars in taxpayer funds.   Treasury entered into Senior Preferred Stock Purchase Agreements (the "PSPAs") with each GSE, through FHFA. Fannie Mae PSPA (AR 17); Freddie Mac PSPA (AR 51).   Under the PSPAs, Treasury committed to advance funds to each GSE for each calendar quarter in which the GSE's liabilities exceeded its assets, in accordance with GAAP, so as to maintain the solvency (*i.e.*, positive net worth) of that enterprise.   If a draw was needed, FHFA submitted a request to Treasury to allow the GSE to draw on the funds committed under its PSPA.   Treasury would then provide funds sufficient to eliminate any net worth deficit.   *See* Fannie Mae PSPA § 2.1, 2.2 (AR 20), Freddie Mac PSPA §§ 2.1, 2.2 (AR 54).

Treasury has increased the amount of funds it has committed to the GSEs through the PSPAs on two occasions.   Initially, Treasury support was capped at $100 billion for each GSE. *See* Fannie Mae PSPA § 2.2 (AR 20); Freddie Mac PSPA § 2.2 (AR 54).   In May 2009, Treasury determined that, given deteriorating market conditions, this cap was insufficient to maintain market confidence in the solvency of the GSEs.   Treasury and FHFA accordingly amended the PSPAs to increase Treasury's commitment to $200 billion for each GSE.   Action Memorandum for Secretary Geithner at 2 (May 6, 2009) (AR 162); Amendment to Amended and Restated Fannie Mae PSPA at 2 (May 6, 2009) (AR 166); Amendment to Amended and Restated Freddie Mac PSPA at 2 (May 6, 2009) (AR 171).

In December 2009, Treasury determined that even the $200 billion commitment to each GSE was insufficient, given that the GSEs remained at risk of even greater losses, which

threatened to introduce uncertainty at a time of fragile economic recovery.  Action Memorandum

for Secretary Geithner at 3 (Dec. 22, 2009) (AR 177).  Accordingly, Treasury and FHFA

amended the PSPAs again to increase the commitment of funds to the GSEs.  Under this Second

Amendment to the PSPAs, the method for calculating the cap was changed.  As of the end of

2012, the cap on Treasury's funding commitment was $234 billion for Fannie Mae and $212

billion for Freddie Mac.  The funding commitment cap under the PSPAs became fixed

permanently at that time, and the remaining PSPA capacity became limited.  Second Amendment

to Amended and Restated Fannie Mae PSPA at 2-3 (Dec. 24, 2009) (AR 190-91); Second

Amendment to Amended and Restated Freddie Mac PSPA at 203 (Dec. 24, 2009) (AR 196-97).

As of August 8, 2012, Fannie Mae had drawn $116.15 billion and Freddie Mac had

drawn $71.34 billion from Treasury.[3]  These draws were necessary to maintain the positive net

worth, and thus the viability, of each company.  Fannie Mae PSPA § 2.2 (AR 20) (draw is made

to cover deficiency in net worth); Freddie Mac PSPA § 2.2 (AR 54) (same).  Had Treasury not

supplied this capital, both companies would have entered mandatory receivership.  *See* 12 U.S.C.

§ 4617(a)(4)(A) (FHFA must place the GSE in receivership if the obligations of the GSE exceed

its assets for 60 calendar days).  In the event of a liquidation of the assets of the GSEs in

receivership, the holders of common stock or junior preferred stock would have had no

expectation of any recovery.  Currently, Freddie Mac has approximately $140.5 billion

remaining to draw on, while Fannie Mae has approximately $117.6 billion remaining.  Data as of

November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and

Mortgage-Related Securities at 2 (AR 4351).

---

[3] Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities at 2 (AR 4351).

In exchange for the capital that it provided to the GSEs, Treasury received senior preferred stock with a liquidation preference,[4] warrants to purchase 79.9 percent of each GSE's common stock, and commitment fees.  Fannie Mae PSPA §§ 3.1-3.4 (AR 21-22); Freddie Mac PSPA §§ 3.1-3.4 (AR 55-56).  The face value of the liquidation preference on Treasury's senior preferred stock was $1 billion from each GSE, and it increased dollar-for-dollar as either Fannie Mae or Freddie Mac drew on their PSPA funding capacity.  Fannie Mae PSPA § 3.3 (AR 22); Freddie Mac PSPA § 3.3 (AR 56).  Treasury received no additional shares of stock when the GSEs made draws under the PSPAs.  Currently, Treasury has a combined liquidation preference of $189.5 billion for the two GSEs.  (This reflects approximately $187.5 billion in draws, plus the initial $2 billion in liquidation preference.)  Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities at 2 (AR 4351). The senior preferred stock creates a liquidation preference in favor of Treasury over all other holders of common or preferred stock in the GSEs, but it does not provide Treasury with any voting rights.  Section 5 of the Senior Preferred Stock Certificate states: "Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special."  Fannie Mae Senior Preferred Stock Certificate § 5 (AR 36); Freddie Mac Senior Preferred Stock Certificate § 5 (AR 70).  Treasury's warrants to purchase common stock of the GSEs (which remain unexercised) likewise confer no voting powers on Treasury.  Fannie Mae Common Stock Warrant (AR 41); Freddie Mac Common Stock Warrant (AR 75).

---

[4] A liquidation preference is "[a] preferred shareholder's right, once the corporation is liquidated, to receive a specified distribution before common shareholders receive anything."  Black's Law Dictionary 1298 (9th ed. 2009).

Treasury also received quarterly dividends on the total amount of its senior preferred stock.  Prior to the Third Amendment, the GSEs paid dividends at an annual rate of ten percent of their respective liquidation preferences.  Fannie Mae Senior Preferred Stock Certificate § 5 (AR 32-34); Freddie Mac Senior Preferred Stock Certificate § 5 (AR 66-68).  (The quarterly dividend payment thus amounted to 2.5% of the liquidation preference.)  Treasury would provide funds to the GSEs to cure the enterprises' negative net worth, which was caused in part by the GSEs' payment of dividends to Treasury.  However, each instance of Treasury providing funds to the GSEs to pay quarterly dividend obligations back to Treasury increased the liquidation preference even further.  In turn, this increased future quarterly dividend payments.

The original PSPAs also restricted dividend payments to all shareholders who were subordinate to Treasury in the capital structure.  Fannie Mae PSPA § 5.1 (AR 24); Freddie Mac PSPA § 5.1 (AR 58).  Under these agreements, the GSEs cannot pay or declare a dividend to subordinate shareholders without the prior written consent of Treasury so long as Treasury's preferred stock is unredeemed.  *Id.*  Nor can the GSEs "set aside any amount for any such purpose" without the prior written consent of Treasury.  *Id.*[5]

As an initial commitment fee, the GSEs provided Treasury with the senior preferred stock and warrants "in consideration of the commitment from Treasury to provide funds [to the GSEs] under the terms and conditions set forth in the senior preferred stock purchase agreement."

---

[5]  The *Perry Capital* complaint cites to the FHFA Inspector General's report, which found, in the plaintiffs' telling, that the Third Amendment deprived the shareholders of their investments.  Perry Compl., ¶ 17.  To the contrary, the Inspector General identified the prohibition against set asides in the *original* PSPAs, rather than any term in the Third Amendment, as the reason that "preferred and common shareholders of Fannie Mae and Freddie Mac . . . effectively lost their investments."  FHFA OIG Report at 25 (AR 3827) (quoted in Perry Compl. ¶ 17).  Indeed, the Inspector General issued his report, describing the GSEs equity holders' investments as lacking any value, three months *before* Treasury and FHFA agreed to the Third Amendment.

Fannie Mae 2011 Form 10K at 34 (AR 2429).  The agreement also required the GSEs to pay a periodic commitment fee to Treasury beginning on March 31, 2010.  Fannie Mae PSPA §§ 3.1, 3.2 (AR 22); Freddie Mac PSPA §§ 3.1, 3.2 (AR 56).  The periodic commitment fee "is intended to fully compensate [Treasury] for the support provided by the ongoing Commitment following December 31, 2009." *Id.*  The amount of the fee was to be "determined with reference to the market value of the Commitment as then in effect," as mutually agreed between Treasury and the GSEs, in consultation with the Chairman of the Federal Reserve. *Id.*  While the fee was initially to be set by December 31, 2009, the PSPAs (as amended) permitted Treasury, in its sole discretion, to waive the fee for up to one year at a time based on conditions in the mortgage market.  Second Amendment to Amended and Restated Fannie Mae PSPA, § 8 (Dec. 24, 2009) (AR 192); Second Amendment to Amended and Restated Freddie Mac PSPA, § 8 (Dec. 24, 2009) (AR 198).  Treasury waived the fee for 2010, 2011, and through the first three quarters of 2012, after determining that the mortgage market remained fragile and that setting the fee would not generate additional return for taxpayers.[6]

Treasury's rights under the PSPAs – its receipt of senior preferred stock with accompanying dividend rights, warrants to purchase common stock, and the right to set commitment fees – reflected the extraordinary nature of the commitment it had made to the

---

[6] *See* Action Memorandum: Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (AR 201-203); Periodic Commitment Fee Waiver Letter (Dec. 29, 2010) (AR 204); Periodic Commitment Fee Waiver Letter (Mar. 31, 2011) (AR 1064); Periodic Commitment Fee Waiver Letter (June 30, 2011) (AR 1462); Periodic Commitment Fee Waiver Letter (Sept. 30, 2011) (AR 1896); Action Memorandum: 2012 Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (Dec. 21, 2011) (AR 2358-2365); Periodic Commitment Fee Waiver Letter (Dec. 21, 2011) (AR 2366); Action Memorandum: Periodic Commitment Fee Waiver Letter for Q2 2012 (Mar. 30, 2012) (AR 3274-3283); Periodic Commitment Fee Waiver Letter (Mar. 30, 2012) (AR 3284); Action Memorandum: Periodic Commitment Fee Waiver Letter for Q3 2012 (June 25, 2012) (AR 3881); Periodic Commitment Fee Waiver Letter (June 25, 2012) (AR 3882).

GSEs.  Simply put, the GSEs would have failed, with dramatically negative results for the United

States economy, if Treasury had not committed hundreds of billions of dollars to ensure their

solvency.  No comparable commitment of ongoing funds was available to the GSEs in the

private market.  FHFA, 2008 Report to Congress, at 79 (May 18, 2009) (FHFA 770).  As Mario

Ugoletti, the Director of Treasury's Office of Financial Institutions Policy in 2008, aptly puts it,

the value of Treasury's commitment to the GSEs was "incalculably large."  Ugoletti Decl., ¶ 9

(FHFA 5).  Given this state of affairs, equity holders in the GSEs had no expectation that they

would have access to any positive returns that the GSEs might experience in the future.  *See*

Action Memorandum for Secretary Geithner at 2 (Dec. 20, 2010) (AR 202) (clarifying that future

positive earnings of the GSEs will be devoted to "recouping taxpayer support," and "existing

common equity holders will not have access to any positive earnings from the GSEs in the

future").

## III.   The Conservatorship of the GSEs

During 2009 and 2010, both GSEs continued to suffer unusually large losses.

Collectively, they drew $126 billion in PSPA funding through the end of 2009, an amount that

increased to $155 billion by the end of 2010.[7]  Because "the common shares of the

Enterprises [were] virtually worthless" after the financial crisis of 2008 and the GSEs' resulting

entry into conservatorship and into the original PSPA, their stock price slipped below the $1

closing price that shares must maintain in order to trade on the New York Stock Exchange, and

FHFA directed the GSEs to delist from that exchange.  FHFA OIG Report at 25 (AR 3827).

Subsequently, their stock has traded solely in over-the-counter markets.

---

[7]  Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE
and Mortgage-Related Securities at 2 (AR 4351).

As a result of the additional losses that the GSEs suffered in the years after they were placed in conservatorship, and the draws from Treasury that they took as a result to maintain their positive net worth, by mid-2012, the GSEs' dividend obligations to Treasury were nearly $19 billion per year.  Treasury's Capital Support for the GSEs: Summary Review and Key Considerations at 4 (Aug. 8, 2012) (AR 3899).  Throughout 2012, in their filings with the SEC and in public comments, both Fannie Mae and Freddie Mac stated that they did not expect to have sufficient earnings to meet their quarterly dividend obligations.  As Fannie Mae put it, "[a]lthough Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial.  We do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future."  Fannie Mae 2011 Form 10K at 21 (AR 2416).  Freddie Mac, likewise recited that "[o]ur annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long-term financial sustainability."  Freddie Mac 2011 Form 10K at 2 (AR 2772).

The GSEs had good reason to project that they would be unable to pay their dividend obligations.  The $19 billion annual dividend amount exceeded the highest combined profits of both companies in any previous year.[8]  In August 2012, the *Wall Street Journal* quoted the CFO

---

[8]  *See* FHFA OIG Report at 15-16 (AR 3817-18); *see also* FHFA Office of the Inspector General, *Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements* at 1 (Mar. 20, 2013), *available at*: http://www.fhfaoig.gov/Content/Files/WPR-2013-002_2.pdf (cited in Perry Compl., ¶ 49).

of Fannie Mae as saying, "It's hard for me to envision that we would be able to make enough every single quarter to cover the dividend payment."[9]  Even when profitable, the GSEs would likely have still needed to draw on their PSPA funding to pay dividends to Treasury.[10]  This would in turn increase Treasury's liquidation preference and, because the funding capacity of the PSPAs was capped at the end of 2012, begin to exhaust the limited amount of capital support from Treasury.[11]  Through the first quarter of 2012, Fannie Mae had drawn $19.4 billion from Treasury simply to pay its dividend obligations back to Treasury (approximately 17 percent of its total draws), and Freddie Mac likewise had drawn $7 billion to make such payments (approximately 10 percent of its total draws).  *See* GSE Preferred Stock Purchase Agreements Summary Review and Key Considerations, Presentation to the Office of Management and Budget ("OMB Presentation") at 10 (May 23, 2012) (AR 3784).  Thus, as FHFA recognized, "it is clear that the draws the companies have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios."  FHFA, A Strategic Plan for Enterprise Conservatorships: The Next Chapter in a Story that Needs an Ending ("FHFA Strategic Plan") at 9 (Feb. 21, 2012) (AR 2378).

---

[9] Nick Timiraos, *Fannie Mae Posts Profit as Home Prices Rise*, Wall Street Journal (Aug. 8, 2012) (FHFA 4026-4027).

[10] *See, e.g.*, Freddie Mac 2011 Form 10K at 2 (AR 2772) ("Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period.").

[11] Fannie Mae 2011 Form 10K at 63 (AR 2458) ("The liquidation preference could increase substantially as we draw on Treasury's funding commitment, if we do not pay dividends owed on the senior preferred stock or if we do not pay the quarterly commitment fee under the senior preferred stock purchase agreement. If we are liquidated, it is unlikely that there would be sufficient funds remaining after payment of amounts to our creditors and to Treasury as holder of the senior preferred stock to make any distribution to holders of our common stock and other preferred stock.").

**IV.     The Third Amendment to the Senior Preferred Stock Purchase Agreements**

On August 17, 2012, Treasury and FHFA agreed to modify the terms of the PSPAs, in light of the cap that was set to go into effect at the end of 2012.  The Third Amendment made five changes to the original agreements: (1) it changed the structure of dividend payments to Treasury; (2) it increased the rate at which the GSEs reduced the size of their retained mortgage portfolio from ten percent to fifteen percent per year; (3) it suspended the periodic commitment fee while the net worth sweep dividend was in place; (4) it required the GSEs to produce annual risk management plans; and (5) it allowed the GSEs to dispose of assets of less than $250 million without prior approval from Treasury.  Third Amendment to Amended and Restated Fannie Mae PSPA (Aug. 17, 2012) (AR 4334-4341); Third Amendment to Amended and Restated Freddie Mac PSPA (Aug. 17, 2012) (AR 4342-4349).

The first change, which is the subject of the present litigation, guaranteed that the GSEs would never have to take a draw from Treasury to pay a dividend.  Beginning with the first quarter of 2013, Treasury replaced the previous dividend formula with a requirement that the GSEs pay, as a dividend, the amount by which their net worth for the quarter exceeds a capital buffer of $3 billion.  The capital buffer gradually declines over time by $600 million per year, and is entirely eliminated in 2018.  Third Amendment to Amended and Restated Fannie Mae PSPA, § 3 (AR 4337); Third Amendment to Amended and Restated Freddie Mac PSPA, § 3 (AR 4345).  If the GSE's net worth for a given quarter is lower than the specified buffer, that GSE would not owe a dividend to Treasury.  *Id.*

**V.      The Plaintiffs' Complaints**

The related cases include three individual cases presenting APA claims against Treasury, and a putative class action presenting common law and Takings Clause claims against Treasury.

The APA claims allege that the Third Amendment exceeded Treasury's statutory authority (and thus violated 5 U.S.C. § 706(2)(C) and 5 U.S.C. § 706(2)(D)) because it constituted a purchase of securities after HERA's authorization of such purchases expired, Perry Compl. ¶¶ 58-63; Fairholme Compl. ¶¶ 100-104; Arrowood Compl. ¶¶ 99-103, and because Treasury did not make the emergency determination or consider the statutory factors required to exercise its purchase authority under HERA.  Perry Compl. ¶¶ 64-67; Fairholme Compl. ¶¶ 105-108; Arrowood Compl. ¶¶ 105-107.  The APA claims further allege that Treasury's conduct was arbitrary and capricious (and thus violated 5 U.S.C. § 706(2)(A)) because, again, Treasury did not make the emergency determination or consider the statutory factors required to exercise its purchase authority under HERA.  Perry Compl. ¶¶ 72-75; Fairholme Compl. ¶¶ 114-117; Arrowood Compl. ¶¶ 112-115.  The plaintiffs further allege that Treasury's conduct in entering into the Third Amendment was arbitrary and capricious because the agreement is incompatible with the fiduciary obligations that Treasury allegedly owes the plaintiffs as a controlling shareholder. Perry Compl. ¶¶ 76-77; Fairholme Compl. ¶¶ 118-119; Arrowood Compl. ¶¶ 116-117.

The putative class action alleges that by entering into the Third Amendment, Treasury breached a fiduciary duty to Fannie Mae, because the Third Amendment allegedly constituted a self-dealing transaction that was not entirely fair to minority shareholders.  Class Action Compl. ¶¶ 175-182.  Further, they allege that the Third Amendment represents an unjust taking of their property in violation of the Fifth Amendment.  Class Action Compl. ¶¶ 183-192.[12]

---

[12] The plaintiffs also assert claims against FHFA, Fannie Mae, and Freddie Mac, who are separately represented.  This memorandum addresses solely the claims that the plaintiffs have raised against Treasury.

**Standard of Review**

Treasury moves to dismiss the complaints for lack of jurisdiction, and for failure to state a claim.  Under Federal Rule of Civil Procedure 12(b)(1), the plaintiffs bear the burden to show that the court has jurisdiction over their claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).   Where the court's subject matter jurisdiction is called into question, the court may consider matters outside the pleadings to ensure that it has jurisdiction over the case.  *See Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1006 (D.C. Cir. 1999).

Under Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted.  In ruling on a Rule 12(b)(6) motion, courts are to presume the truth of all factual allegations in the complaint but need not and should not accept "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (brackets in original).  Courts are also "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  A court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," as well as "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."  *Ward v. D.C. Dep't of Youth Rehab. Servs*., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotations and citations omitted); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 67 n.5 (D.D.C. 2007) (citation omitted).  It is also proper to consider documents of which courts may take judicial notice, such as government documents and other public records, when reviewing a Rule 12(b)(6) motion.  *See EEOC v. St. Francis Xavier Parochial Sch*., 117 F.3d 621, 624 (D.C. Cir. 1997).

Treasury also moves, in the alternative, for summary judgment with respect to the plaintiffs' claims.  Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where the plaintiffs' claims involve a review of agency action under the APA, the summary judgment standard set forth in Federal Rule of Civil Procedure 56(c) is limited by the Court's role in reviewing the agency's administrative record.  *See Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 127 (D.D.C. 2012).  Under the APA, it is the role of the agency to resolve factual issues in the process of arriving at a decision that is supported by the administrative record, and the function of the district court is to determine whether, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did.  *See Richard v. INS*, 554 F.2d 1173, 1174 & n.28 (D.C. Cir. 1977).

## Argument

## I.    HERA Precludes the Plaintiffs From Challenging the Third Amendment

The plaintiffs challenge Treasury and FHFA's decision to enter into the Third Amendment to the PSPAs, under a variety of theories.  This Court lacks jurisdiction over the complaints, however, because they violate two separate, and independent, barriers to judicial review over such claims that Congress erected when it enacted HERA.  First, HERA prohibits relief that would restrain the powers that FHFA exercises as conservator of the GSEs, such as the decision to enter into the Third Amendment.  Second, HERA prohibits suits, such as those brought by the plaintiffs here, based on the plaintiffs' status as shareholders in the GSEs; under HERA, the conservator (FHFA) has succeeded to all of the rights of the shareholders in those institutions.

21

### A.      HERA Bars the Relief Requested in the Complaints

At the outset, the complaints must be dismissed because they are barred by the anti-injunction provision of HERA.  In their complaints, the plaintiffs seek a declaratory judgment that the Third Amendment is unlawful, as well as injunctions preventing FHFA and Treasury "from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment."  Perry Compl., Prayer for Relief; Fairholme Compl., Prayer for Relief (seeking order vacating the Third Amendment and an injunction requiring Treasury to return dividend payments made pursuant to the agreement); Arrowood Compl., Prayer for Relief (seeking order vacating the Third Amendment, treating excess payments as redemption of senior preferred stock, and enjoining Treasury employees "from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment.").  The putative class action plaintiffs, for their part, seek equitable remedies, such as the rescission of the Third Amendment, as well as damages.  Class Action Compl., Prayer for Relief.

This requested relief, however, conflicts with the statutory bar against injunctive or other relief restraining FHFA's powers as conservator of the GSEs.  Specifically, 12 U.S.C. § 4617(f) states that: "Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."  By its terms, this provision "excludes judicial review of 'the exercise of powers or functions' given to the FHFA as conservator."  *Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012).  Where, as here, acts taken by FHFA as conservator are challenged, "[a] conclusion that the challenged acts were directed to an institution in conservatorship and with the powers given to the conservator ends the inquiry."  *Id.*

Section 4617(f) does not permit judicial review of FHFA's actions as conservator or receiver.  Indeed, courts interpreting a nearly identical provision – barring judicial review of actions by the Resolution Trust Corporation (and its successor, the Federal Deposit Insurance Corporation) as conservator or receiver of failed banking institutions[13] – have held that the provision permitted review only "where the [agency] is acting clearly outside its statutory powers."  *Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir. 1992).  By contrast, "where the [agency] performs functions assigned it under the statute, injunctive relief will be denied even where the [agency] acts in violation of other statutory schemes."  *Id.*; *see also Freeman v. Fed. Deposit Ins. Corp.*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) ("Section 1821(j) does indeed effect a sweeping ouster of the court's power to grant equitable remedies"); *National Trust for Historic Preservation v. Fed. Deposit Ins. Corp.*, 995 F.2d 238, 240 (D.C. Cir. 1993), *aff'd and reinstated on reh'g*, 21 F.3d 469 (D.C. Cir. 1994); *accord Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir. 1993) (because "disposing of assets of the failed thrift when acting as its conservator or receiver is a quintessential statutory power of the RTC," injunctive relief is unavailable even if the RTC is "improperly or even unlawfully exercising" that power).  Moreover, the D.C. Circuit has found that the prohibition against relief that would "restrain or affect" the actions of a conservator or receiver apply to all "nonmonetary remedies, including injunctive relief, declaratory relief, and rescission."  *Freeman*, 56 F.3d at 1399.

---

[13]  *Compare* 12 U.S.C. § 1821(j) ("Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or receiver.") *with* 12 U.S.C. § 4617(f) ("Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver.").

Congress obviously envisioned that Treasury would purchase preferred shares or other obligations of the GSEs.  *See* 12 U.S.C. § 1719(g)(1) (empowering the Treasury Department to purchase shares of Fannie Mae); *id.* § 1455(*l*)(1) (same power with respect to shares of Freddie Mac).  Congress also envisioned that Treasury would exercise its rights pursuant to those purchases, including its rights to change the payment of dividends.  *Id.* §§ 1719(g)(2)(A), 1455(*l*)(2)(A).  Furthermore, HERA grants FHFA, as conservator, the power to "carry on the business" of the GSEs, and "put the [GSEs] in a sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  The conservator is empowered to "transfer or sell any asset of the [GSEs] in default, and may do so without any approval, assignment, or consent with respect to such transfer or sale."  12 U.S.C. § 4617(b)(2)(G).  The PSPAs with Treasury provided both companies the capital that they needed to continue operations after the third quarter of 2008.  In subsequent quarters for the next several years, funding from Treasury corrected net worth deficiencies that would have triggered mandatory receivership.  The Third Amendment ended the need for the GSEs to draw funds from Treasury to pay dividends to Treasury, and materially reduced the risk that the GSEs would be insolvent in the future.  It was thus squarely within FHFA's powers as conservator.  *See Town of Babylon*, 699 F.3d at 227-28 ("the exclusion of judicial review over the exercise of [FHFA's power as conservator] would be relatively meaningless if it did not cover an FHFA directive to an institution to mitigate or avoid a perceived financial risk."); *Nat'l Trust for Historic Preservation*, 995 F.2d at 239 ("An injunction against the planned sale would surely 'restrain or affect' the FDIC's exercise of those powers or functions."); *see also Kuriakose v. Fed. Home Loan Mortg. Co.*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009) ("By moving to declare unenforceable the non-participation clause in Freddie Mac severance agreements, in essence the plaintiffs are seeking an order which restrains the FHFA from enforcing this

contractual provision in the future.  The FHFA is well within its statutory authority to enforce the contracts of Freddie Mac and take any other action it determines to be in the best interest of Freddie Mac.  HERA clearly provides that this Court does not have the jurisdiction to interfere with such authority.").

The plaintiffs cannot evade HERA's limitation on judicial review by suing both FHFA and Treasury, the counter-party to the Third Amendment.  Section 4617(f) precludes any court from taking any action "to restrain *or affect* the exercise of powers or functions of the Agency as a conservator or a receiver."  12 U.S.C. § 4617(f) (emphasis added).  Injunctive relief that, in the words of the *Perry Capital* complaint, prevents a counter-party from "from implementing, applying, or taking any action whatsoever" pursuant to an agreement with a conservator would obviously "affect" FHFA's powers as conservator.  Such an order would completely set aside the agreements that have allowed both companies to continue operating after 2008.  *See Rhinelander Paper Co. v. FERC*, 405 F.3d 1, 6 (D.C. Cir. 2005) ("The verb 'affect' means, very broadly, 'to produce an effect on; to influence in some way.'") (citing Black's Law Dictionary 92 (8th ed. 2004)); *see also United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) ("affect" means "to 'make a material impression on; to act upon, influence, move, touch, or have an effect on,' Oxford English Dictionary 211 (2d ed. 1989), or, perhaps more appositely to this case, 'to have a detrimental influence on,' Webster's Third New International Dictionary 35 (2002)").  HERA's plain language protects FHFA's actions as a conservator by precluding aggrieved parties from enjoining the counter-parties to FHFA's conservatorship actions.

The plaintiffs attempt to dodge HERA's anti-injunction provision by alleging that, when it agreed to the Third Amendment, FHFA acted outside of its conservatorship authority.  This argument takes two forms.  First, the plaintiffs contend that the Third Amendment was not a

conservatorship action because it begins a supposedly unlawful wind-up of the GSEs.   The

plaintiffs assert that, as conservator, FHFA "is without authority to wind up the Companies'

operations," Perry Compl. ¶ 82, and that FHFA's powers under HERA are "strictly limited" and

"require[] the FHFA to take steps to put the Companies in a 'sound and solvent condition' and to

work to 'conserve [their] assets and property.'"  Perry Compl. ¶ 81 (quoting 12 U.S.C.

§ 4617(b)(2)(D)).  This argument depends on two premises, both of which are flawed.  The first

premise – that FHFA does not have the power to wind up the companies as conservator – is

contradicted by the text of the statute.  HERA provides that "[t]he Agency may, at the discretion

of the Director, be appointed *conservator or receiver* for the purpose of reorganizing,

rehabilitating, or *winding up* the affairs of a regulated entity."  12 U.S.C. § 4617(a)(2) (emphasis

added).[14]

Indeed, in the exercise of this statutory authority, FHFA has consistently maintained that

the conservatorship aims to shrink the size of the GSEs' operations and to contract their

portfolios.  As it reported to Congress in early 2012, one of the goals of conservatorship is to

"[g]radually contract the Enterprises' dominant presence in the marketplace while simplifying

and shrinking their operations."  FHFA Strategic Plan at 2 (AR 2371).  Consistent with this goal,

the original PSPAs required each GSE to reduce the amount of mortgage assets that they own by

10% per year, until each GSE holds no more than $250 billion in mortgage assets, less than a

third of their holdings prior to the onset of the financial crisis.  Fannie Mae PSPA § 5.7 (AR 25);

---

[14]  HERA departs from the FDIC statute in this respect, because the FDIC statute has, at times,
limited the agency to winding up the affairs of a financial institution only if the agency appoints
itself as a receiver rather than a conservator.  *See Gibraltar Sav. v. Ryan*, No. 89-3207, 1990 WL
484155 (D.D.C. July 10, 1990) (discussing amendments to the FDIC statute creating a
distinction between conservatorship and receivership).  This limitation does not exist in HERA,
and so is not applicable to FHFA.

Freddie Mac PSPA § 5.7 (AR 59).  The Third Amendment accelerated the reduction of mortgage

assets to 15% per year.   Third Amendment to Amended and Restated Fannie Mae PSPA, § 6

(AR 4339); Third Amendment to Amended and Restated Freddie Mac PSPA, § 6 (AR 4347).

Thus, the plaintiffs' allegations that the Third Amendment "begins the process of

winding down the companies," Fairholme Compl. ¶ 64, miss the mark.  The contraction of the

GSEs' investment portfolios – the source of sizable losses both before and after the enterprises

entered into conservatorship – has been a goal of the conservatorship ever since the FHFA and

Treasury first agreed to the PSPAs.  *See* Fannie Mae PSPA § 5.7 (AR 25); Freddie Mac PSPA

§ 5.5 (AR 59).  As noted, HERA provided FHFA with statutory authority, as conservator, to

"wind up" the GSEs' operations, and FHFA exercised that authority in 2008 to require the GSEs

to reduce their investment portfolios.  *See* 12 U.S.C. § 4617(a)(2).  The Third Amendment, in

turn, restructured the fixed dividend payments to Treasury to account for the effect that these

reductions would have on the GSEs' long-run profitability.  The agreement was plainly

consistent with FHFA's powers as conservator, and eliminated the risk that the GSEs would need

to draw on their funding from Treasury in order to pay dividends on the senior preferred stock,

thus diminishing Treasury's PSPA support – a risk that the GSEs had repeatedly acknowledged.

*See supra*, Backgound, Section III.

The second premise of the plaintiffs' theory that FHFA exceeded its conservatorship

powers – that HERA sets forth certain actions that the conservator would be required to

undertake – misconstrues the authority that Congress granted to FHFA.  The statute empowers

FHFA to take a number of steps as conservator or receiver, but those powers are expressed in

permissive, not mandatory, terms.  *See* 12 U.S.C. § 4617(b)(2)(B) ("The Agency *may*, as

conservator or receiver" exercise the authority specified in § 4617(b)(2)(B)(i)-(v)) (emphasis

added); *id.* § 4617(d) ("The Agency *may*, as conservator, take such action as may be – (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.") (emphasis added).  At any rate, as has already been discussed, the Third Amendment eliminated the need to draw funds from Treasury to pay dividends to Treasury, thereby preserving the remaining PSPA funding to cover future net worth deficits; the amendment was thus consistent with FHFA's obligations as conservator, even under the plaintiffs' theory.

Second, the plaintiffs argue that FHFA acted outside of its powers as conservator because the Third Amendment supposedly contravenes the priority of liquidation under receivership. Fairholme Compl. ¶ 10.  However, FHFA's maximum liability to shareholders in the event of receivership was fixed by 12 U.S.C. § 4617(e), which limits that liability to the amount that shareholders would have received  had the GSEs' assets and liabilities been liquidated at the time the conservator was appointed in September 2008.  And, in any event, the statute's provisions concerning the distribution priority in *receivership* does not restrain FHFA's authority to transfer assets in *conservatorship*.  As a court of appeals noted in reviewing a similar challenge to FDIC's authority as receiver, the agency's power to transfer funds provided "specific statutory authorization for its actions," and a challenge to that transfer was barred, notwithstanding the plaintiffs' claim that FDIC had contravened a similar statutory distribution priority scheme. *Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007).

None of the allegations in the individual complaints demonstrate that FHFA overstepped its conservatorship authority through the Third Amendment.  As conservator, the FHFA has broad powers to, among other things, "take over the assets of and operate the regulated entity

with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity," 12 U.S.C § 4617(b)(2)(B)(i), "perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver," *id.* § 4617(b)(2)(B)(iii), and take actions "appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(D)(ii).  FHFA is not required to take these actions with the sole goal of rehabilitating the GSEs and returning them to the market in their prior form. Rather, as conservator, FHFA can act with the goal of "reorganizing, rehabilitating, *or* winding up" the affairs of the GSEs.  *Id.* § 4617(a)(2) (emphasis added).  This would include the authority to contract the GSEs' operations, which has been FHFA's self-described goal in conservatorship. *See* FHFA Strategic Plan at 2 (AR 2371).

The PSPA funding represents, by far, the GSEs' single largest source of capital support, and the Third Amendment guaranteed that neither GSE would have to draw on that support (which otherwise risked being depleted) in order to pay quarterly dividends.  There is no question that FHFA acted within its enumerated conservatorship powers by acting to preserve the critical source of funding that FHFA, as conservator, had previously used to prevent both GSEs from entering mandatory receivership.  That fact "ends the inquiry." *Town of Babylon*, 699 F.3d at 228.  The plaintiffs may disagree with FHFA's use of its conservatorship powers, but HERA's bar on judicial review exists to prevent such second-guessing of the conservator's decisions.

## B.      HERA Prohibits the Plaintiffs from Bringing Claims Predicated on Their Status as Shareholders

Further, the complaints must be dismissed because, in addition to barring challenges to the actions of FHFA as conservator, HERA bars suits by shareholders.  The plaintiffs allege that

they have been injured by the Third Amendment because "the Third Amendment prevents [the GSEs] from ever paying dividends on the Private Sector Preferred Stock and from rebuilding their capital to benefit holders of their common stock.  As a result, the Third Amendment strips the Companies' Private Sector Preferred Stock and their common stock of substantially all value."  Perry Compl. ¶ 23.  The complaints in *Fairholme Funds* and *Arrowood* similarly allege that the Third Amendment prevents the GSEs from paying dividends to shareholders junior to Treasury, Fairholme Compl. ¶ 124, Arrowood Compl. ¶ 7, and reduces the value of their preferred stock because it allegedly reduces the amount of capital available to them in the event that the company is liquidated, Fairholme Compl. ¶ 125, Arrowood Compl. ¶ 7.   The putative class action plaintiffs rest their breach of fiduciary duty and takings claims on the value of their status as shareholders.  Class Action Compl. ¶¶ 175-192.  The plaintiffs thus premise these lawsuits on the supposedly reduced value of their shareholdings.

## 1.  HERA Bars Direct and Derivative Shareholder Claims

As recognized by the D.C. Circuit, HERA bars lawsuits brought by shareholders and provides that the plaintiffs may not sue based upon the supposedly reduced value of the shareholdings.  Upon its appointment as conservator of the GSEs, FHFA succeeded to all of the "rights, titles, powers, and privileges" of the GSEs and "of any stockholder, officer, or director" of the GSEs.  12 U.S.C. § 4617(b)(2)(A)(i).  HERA further empowered FHFA to "take over the assets of and operate [the GSEs] with all the powers of [the GSEs'] shareholders, . . . directors, and . . . officers," and to "conduct all business of [the GSEs]."  *Id.* § 4617(b)(2)(B)(i).  The Court of Appeals has held that Section 4617(b) "plainly transfers shareholders' ability to bring derivative suits – a 'right[], title[], power[], [or] privilege[]' – to FHFA."  *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012) (alterations in original).  The Fourth Circuit has likewise affirmed a district court's post-HERA determination that "the plain meaning of the statute is that

*all* rights previously held by Freddie Mac's stockholders, including the right to sue derivatively, now belong exclusively to the FHFA." *In re Fed. Home Loan Mortg. Corp. Derivative Litig.* ("*In re Freddie Mac*"), 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) (emphasis in original), *aff'd sub nom. La. Mun. Police Emp. Ret. Sys. v. Fed. Hous. Fin. Agency*, 434 Fed App'x 188 (4th Cir. 2011).

Moreover, there is no conflict of interest exception to this explicit bar on lawsuits brought by shareholders. In *Kellmer*, the D.C. Circuit referred in passing to authority in other circuits discussing a "manifest conflict of interest" exception to FIRREA's bar to shareholder suits. *See Kellmer*, 674 F.3d at 850 ("All of these courts have found that, absent a manifest conflict of interest by the conservator not at issue here, the statutory language bars shareholder derivative actions."). The D.C. Circuit, however, has never adopted this exception, even in the context of suits under FIRREA, and of the three cases that the court cited in *Kellmer*, only *First Hartford v. United States*, 194 F.3d 1279, 1295 (Fed. Cir. 1999), recognized such an exception to FIRREA's prohibition against shareholder suits. In other contexts, the D.C. Circuit has not recognized a party's standing to sue a receiver based on allegations of a conflict of interest on the receiver's part. *See Deutsche Bank Nat. Trust Co. v. Fed. Deposit Ins. Corp.*, 717 F.3d 189, 192-93 (D.C. Cir. 2013) (denying motion of senior note holders to intervene in litigation against the FDIC, and stating that "a precedent allowing an ordinary creditor to intervene in litigation involving a receiver would presumably have widespread effect.").

Nor would the D.C. Circuit judicially adopt such an exception, if the question were presented to it. "[T]o resolve this issue, we need only heed Professor Frankfurter's timeless advice: '(1) Read the statute; (2) read the statute; (3) read the statute!'" *Kellmer*, 674 F.3d at 850 (internal quotation omitted). HERA categorically prohibits shareholder suits, and does not

contain any language creating an exception to this categorical prohibition for supposed conflicts

of interest, or for any other reason.  This Court is not free to judicially create such an exception,

where Congress did not see fit to do so.  The district courts presented with this issue thus have

reasoned, correctly, that HERA does not include any exception to its bar on shareholder suits, let

alone an exception for a supposed conflict of interest.  *In re Fed. Nat'l Mortg. Ass'n Secs.,*

*Derivative & "ERISA" Litig.* ("*In re Fannie Mae*"), 629 F. Supp. 2d 1, 4 (D.D.C. 2009)

("HERA's plain language provides, in a broad stroke, that the FHFA succeeds to 'all rights,

titles, powers, and privileges' of the stockholders of Fannie Mae . . . .  This directive implies no

exception, and plaintiffs[] fail to identify any accompanying statutory text to persuade this Court

that, when read as a whole, HERA carved out or otherwise permits the exception they

propound."), *aff'd sub nom. Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012); *In re Freddie*

*Mac*, 643 F. Supp. 2d at 797 ("the broad, sweeping language of HERA . . . clearly demonstrates

Congressional intent to transfer as much control of Freddie Mac as possible to the FHFA,

including any right to sue on behalf of the corporation.").

  These decisions are consistent with both the plain meaning of HERA, which contains no

exceptions to the bar on shareholder lawsuits for either direct or derivative lawsuits, as well as

the broader purposes of the conservatorship statute.  After all, derivative actions arise only in

circumstances where the shareholder alleges that the corporate directors have violated a duty of

care to the corporation.  A provision that bars shareholders from suing derivatively, but that also

provides for an exception whenever the conservator declines to sue itself or its counter-party,

would be – to borrow an analogy from the D.C. Circuit in a different context – "about as useful

as a mosquito net made of chicken wire."  *Bowie v. Maddox*, 653 F.3d 45, 48 (D.C. Cir. 2011).

The derivative nature of these suits is obvious.  Even if (despite HERA's anti-injunction bar) the plaintiffs succeeded in having the Third Amendment set aside, that relief would only affect the GSEs themselves, not their shareholders.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (issue of whether or not a suit is derivative "must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?").  The original PSPAs, in place since 2008 and unchallenged in these cases, prevent the GSEs from declaring a dividend on any other class of stock, or setting aside funds for the payment of such dividends, while the senior preferred stock remains outstanding.  Regardless of the outcome of this case, the GSEs cannot pay dividends on junior preferred stock or common stock for the duration of the conservatorship.  Moreover, Count VII of the putative class action complaint is brought on behalf of Fannie Mae itself and is an outright derivative claim.  Class Action Compl. ¶ 179.

## 2.   The Plaintiffs' Claims Concerning their Right to a Liquidation Preference are Not Ripe for Judicial Review

The plaintiffs assert that setting aside the Third Amendment would improve their potential recovery in the event of the GSEs' liquidation.  Such a claim, however, is not ripe for judicial review.  Neither GSE is in liquidation, nor headed for immediate liquidation (thanks to Treasury's unprecedented commitment and provision of funds to the GSEs), and this is not an alleged injury that is even ripe for review at this point.  *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur."); *see also Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) ("[W]hen an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' the prospect of entangling ourselves in a challenge to such a decision is an

element of the fitness determination [of the ripeness inquiry] as well.") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

Further, the plaintiffs overlook the limit on their recovery put in place by HERA in the event of receivership. The statute contains a limitation on recovery by shareholders which fixes FHFA's liability to them in the event of receivership at the amount that the shareholders would have received had the GSEs gone into immediate liquidation at the time FHFA began the conservatorship. *See* 12 U.S.C. § 4617(e)(2). In any eventual receivership, shareholders will be entitled to claim no more than they could have claimed in a hypothetical liquidation in September 2008, when both GSEs were suffering substantial losses, and as the subsequent financial statements bear out, about to become insolvent. This provision exists to prevent the plaintiffs from doing precisely what they are attempting to do through this lawsuit: recover a windfall because of the conservatorship actions of FHFA, executed with taxpayer funds from Treasury. Further, adjudicating this claim would require the Court to determine the amount of capital available to pay residual shareholder equity claims if the GSEs liquidated (prior to either GSE actually entering liquidation, and before other creditors with superior claims have stepped forward), and to compare that sum to a calculation of what the plaintiffs would have received under a hypothetical liquidation of the GSEs in September 2008 (before the receiver is given a chance to calculate a hypothetical liquidation). This purported injury is not one that is ripe for review at this stage.

### 3. As Shareholders, the Plaintiffs Lack Prudential Standing To Sue for Injuries to the GSEs

Moreover, because the purported injury in this suit is an injury to the value of their stockholdings, Compl. ¶ 23, the plaintiffs lacks prudential standing under the shareholder standing rule. As a prudential limit on standing, the shareholder standing rule, also known as the

derivative injury rule, prevents shareholders from suing over injuries to the corporation.

*Franchise Tax Bd. of California v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) ("Related to

this principle we think is the so-called shareholder standing rule . . . [T]he rule is a longstanding

equitable restriction that generally prohibits shareholders from initiating actions to enforce the

rights of the corporation unless the corporation's management has refused to pursue the same

action for reasons other than good-faith business judgment.").  "The derivative injury rule holds

that a shareholder (even a shareholder in a closely-held corporation) may not sue for personal

injuries that result directly from injuries to the corporation."  *In re Kaplan*, 143 F.3d 807, 811-12

(3d Cir. 1998) (Alito, J.).  The "circuits are consistent in holding that 'an action to redress

injuries to a corporation . . . cannot be maintained by a stockholder in his own name.'"  *Canderm*

*Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 602-03 (6th Cir. 1988) (citing cases).  This

result holds "even though in an economic sense real harm may well be sustained as the impact of

such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general

business reputation, *or diminution in the value of ownership.*"  *Schaffer v. Universal Rundle*

*Corp.*, 397 F.2d 893, 896 (5th Cir. 1968) (quoting *Martens v. Barrett*, 245 F.2d 844, 846 (5th

Cir. 1956)) (emphasis added).  Indeed, courts do not regard a decline the value of stock as a

personal injury suffered by the holder of stock: "[A] diminution in the value of corporate stock

resulting from some depletion of or injury to corporate assets is a direct injury only to the

corporation; it is merely an indirect or incidental injury to an individual shareholder."  *Gaff v.*

*Fed. Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987) (citing *Eagle v. American Tel. & Tel.*

*Co.*, 769 F.2d 541, 545-46 (9th Cir. 1985)).

Under D.C. Circuit precedent, "[n]o shareholder – not even a sole shareholder – has

standing in the usual case to bring suit in his individual capacity on a claim that belongs to the

corporation." *American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 n. 14 (D.C. Cir. 1984).  The plaintiffs cannot premise standing for this case on their status as shareholders in the GSEs.  Nor can they sue derivatively on behalf of the GSEs.  With no basis for standing, their complaints should be dismissed.

## II.  The Plaintiffs' APA and Fiduciary Duty Claims Fail as a Matter of Law

The plaintiffs raise two claims against Treasury under the APA.  First, the plaintiffs allege that Treasury did not have the statutory authority to enter into the Third Amendment with FHFA because, in their view, the Third Amendment was a purchase of new securities beyond the sunset date contained in 12 U.S.C. § 1719(g)(4).  Perry Compl. ¶¶ 58-63; Fairholme Compl. ¶¶ 102-04; Arrowood Compl. ¶¶ 100-02.  The plaintiffs further allege that Treasury contravened HERA by not making the determinations set forth in § 1719(g)(1)(B) or considering the factors set forth in the § 1719(g)(1)(C) before entering into the Third Amendment.  Perry Compl. ¶¶ 64-68; Fairholme Compl. ¶¶ 105-08; Arrowood Compl. ¶¶ 105-07.  Second, the plaintiffs allege that Treasury was arbitrary and capricious in entering into the Third Amendment without making the determinations required by § 1719(g)(1)(B), and for overlooking obligations that Treasury allegedly owes to junior shareholders under Virginia or Delaware law.  Perry Compl. ¶¶ 69-78; Fairholme Compl. ¶¶ 114-19; Arrowood Compl. ¶¶ 112-17.  The putative class plaintiffs offer a variation on the last claim; instead of raising a claim under the APA, they attempt to directly assert liability against Treasury for a violation of a fiduciary duty with respect to Fannie Mae. Class Action Compl. ¶¶ 175-82.

None of these arguments states a claim for relief.  Treasury did not purchase any securities from the GSEs by entering into the Third Amendment.  The GSEs have not issued to Treasury, and Treasury has not received, any additional securities of either GSE since September

2008.  Moreover, the Third Amendment did not obligate any additional funds from Treasury to the GSEs and did not increase the amount of Treasury's investment, and thus was in no sense a "purchase" of securities under § 1719(g)(1)(A).  Accordingly, Treasury was not required to make the determination required for an exercise of purchase authority under § 1719(g)(1)(B).  Rather, under HERA, Treasury "may, at any time, exercise any rights received in connection with such purchases [of obligations from the GSEs]."  12 U.S.C. § 1719(g)(2)(A).  HERA explicitly provides that "[t]he authority of the Secretary of the Treasury to hold, exercise any rights received in connection with, or sell, any obligations or securities purchased is not subject to the provisions of paragraph (4) [the sunset provision]."  12 U.S.C. § 1719(g)(2)(D).  As the Third Amendment was not a purchase of new securities, Treasury was not required to make the determination, or consider the factors, that the statute specified for a purchase of securities. Finally, Treasury does not owe any fiduciary obligations to other shareholders of the GSEs, and at any rate its conduct did not violate any such obligation.

## A.  The Third Amendment Was an Exercise of Rights Under the Original PSPAs and Not a Purchase of New Securities

The plaintiffs' claims under HERA rest on their characterization of the Third Amendment as a purchase of new securities.  They assert that the Third Amendment was contrary to HERA because it was entered into after Treasury's authority to purchase stock in the GSEs had expired on December 31, 2009, and because it was made without considering certain factors set forth in the statute for such purchases.  The claims depend upon a false premise, however.  The Third Amendment was not a purchase of new securities, because it did not obligate or pay new funds to the GSEs.

HERA itself does not define the term "purchase."  The interpretation of that term thus begins with the ordinary meaning.  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885,

1891 (2011) ("Because the statute does not define 'report,' we look first to the word's ordinary meaning."). The Oxford English Dictionary ("OED") – which the Supreme Court recognizes as "one of the most authoritative on the English language," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2003 (2012) – defines "purchase" as "[t]o acquire in exchange for payment in money or an equivalent; to buy." Oxford English Dictionary (3d ed. Sept. 2007) (viewed online). The OED adds that this definition is "[n]ow the usual sense" of the word. *Id*; *see also* Black's Law Dictionary 1359 (9th ed. 2009) ("The act or an instance of buying."); Random House Dictionary of the English Language 1568 (2d ed. 1987) ("to acquire by the payment of money or its equivalent; buy"). An action that did not commit additional funds from Treasury (nor increase the amount of its liquidation preference) is thus not a "purchase" within the ordinary meaning of the word.

Nor are the terms "obligations and other securities" as used in § 1719(g) defined, except to state that those obligations or other securities shall be issued "on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine." 12 U.S.C. § 1719(g)(1)(A). The legislative history of the provision characterized it as "increas[ing] Treasury authority under existing lines of credit to Freddie Mac, Fannie Mae, and the Federal Home Loan Banks for the next 18 months, giving Treasury standby authority to buy stock or debt in those companies if it determines an emergency exists and the purchase is necessary to provide market stability, prevent disruptions to availability of mortgages, protect the taxpayer, and restore orderly markets." H.R. Rep. No. 110-767, at 2 (2008).

The purpose of the sunset provision was thus to limit the time under which Treasury had increased authority "to buy stock or debt" "under existing lines of credit," not to prevent Treasury and FHFA from agreeing to changes to the PSPA that would not obligate any new

funds from the public fisc.  To underscore this point, Congress created a separate statutory provision allowing Treasury to, "at any time, exercise any rights received in connection with such purchases." 12 U.S.C § 1719(g)(2)(A).  Congress then explicitly stated that such authority is not subject to the December 31, 2009 sunset provision.  *Id.* § 1719(g)(2)(D).  One such right that Treasury had under the original PSPAs was the ability to amend those original agreements with FHFA.  *See* Fannie Mae PSPA, § 6.3 (AR 27-28); Freddie Mac PSPA, § 6.3 (AR 61-62).

The Third Amendment made five modifications to the terms of the original PSPAs.  First, it replaced the fixed ten-percent dividend with a net-worth-sweep dividend, beginning in 2013. Second, it accelerated the rate at which the GSEs were required to reduce the size of their retained investment portfolio holdings from ten percent per year to fifteen percent per year. Third, it required that the GSEs deliver an annual risk management plan to Treasury; those risk management plans must state how each GSE plans to reduce the financial and operational risk profile associated with both their mortgage guarantee and retained investment portfolio businesses in order to help protect taxpayers from future losses.  Fourth, it suspended the Periodic Commitment Fee from the original PSPAs, while the net-worth-sweep dividend is in effect; that fee, as discussed above, had been intended to compensate taxpayers for the financial support that Treasury provides to the GSEs through the PSPAs.  Fifth, it permitted the GSEs to engage in asset and property sales of less than $250 million in fair market value without prior written consent from Treasury.  None of these five modifications increased Treasury's funding commitments in the PSPAs or resulted in the issuance of any new securities to Treasury. Instead, the modifications were an exercise of Treasury's right to amend the PSPAs and the

senior preferred stock with FHFA's agreement, a right that Treasury received in § 6.3 of the original PSPAs.[15]

The plaintiffs cannot allege that Third Amendment obligated new funds to the GSEs, so they argue instead that the Third Amendment was *effectively* a purchase of a new security because it "altered the underlying stock certificates," Perry Compl. ¶ 62, and "effected a wholesale change to the nature of Treasury's securities," Perry Compl. ¶ 63, by changing the formula for calculating dividend payments. *See also* Fairholme Compl. ¶ 104; Arrowood Compl. ¶ 102. The plaintiffs thus advert to the so-called "fundamental change" doctrine of securities law, which in some judicial circuits allows a plaintiff to pursue securities fraud charges under § 10(b) of the Securities Exchange Act of 1934 if the plaintiff can demonstrate that "changes in the rights of a security holder . . . qualify as the 'purchase' of a new security under Section 10(b) and Rule 10b-5." *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977). Their argument, in essence, is that while the Third Amendment is not a "purchase" according to the plain meaning of that term, Congress nevertheless imported a judicial gloss on that term from an entirely different statute when it drafted HERA.

There is no reason to believe that, in interpreting HERA, the Court should use anything other than the ordinary meaning of the word "purchase." The "fundamental change" doctrine, upon which the plaintiffs rely, is an "esoteric and dubious judge-made doctrine," *Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 535 (7th Cir. 1998), that the D.C. Circuit has never adopted, even in the securities law context. Moreover, in the years prior to the passage of HERA

---

[15] The terms of the senior preferred stock certificates authorize the GSEs, with the consent of two-thirds of the holders of senior preferred stock (*i.e.*, Treasury), to amend the terms of the senior preferred stock certificates. Fannie Mae Senior Preferred Stock Certificate § 10(g) (AR 38-39); Freddie Mac Senior Preferred Stock Certificate § 10(g) (AR 72-73).

courts were deeply skeptical as to the theory's viability.  "The First Circuit has never adopted it;

the Second Circuit, which created it, has drastically cut it back; and the courts of this district,

while professing to continue endorsing the doctrine, have construed it narrowly and have not

found it satisfied in many years." *Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 26 (D.

Mass. 2002); *see also Isquith*, 136 F.3d at 536 ("[W]e very much doubt that the doctrine retains

any validity in any class of case, even in squeeze-out cases.").  Even those circuits that have

adopted this judge-made doctrine acknowledge that it "does not cut a wide swath," and "we have

rarely encountered instances where it applies." *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493,

1499 (9th Cir. 1995).  Other circuits have expressly declined to adopt it.  *Katz v. Gerardi*, 655

F.3d 1212, 1221 (10th Cir. 2011).

The plaintiffs have not provided this Court with any reason to believe that Congress

meant to import a contested judicial gloss on the meaning of "purchase" in § 10(b) of the

Securities Act into HERA.  That statute gives Treasury the authority to purchase "obligations

and other securities" of the GSEs "on such terms and conditions as the Secretary may

determine," 12 U.S.C. § 1719(g)(1)(A), and does not expressly incorporate any requirement of

federal securities law, let alone the requirements of § 10(b).  Nor have courts consistently

interpreted § 10(b), nor any other federal statutes using the word "purchase," by means of the

fundamental change doctrine.  In short, this is a situation where the plain meaning of the term

controls.  *See Bruesewitz v. Wyeth*, 131 S. Ct. 1068, 1082 (2011) ("When 'all (or nearly all) of

the' relevant judicial decisions have given a term or concept a consistent judicial gloss, we

presume Congress intended the term or concept to have that meaning when it incorporated it into

a later-enacted statute . . .  We cannot make the same assumption when widespread disagreement

exists among the lower courts. We must make do with giving the term its most plausible meaning using the traditional tools of statutory interpretation.").[16]

### B. Treasury Was Not Required to Make the Determinations Set Forth in HERA Prior to Exercising its Right to Amend the PSPAs

For the same reason, the complaints do not state a claim under the APA by alleging that Treasury failed to make the emergency determination required for a purchase under 12 U.S.C. § 1719(g)(1)(B), or to consider the factors for an exercise of purchase authority set forth in 12 U.S.C. § 1719(g)(1)(C). The emergency determination is required "in connection with any use" of the authority contained in paragraph (1) of subsection (g), *i.e.*, the authority "to purchase any obligations and other securities" issued by the GSEs. *Id.* § 1719(g)(1)(A). HERA does not require such a determination before the Secretary can exercise the authority granted by paragraph (2) of the same subsection, the authority to "at any time, exercise any rights received in connection with such purchases." *Id.* § 1719(g)(2)(A). Similarly, the considerations set forth in § 1719(g)(1)(C) apply "in connection with exercising the authority contained in this paragraph," where "this paragraph" refers to the authority to purchase securities pursuant to paragraph (1), not the authority to exercise rights received by such purchases, which is granted by a separate paragraph.

Treasury made the emergency determination under § 1719(g)(1)(B) before entering into the PSPAs, as well as before entering into the First and Second Amendments to the PSPAs. *See*

---

[16] However, even assuming the fundamental change doctrine did apply, modifications to aspects of the securities such as the dividend structure would not qualify as a "purchase" of securities giving an investor standing to sue for securities fraud. *See Allard v. Arthur Andersen & Co. (U.S.A.)*, 957 F. Supp. 409, 421 (S.D.N.Y. 1997) (no new "purchase" where shareholder changed payment structure from cash to stock); *Reliance Ins. Co. v. Eisner & Lubin*, 685 F. Supp. 449, 456-57 (D.N.J. 1988) (no new "purchase" where plaintiff's debt was subordinated to newly incurred debt).

Determination (Sept. 7, 2008) (AR 1); Determination (May 6, 2009) (AR 163); Determination

(Dec. 24, 2009) (AR 187).  However, Treasury obligated funds to the GSEs in the original

PSPAs, and obligated additional funds to them in the first two amendments – doubling the

amount of PSPA funding, in the First Amendment, and further increasing the funding cap based

on future draws, in the Second Amendment.  Any draws of those obligated funds would also

increase Treasury's liquidation preference.  Accordingly, Treasury determined that these

amendments to the PSPAs were tantamount to the purchase of additional senior preferred stock

from the GSEs, and it thus relied on the authority to purchase securities described in

§ 1719(g)(1).  Not so the Third Amendment, which, as explained above, did not obligate

additional funds or increase the taxpayers' liquidation preference. *See supra* Argument, § II.A.

The plaintiffs' allegations that the Third Amendment is inconsistent with the factors in

§ 1719(g)(1)(C), *see* Perry Compl. ¶ 67, Fairholme Compl. ¶ 108, Arrowood Compl. ¶ 107, is

thus irrelevant.  Those considerations do not apply to Treasury's exercise of its rights that it

already possessed with respect to the existing senior preferred stock.  And to the extent that the

plaintiffs mean to allege that Treasury's actions were not the result of reasoned decision making,

they are incorrect.  As explained *infra* in section II.D, the Third Amendment eliminated the need

to draw funds from Treasury to pay dividends to Treasury, thereby preserving the PSPA funding

to cover future quarterly net worth deficits.  It also maintained investor confidence in the

adequacy of Government support to the GSEs.

### C.      Treasury Did Not Breach Any Fiduciary Duty to the Plaintiffs

The individual plaintiffs also claim that Treasury violated the APA in agreeing to the

Third Amendment, because it arbitrarily and capriciously failed to consider whether it owed

fiduciary obligations to minority shareholders such as the plaintiffs.  Perry Compl. ¶ 77;

Fairholme Compl. ¶ 119; Arrowood Compl. ¶ 117.  The class action plaintiffs, for their part, forgo the veneer of an APA claim, and attempt directly to assert a breach-of-fiduciary duty claim against Treasury.  Class Action Compl. ¶ 179.   The plaintiffs' attempt to impose a fiduciary obligation on Treasury, either directly or through the rubric of an APA claim, is unavailing.

As an initial matter, the plaintiffs' assertion that Treasury owes them a fiduciary duty is a claim that is founded on a contractual relation, and thus it is subject to the jurisdictional limits of the Tucker Act.  Under the Tucker Act, a claim founded on contractual relationships must be brought in the Court of Federal Claims.  28 U.S.C. § 1491.  A claim that Treasury owes the plaintiffs a fiduciary obligation is, at heart, a claim that Treasury assumed such obligations in entering into the PSPAs.  Thus, because a contract is the source of the alleged rights that the plaintiffs assert, their "breach of fiduciary duty claim is essentially a contract action" within the exclusive jurisdiction of the Court of Federal Claims.  *Albrecht v. Comm. on Employee Benefits of the Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 68-69 (D.C. Cir. 2004).  It makes no difference that the individual plaintiffs have attempted to plead their contract-based claim as an APA claim:  "Courts have not hesitated to look beyond the pleadings of a case brought in district court to determine if it involves a claim over which the Court of Claims has exclusive jurisdiction .... [A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief in such a case."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982).  *See also Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992); *Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F. Supp. 2d 30, 43 (D.D.C. 2007).  Thus, the plaintiffs are barred from seeking relief under the APA for Treasury's supposed violation of

contract-based rights, such as fiduciary obligations, and they must proceed on any such claim in the Court of Federal Claims under the Tucker Act.

Even apart from the jurisdictional barrier of the Tucker Act, the plaintiffs are incorrect in their premise that the APA would require Treasury to consider policies embodied in sources of law other than HERA, the federal statute under which Treasury was operating.  The Supreme Court has clarified that the APA imposes no such obligation.  *See PBGC v. LTV Corp.*, 496 U.S. 633, 645-46 (1990).  As the Court noted,  "[i]f agency action may be disturbed whenever a reviewing court is able to point to an arguably relevant statutory [or here, common law] policy that was not explicitly considered, then a very large number of agency decisions might be open to judicial invalidation."  *LTV Corp.*, 496 U.S. at 646; *see also Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934 (D.C. Cir. 2008).  Treasury's consideration of whether the Third Amendment comported with the policies of HERA, therefore, fully satisfied its obligations for reasoned decision making under the APA.

In any event, the plaintiffs' assertion of a violation of a fiduciary duty fails on the merits. First, the plaintiffs' allegations ignore the fact that FHFA, as the conservator of the GSEs, is the only entity to whom Treasury could owe a fiduciary duty because, for the duration of the conservatorships, FHFA possesses all of the "rights, titles, powers, and privileges" of the GSEs' stockholders.  12 U.S.C. § 4617(b)(2)(A)(i).  HERA granted FHFA the authority to place the GSEs into conservatorship and "take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity."  *Id.* § 4617(b)(2)(B)(i).   A fiduciary duty could only arise through the shareholders' claim on the assets of the corporation – but they have no such claim. During the conservatorship, only FHFA, as the successor to the shareholders' rights, could have

a claim on the corporations' assets.  *See Esther Sadowsky Testamentary Trust v. Syron*, 639 F.

Supp. 2d 347, 351 (S.D.N.Y. 2009) ("Congress has clearly announced that the FHFA has

inherited all rights and powers of the Freddie Mac shareholders . . . In HERA, Congress did not

intend that acts lying fully within the FHFA's discretion as Conservator of Freddie Mac would

violate some residual fiduciary duty owed to the shareholders.  The shareholders' rights are now

the FHFA's.").  The PSPAs are agreements between FHFA – acting as conservator – and

Treasury, and the agreements explicitly exclude third-party beneficiaries, such as the plaintiffs.

*See* Fannie Mae PSPA § 6.1 (AR 27); Freddie Mac PSPA § 6.1 (AR 61).  The purpose of the

PSPA funding is to cover any quarterly net worth deficiencies that arise during the

conservatorship in order to avoid the placement of the enterprises into mandatory receivership.

The purpose is not to use taxpayer funds to bailout the shareholders of the GSEs, and certainly

not to provide a taxpayer-funded windfall for investors who swooped in during the

conservatorship in the hopes of obtaining a bargain.

HERA, in fact, directs the Treasury to consider the public interest, rather than the

interests of shareholders, when making investment decisions with respect to the GSEs.  HERA

directs Treasury to consider a number of factors "to protect the taxpayers" before exercising its

authority to purchase securities.  12 U.S.C. § 1719(g)(1)(C).  Among other factors, these include

"[t]he need for preferences or priorities regarding payments to the Government," and

"[r]estrictions on the use of corporation resources, including limitations on the payment of

dividends and executive compensation and any such other terms and conditions as appropriate

for those purposes."  12 U.S.C. § 1719(g)(1)(C)(i),(vi).  This provision, directing Treasury to

consider whether restrictions on the use of GSE resources are needed to protect taxpayers, is

plainly inconsistent with any purported duty on Treasury's part to maximize the returns of

shareholders like these plaintiffs.  Thus, even if Treasury did possess fiduciary duties under state

law (and as explained below, it does not) such an obligation would be preempted by HERA.  *See*

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007) ("[W]hen state prescriptions significantly

impair the exercise of authority, enumerated or incidental under [the federal statute], the State's

regulations must give way."); *see also Starr Int'l Co. v. Fed. Reserve Bank of New York*, 906 F.

Supp. 2d 202, 236-46 (S.D.N.Y. 2012).

Moreover, even if such a proposition were consistent with HERA, as a matter of law,

Treasury does not owe any state-law fiduciary duties to the plaintiffs.  Such obligations exist

only for a controlling shareholder, defined as a shareholder owning more than fifty percent of the

voting power of the company, or a shareholder who exercises "actual control" over the board of

directors of a company.  *See Zimmerman v. Crothall*, 62 A.3d 676, 699-700 (Del. Ch. 2013) ("A

shareholder will be considered 'controlling' if it either owns more than 50% of the voting power

of the company, or exercises 'actual control' over the board of directors during the course of a

particular transaction."); *In re PNB Holding Co. Shareholders Litig.*, CIV.A. 28-N, 2006 WL

2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling shareholder exists when

a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises

control over the business and affairs of the corporation."); *see also Brown v. Scott Cnty. Tobacco*

*Warehouses*, 5 Va. Cir. 75, 79 (Scott County Cir. Ct. 1983).  Neither part of that test is satisfied

here.

Treasury does not possess voting rights in the GSEs by virtue of its PSPAs, and as a

preferred shareholder its rights are entirely contractual.  The PSPAs create a liquidation

preference in favor of Treasury, but do not confer voting or control rights.  *See* Fannie Mae

Senior Preferred Stock Certificate § 5 (AR 36); Freddie Mac Senior Preferred Stock Certificate

§ 5 (AR 70) ("Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.").[17]  Nor do Treasury's warrants to purchase common stock confer any voting rights.  Moreover, even if Treasury did possess voting rights, it could not exercise them during the period of conservatorship; by statute, FHFA acceded to "all rights, titles, powers, and privileges of . . . any stockholder . . . of the regulated entity."  12 U.S.C. § 4617(b)(2)(A)(i).

Further, Treasury does not exercise control over the business and affairs of the GSEs.  FHFA, the conservator of the GSEs, is an independent regulator not subject to the direction or control of Treasury.  By statute, FHFA, "when acting as conservator . . . shall not be subject to the direction or supervision of any other agency of the United States."  *Id.* § 4617(a)(7).  The complaints, glossing over the independence of FHFA, claim that Treasury exercises actual control over the GSEs because (1) Treasury is their sole source of capital support during the conservatorship, and (2) Treasury must approve new debt and equity offerings by the GSEs.[18]  Perry Compl. ¶ 76; Fairholme Compl. ¶ 118; Arrowood Compl. ¶ 116; Class Action Compl. ¶ 177.  Nowhere in their complaints do the plaintiffs elucidate how either point satisfies the standard for "actual control."  The PSPAs are enforceable contractual agreements.  The fact that Treasury has made a binding commitment to provide funds to the GSEs is not a mechanism for controlling those companies.

---

[17]  The only voting power set forth in the Stock Certificate appears in Section 10(g), which states that the GSEs can amend the Certificate with the consent of the holders of Senior Preferred Stock.  Fannie Mae Senior Preferred Stock Certificate § 10(g) (AR 38-39); Freddie Mac Senior Preferred Stock Certificate § 10(g) (AR 72-73).

[18]  Treasury had the ability to approve new debt offerings by the GSEs under their charter acts, even prior to HERA.  *See* 12 U.S.C. §§ 1455(j), 1719(b).

Nor do the PSPAs' terms with respect to debt and equity offerings give Treasury "actual control." The PSPAs merely prevent the GSEs from taking on debt that exceeds a specified amount (originally 110% of their aggregate debt as of June 30, 2008; subsequently 120% of the portfolio cap). *See* Fannie Mae PSPA § 5.5 (AR 25); Freddie Mac PSPA § 5.5 (AR 59); First Amendment to Amended and Restated Fannie Mae PSPA § 7 (AR 167); First Amendment to Amended and Restated Freddie Mac PSPA § 7 (AR 172). Nor is Treasury's approval required for all equity offerings; rather, the GSEs must seek Treasury's approval before offering equity securities equal to, or on parity with, Treasury's senior preferred stock. Fannie Mae Stock Certificate § 9 (AR 37); Freddie Mac Stock Certificate § 9 (AR 71). None of the three complaints cites a single case in which a limitation on debt or equity issuance was deemed to give an outside entity actual control over the affairs of a corporation.

**D.      The Third Amendment Was the Result of Reasoned Decision Making**

Judicial review of agency action under the APA is meant to ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Highly deferential, '[t]he arbitrary and capricious standard . . . presumes the validity of agency action.'" *City of Portland, Oregon v. Envtl. Prot. Agency*, 507 F.3d 706, 713 (D.C. Cir. 2007) (quoting *Nat'l Ass'n of Clean Air Agencies v. Envtl. Prot. Agency*, 489 F.3d 1221, 1228 (D.C. Cir. 2007)). A reviewing court "must affirm the decision if we find that it is not contrary to law, that it is supported by substantial evidence and based upon a consideration of the relevant factors, and if we determine that the conclusions reached have a rational connection to the facts found." *Melcher v. FCC*, 134 F.3d 1143, 1152 (D.C. Cir. 1998) (citations and quotation marks omitted).

The purpose of the net worth sweep – the aspect of the Third Amendment challenged in these three cases – was to eliminate the vicious circle of the GSEs paying dividends to Treasury, drawing funds back from Treasury, and paying further dividends on those draws. In the second and third quarter of 2012, when Treasury was examining amending the PSPAs, this was a salient concern. The financial modeling employed by the GSEs, FHFA, and Treasury highlighted that a sizable portion of projected future GSE draws would be used to pay dividend payments to Treasury. OMB Presentation at 10-14 (AR 3784-3788).[19] In addition, FHFA's most recent stress tests on the GSEs at the time included a base and downside case with projections out to year 2014. FHFA, Projections of the Enterprises' Financial Performance (Oct. 27, 2011) (AR 1898-1912). By the end of 2012, total gross draws under the base case scenario were expected to reach approximately $142 billion at Fannie Mae and approximately $76 billion at Freddie Mac. *Id.* at 4 (AR 1901).

Treasury expected that financial markets would scrutinize the GSEs' expected losses and dividend payments relative to the level of remaining PSPA funding. Action Memorandum: Third Amendments to the Senior Preferred Stock Purchase Agreements with Fannie Mae and Freddie Mac (Aug. 15, 2012) (AR 4332). Minimizing additional draws after 2012 was important to maintain investor confidence in the adequacy of Treasury support to the GSEs. *Id.* The issue

---

[19] *See also* Freddie Mac 2011 Form 10K at 2 (AR 2772) ("Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period… it is unlikely that we will regularly generate net income . . . in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long-term financial sustainability. Continued cash payment of senior preferred dividends . . . will have an adverse impact on our future financial condition and net worth . . . ."); Fannie Mae 2011 Form 10K at 5-6 (AR 2400-01) ("We will continue to need funds from Treasury as a result of a number of factors, including the dividends we are required to pay Treasury on the senior preferred stock . . . . As a result of our draws, we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future.").

was not simply whether the GSEs would be profitable, but whether they would consistently earn enough to pay the fixed annual ten percent dividend to Treasury.  Though Freddie Mac was expected to be consistently net income positive by the end of 2012 and Fannie Mae by the end of 2013, over time, both institutions were expected to struggle to have sufficient income to pay the required ten percent dividend.  OMB Presentation at 13, 15 (AR 3787, 3789).  This was the result of the large dividends required on a yearly basis after 2012 on the cumulative liquidation preferences (*i.e.*, the aggregate senior preferred stock draws and the initial $2 billion commitment fee) and insufficient steady income at the GSEs, largely due to the contraction of their retained mortgage portfolios, going forward.  Treasury's Capital Support for the GSEs: Summary Review and Key Considerations at 4 (Aug. 8, 2012) (AR 3899) ("Longer term, the GSEs will not generate enough income to meet their dividend requirement due to the enterprises being wound down . . . .  Absent a change, this will lead to the GSE's insolvency as they will exhaust the finite amount of capital support remaining after 2012[.]"); *see also* Illustrative Financial Forecasts – Fannie Mae: Base Case and Stress Scenarios at 6-11 (July 2012) (AR 3889-3894) (noting projected reduction in Fannie Mae's income from investment portfolio).

As the GSEs continued to draw upon the PSPAs after December 31, 2012 to pay dividends back to Treasury, the total funding capacity under the PSPAs would have continued to dwindle.  Over the subsequent ten years, Treasury expected that the total remaining PSPA capacity under the base case scenario would decrease to approximately $39 billion at Fannie Mae and $137 billion at Freddie Mac.  OMB Presentation at 13, 15 (AR 3787, 3789).  Furthermore, under a downside scenario, cumulative gross draws could have reached $317 billion at Fannie Mae and $142 billion at Freddie Mac.  *Id.* at 14, 16 (AR 3788, 3790).  More significantly, under this scenario Fannie Mae would have exhausted its remaining capacity under its PSPA by 2021.

*Id.* at 14 (AR 3788).  As a result, absent policy action or a more material change in its earnings profile, Fannie Mae would have been at risk of insolvency.  Other market observers, including Moody's, shared this view.  Moody's: Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support at 2 (Sep. 26, 2011) (AR 1894) ("dividends on the US Treasury's senior preferred stock will eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022," even in the "unlikely" event "that the GSEs are able to fully offset credit losses").

These projections were shared by the GSEs, which stated throughout 2012 that they did not expect that they would ever generate sufficient earnings to consistently pay the ten percent dividend.  *See* Fannie Mae 2011 Form 10K at 21 (AR 2416); Freddie Mac 2011 Form 10K at 2 (AR 2772).  Outside forecasters offered similar projections.  A Moody's Issuer Comment from August 2012 characterized the GSEs' profitability as "fleeting": "Improving housing values will reduce [the GSEs'] credit losses in their mortgage portfolios. However, once the benefit of reserve release runs its course, we believe the government sponsored enterprises' ultimate path remains unchanged: they will deplete their capital bases because the dividends they'll be paying on their preferred securities will be greater than their earnings."  Moody's Issuer Comment: Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting (Aug. 13, 2012) (FHFA 4028).  A Barclay's report issued after Treasury and FHFA announced the Third Amendment also noted that the agreement was necessary to protect the long-term credit support for the GSEs. Barclays Interest Rates Research: Update: Treasury Changes the PSPAs: Initial Thoughts (Aug. 17, 2012) (FHFA 4049) ("Our baseline projections for GSE profitability have always assumed that legacy credit losses would be fully provisioned in 2012, allowing the GSEs to return to profitability even after the 10% dividend; we saw clear evidence of this in the Q2 results.

However, the primary driver of profitability was net interest income from the portfolio; as this was slated to shrink 10% per annum, it could not be counted on as a sustainable source of revenues.  As a result, we were more concerned about the viability of finite credit support 7-10y out, rather than in the near term.").  *See also* Deutsche Bank Outlook at 4-6 (Mar. 14, 2012) (AR 3251-53) ("Both Fannie Mae and Freddie Mac have subsequently said that the need to pay dividends to Treasury creates 'significant uncertainty about our long-term financial sustainability.'  That uncertainty puts both their MBS and debt at risk.").

In projecting the future earnings of the GSEs, Treasury projected the future path of housing prices, as well as the GSEs' earnings from guarantee fees and other ongoing operations. OMB Presentation at 12 (AR 3786).   That projection was supported by, among other things, FHFA's own projections about the profitability of the GSEs in future years, and projected draws in order to pay the fixed dividend.  FHFA, Projections of the Enterprises' Financial Performance (Oct. 27, 2011) (AR 1898-1912).  Such a predictive judgment, made in an area of the agency's expertise, is entitled to special deference.  *See, e.g., Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983) ("predictive judgments about areas that are within the agency's field of discretion and expertise" are entitled to "particularly deferential" treatment); *see also Nuvio Corp. v. FCC*, 473 F.3d 302, 306-07 (D.C. Cir. 2006) (deferring to predictive judgment of the FCC); *Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 44 (D.C. Cir. 2006) (same).

The Third Amendment solved the problem that the dividend structure of the PSPAs posed for the solvency of the GSEs.  Under the Third Amendment, the GSEs were assured that they would no longer need to draw funds from Treasury to pay dividends to Treasury.  OMB Presentation at 18 (AR 3792).  As a result, Treasury reasonably projected that its overall

investment in the GSEs and its ultimate return on that investment would remain materially the same, while improving investor confidence in the GSEs.  This would thereby improve the long-term viability of the enterprises.  *Id.* at 27-28 (AR 3801-3802).

Despite the foregoing, the individual plaintiffs contend that Treasury did not engage in reasoned decision making, because it purportedly failed to consider alternative solutions, such as "refinancing" the senior preferred stock, or permitting the GSEs to pay dividends to the junior shareholders.  Perry Compl., ¶ 73; Fairholme Compl., ¶ 115; Arrowood Compl., ¶ 89.  The plaintiffs fail to explain how their proposed alternatives could have accomplished the goals of maintaining the solvency of the GSEs while also protecting the interests of taxpayers, who had made an extraordinary investment of incalculable value in those enterprises.  The plaintiffs' proposal for the distribution of dividends to them and the other junior equity holders, for example, would only have served to worsen the condition of the GSEs' balance sheets, and would have done nothing to address the vicious circle created by the GSEs' dividend obligations to Treasury under the pre-Third Amendment PSPAs.  In sum, Treasury's decision to enter into the Third Amendment cannot "be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989).

The plaintiffs apparently recognize that Treasury was reasonable in its projections that the GSEs would be unlikely to be profitable enough, going forward, to meet their dividend obligations, absent the Third Amendment.  They also apparently recognize that Treasury's projections on this score are based in part (and reasonably so) on the fact that the GSEs are in the process of winding down their investment portfolios.  They accordingly seem to challenge, not only Treasury's decision to enter into the Third Amendment, but also the rational basis of the

underlying policy decision (made four years before the Third Amendment) to require the GSEs to wind down their investment portfolios.  *See, e.g.,* Perry Compl., ¶ 77; Fairholme Compl., ¶¶ 119-120; Arrowood Compl., ¶ 90.   But FHFA and Treasury, plainly, had a rational basis in 2008 to conclude that the GSEs' investment portfolios had grown too large.  Indeed, it was apparent at the time that the GSEs' losses, and their contribution to the larger financial crisis, were caused in substantial part by a financial model that had resulted in the GSEs' overwhelming losses in 2008.   Before the financial crisis, the widespread perception that the GSEs' losses "would be backstopped by the taxpayer" resulted in the overextension of the GSEs' investment portfolios, which ultimately resulted in the failure of the enterprises.  *See* Reforming America's Housing Finance Market at 8 (AR 213).   These risks had threatened the stability of the national housing market.  FHFA recognized, accordingly, that a reduction in the GSEs' portfolios was necessary to protect homeowners, taxpayers, and market participants and to "mitigate the systemic risk that contributed directly to instability in financial markets."  FHFA Strategic Plan at 8 (AR 2377).  FHFA and Treasury plainly acted reasonably to protect the national housing market from the risks that would be posed if the GSEs returned to the outsized role that they had played in that market before the financial crisis.

## III.   The Class Plaintiffs' Takings Claim Should Be Dismissed

The class plaintiffs also purport to bring a takings claim against Treasury.  Class Action Compl. ¶¶ 183-92.  This claim should be dismissed for three reasons.  First, under the Tucker Act, the Court of Federal Claims, and not this Court, holds exclusive jurisdiction over this claim. Second, the takings claim fails as a matter of law, given that (among other reasons) the plaintiffs lack any reasonable investment-backed expectation that they would receive dividends from the

GSEs, or that they would receive payment upon the GSE's liquidation.  Third, even if such an

expectation could be reasonable, such a claim is premature and should be dismissed as unripe.

### A.      This Court Lacks Jurisdiction Over the Takings Claim

Under the "Little Tucker Act," federal district courts have concurrent jurisdiction with

the United States Court of Federal Claims over civil actions or claims against the United States

"not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of

Congress, or any regulation of an executive department, or upon any express or implied contract

with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

28 U.S.C. § 1346(a)(2).  In contrast, under the "Big" Tucker Act, claims that exceed the $10,000

jurisdictional ceiling are within the exclusive jurisdiction of the Court of Federal Claims.  *See*

*United States v. Hohri*, 482 U.S. 64, 72 (1987); *Goble v. Marsh*, 684 F.2d 12, 15 (D.C. Cir.

1982).  Takings claims for just compensation fall under the Tucker Act, of course, and so must

be brought in the Court of Federal Claims if they exceed the $10,000 jurisdictional ceiling.

*Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 690 (D.C. Cir. 2000).

A plaintiff may bring his claim within the Little Tucker Act by waiving a right to any

award of more than $10,000.   *See Waters v. Rumsfeld*, 320 F.3d 265, 271 (D.C. Cir. 2003).

Such a waiver, however, must be "'clearly and adequately expressed.'"  *Id.* (quoting *Goble*, 684

F.2d at 17).  A plaintiff must "expressly disclaim" an award over $10,000 to bring his claim

within the Little Tucker Act.  The waiver generally "should be set forth in the initial pleadings."

*Stone v. United States*, 683 F.2d 449, 454 n.8 (D.C. Cir. 1982); *see also Bliss v. England*, 208

F. Supp. 2d 2, 7 (D.D.C. 2002).

The plaintiffs apparently base their claim of Little Tucker Act jurisdiction on their

definition of their putative "Takings Class," which would include persons who suffered less than

$10,000 in damages from the defendants' purported takings. Class Action Compl., ¶ 120. But no class has been certified, and the named plaintiffs must first show that this Court has jurisdiction over their individual claims before proceeding to questions of class certification. *See Disability Rights Council of Greater Washington v. WMATA*, 239 F.R.D. 9, 15-16 (D.D.C. 2006). None of the named plaintiffs in the class complaint has disclaimed an award over $10,000. Indeed, some of those plaintiffs are simultaneously pursuing the same takings claim in the Court of Federal Claims. Those plaintiffs, presumably, would not disavow any larger recovery from that court. *See* Complaint, *Cacciapalle v. United States*, No. 1:13-cv-00466-MMS (Fed. Cl. filed July 10, 2013) (claims of Joseph Cacciapalle and Melvin Bareiss); Complaint, *Am. European Ins. Co. v. United States*, No. 1:13-cv-00496-MMS (Fed. Cl. filed July 19, 2013); Complaint, *Dennis v. United States*, No. 1:13-cv-00542-MMS (Fed. Cl. filed Aug. 5, 2013).

In the absence of a clear and unequivocal waiver of a recovery greater than $10,000, the individual named plaintiffs cannot assert that this Court has jurisdiction over their claims under the Little Tucker Act. They should bring their takings claims (if any such claim would be viable) instead in the Court of Federal Claims – as some of the plaintiffs are, indeed, already doing.

### B.   Treasury Did Not Take the Plaintiffs' Property by Entering into the Third Amendment

The Fifth Amendment states that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. A two-part test applies to determine whether a compensable Fifth Amendment taking has occurred. The Court: (1) first determines whether the plaintiff has identified a cognizable property interest; and (2) then determines whether Government action amounted to a taking of the property interest. *See, e.g.*, *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377-78 (Fed. Cir. 2008); *Am. Pelagic Fishing Co,*

57

*L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  The Supreme Court has recognized

only two types of takings, neither of which has occurred here.  The first occurs through the

Government's physical invasion or appropriation of private property.  *See Lucas v. S.C. Coastal*

*Council*, 505 U.S. 1003, 1014-15 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458

U.S. 419, 427 (1982).  Second, a taking can also occur through Government regulations that

unduly burden private property interests.  *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

Because the class plaintiffs do not allege a physical taking of their property (nor could they;

Treasury has not physically occupied or seized any of the plaintiffs' property), their complaint

can only be understood to allege, at best, a regulatory taking.  As demonstrated below, plaintiffs'

allegations in this case do not satisfy even the most basic elements of a regulatory taking.

Moreover, Treasury cannot be liable for a taking when it acts as a market participant in its

proprietary capacity, rather than as the sovereign.

### 1.   The Plaintiffs Do Not Have Any Legally Cognizable Property Interest For Purposes Of A Takings Claim

The plaintiffs assert that Treasury has taken property from them by entering into the

Third Amendment, because it deprived them of the expectation either that they would receive

dividends from the GSEs, or that they would receive payment upon the GSEs' liquidation.  This

claim does not identify a legally cognizable property interest for purposes of a takings claim.

The longstanding authority of FHFA and its predecessor, OFHEO, to place the GSEs into

conservatorships and manage the GSEs' assets necessarily limits the plaintiffs' rights as

shareholders.  This limitation prevents the plaintiffs from asserting a legally cognizable property

interest in the GSEs' profits or assets when in conservatorship.

Property interests are, for takings purposes, limited by the statutory and regulatory

framework in existence when the property was acquired.  This legal framework inheres in the

property, negating any Fifth Amendment taking when the Government acts within the framework.  *See, e.g.*, *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 857-58 (Fed. Cir. 2009).  Shareholders, accordingly, lack any property interest cognizable under the Takings Clause in shares of entities that are in conservatorship or receivership, because the laws authorizing conservatorship and receivership actions inhere in, and thus limit, the plaintiffs' rights in those shares.  *See Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994); *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 (Fed. Cir. 1992); *see also Am. Cont'l Corp. v. United States*, 22 Cl. Ct. 692, 701 (1991).  Specifically, regulated financial institutions lack "the fundamental right to exclude the government from [their] property;" therefore, shareholders in those institutions "held less than the full bundle of property rights."  *See Golden Pacific*, 15 F.3d at 1073-74 (internal quotation omitted).

The same result holds here.  Since their inception, the GSEs have been subject to federal oversight and regulation.  Further, Fannie Mae and Freddie Mac have been subject to appointment of a conservator, first under the Safety and Soundness Act, 12 U.S.C. § 4619, and more recently under HERA, 12 U.S.C. § 4617.  Congress granted FHFA the authority, with or without the consent of the enterprises or their shareholders, to appoint a conservator "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."  12 U.S.C. § 4617(a)(2).  In conservatorship, FHFA is authorized to take over the assets and conduct the business of the enterprises, with all the powers of shareholders, directors, and officers.   12 U.S.C. § 4617(b)(2).  This statutory authority includes the authority to "transfer or sell any asset or liability" of the enterprise.  12 U.S.C. § 4617(b)(2)(G).  Not only does HERA give FHFA the authority to operate the GSEs, the statute broadly authorizes FHFA to take any action that FHFA

determines to be in the best interests of the enterprises.  12 U.S.C. § 4617(b)(2)(J).  These

statutes, as well as regulations promulgated pursuant to those statutes, are the "background

principles" of federal law that inhere in the plaintiffs' property interests as shareholders.  *See*

*Acceptance Ins. Cos.*, 583 F.3d at 857-58; *see also Maritrans, Inc. v. United States*, 342 F.3d

1344, 1352 (Fed. Cir. 2003).

      For this reason, the plaintiffs lack the cognizable property interest that is necessary for a

takings claim.  Their alleged property rights are nearly identical to those rejected in *Golden*

*Pacific* and *California Housing Securities*.  Like the regulators in *Golden Pacific* and *California*

*Housing Securities*, FHFA possessed the statutory right to place the GSEs into conservatorships,

and this right inhered in the plaintiffs' shares.  As shareholders in regulated financial institutions,

the plaintiffs lack the right to exclude others, and specifically lack the right to exclude federal

regulators.  *See Golden Pacific*, 15 F.3d at 1073-74.  Moreover, the plaintiffs chose to invest in

regulated entities.  *See id.* at 1073 ("Golden Pacific voluntarily entered into the highly regulated

banking industry by choosing to invest in the Bank.").  For these reasons, the plaintiffs' asserted

property interests are non-cognizable and non-compensable for purposes of a taking.

      Here, the plaintiffs assert that the Government took their shareholder rights to a dividend.

Yet, shareholders in the GSEs do not possess an unfettered right to a dividend; indeed, the

PSPAs explicitly prohibited the payment of dividends absent Treasury's approval.  Indeed, the

plaintiffs have no right to expect that FHFA, as conservator, will act in any particular fashion

when managing the enterprises.  FHFA possesses authority to manage the enterprises' earnings

or assets during the conservatorships, and shareholders do not have the right to exclude FHFA

from that management.  The absence of any legally cognizable property interest defeats the

plaintiffs' takings claim.

## 2.   Treasury Has Not Taken Any of the Plaintiffs' Property Interests

Even if conservatorship of a regulated financial institution could give rise to a takings claim, which it cannot, the plaintiffs fail to explain how the Government's actions constitute a taking under the Fifth Amendment.  The plaintiffs do not allege a physical taking of their property, nor could they.  *See Cal. Housing Sec.*, 959 F.2d at 958; *Golden Pacific*, 15 F.3d at 1073-74.  The plaintiffs' claim can only be understood to allege that the Third Amendment amounted to a regulatory taking.  No such regulatory taking occurred.

The plaintiffs have not alleged a valid regulatory taking, either under a categorical or balancing analysis.  Under a categorical, or "total wipeout," theory, a taking may be established by showing that a "regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015.  The Supreme Court, however, has explained that the categorical takings analysis introduced by *Lucas* applies only in the "relatively rare" and "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  *Id.* at 1017-18 (emphasis in original).  "The categorical rule . . . applied in *Lucas* states that compensation is required when a regulation deprives an owner of '*all* economically beneficial uses' of his land."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (emphasis in original).  *Lucas* thus applies only to allegations regarding real property.  *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007) ("*Lucas* protects real property only"); *see also Branch*, 69 F.3d at 1576 (finding, based on *Lucas*, that principles of takings law applicable to real property do not apply to statutes imposing monetary liability).  Real property is not at issue here.[20]

---

[20]  Moreover, *Lucas* requires a deprivation of all beneficial use of property.  *Lucas*, 505 U.S. at 1019.  Thus, even if the reasoning in *Lucas* could be extended to the facts of this case, plaintiffs

In the absence of a categorical taking, the plaintiffs' regulatory takings claim is governed by *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). *See Cienega Gardens v. United States*, 331 F.3d 1319, 1337 (Fed. Cir. 2003); *Building Owners & Mgrs. Ass'n Int'l v. FCC*, 254 F.3d 89, 99 (D.C. Cir. 2001). The *Penn Central* inquiry looks at three factors: (1) the economic impact of the regulation, (2) the extent to which the regulation interferes with investment-backed expectations, and (3) the nature or character of the governmental action. 438 U.S. at 124. Failure to meet one of the three factors is usually fatal to a *Penn Central* takings claim. *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 511 (2009). The plaintiffs, however, fail to explain how their claim satisfies any of these three factors.

First, the plaintiffs have failed to show that the Third Amendment had any economic impact upon their dividend or liquidation rights. The GSEs, after all, were placed into conservatorship because they were at the brink of insolvency, and would have been liquidated absent Treasury's extraordinary commitment and provision of hundreds of billions of dollars to those entities. Indeed, since the formation of the PSPAs, the GSEs have been prohibited from distributing dividends to junior shareholders. Moreover, in the event of receivership, junior shareholders would receive no more than what they would have received if the entities had liquidated in 2008. *See* 12 U.S.C. § 4617(e). Because "[t]he existence of economic injury is indispensable to demonstrating a regulatory taking," *Seiber v. United States*, 364 F.3d 1356, 1370 (Fed. Cir. 2004), the takings claim thus fails.

---

could not establish a "total wipeout" of their property. Indeed, notwithstanding the execution of the PSPAs, including the Third Amendment, the plaintiffs still own their preferred shares, the shares retain value as traded equities, and the share prices have fluctuated since FHFA placed the GSEs into conservatorships. Thus, the plaintiffs cannot establish a "total wipeout" of share value.

Second, shareholders do not have reasonable investment-backed expectations that highly-regulated entities, such as the GSEs, will not be placed into conservatorship or receivership.  *See Golden Pacific*, 15 F.3d at 1074-75; *Cal. Hous. Sec.*, 959 F.2d at 958-59; *see also Am. Cont'l Corp.*, 22 Cl. Ct. at 697.  The Government's exercise of its long-standing authority to place the GSEs into conservatorship, and to take authorized actions during that conservatorship, cannot give rise to a "taking."  *See Golden Pacific*, 15 F.3d at 1074; *Cal. Hous. Sec.*, 959 F.2d at 958-59.  Given the prohibition in the PSPAs against the distribution of dividends to junior shareholders, and the statutory limit on the junior shareholders' liquidation preference, the plaintiffs cannot credibly contend that they possessed reasonable expectations to receive these payments at any time, much less while the GSEs are in conservatorship.

Third, with respect to the nature or character of the governmental action, the analysis focuses on the question of whether the plaintiffs are being forced to bear a financial burden that should properly fall on the greater public.  *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1282 (Fed. Cir. 2009).  "[I]t is rational to attempt to impose the costs inherent in a certain type of business activity on 'those who have profited from the fruits' of the business in question."  *Branch*, 69 F.3d at 1580 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18 (1976)).  This factor weighs heavily against any takings liability.  Shareholders in the GSEs have benefitted for years from those entities' unique relationship with the Government.  In the American system of finance, shareholders should, properly, absorb any costs that arose from their investments.  In the case of Fannie Mae and Freddie Mac, however, shareholders have not borne those costs; instead, Treasury committed and provided hundreds of billions of dollars to rescue the entities leading up to the financial crisis of 2007 and 2008.  Having gained that benefit, the shareholders cannot credibly claim that the Fifth Amendment demands that Treasury

compensate them further for their investment.  Under *Penn Central*, the character of the

Government's actions undermines the plaintiffs' takings claim.

### 3. Treasury Cannot Be Subject To Takings Liability, Because It Entered into the Third Amendment as a Market Participant

The plaintiffs do not allege any action or conduct by the United States that triggers an

obligation to provide compensation under the Fifth Amendment.  They instead base their claims

upon Treasury's contracts with FHFA, acting on behalf of the enterprises as conservator.  *See*

Class Action Compl., ¶¶ 183-92.  Takings claims, however, cannot be premised upon

Government action undertaken in a proprietary or commercial capacity.  *See, e.g., Alaska*

*Airlines v. Johnson*, 8 F.3d 791, 798 (Fed. Cir. 1993).  When it agreed with FHFA to modify the

PSPAs (and, indeed, when it chose to invest in the GSEs in the first place), Treasury was a

commercial actor acting as an investor entering into a contractual relationship.  Thus, the

execution of the Third Amendment could not have triggered any Fifth Amendment obligations.

Any liability on Treasury's part, then, must be based on some source of law other than the

Takings Clause; as shown above, however, no such liability exists.

For purposes of the Takings Clause, there is a fundamental distinction between actions of

the Government as sovereign and actions undertaken in a commercial or proprietary capacity.

When the United States "comes down from its position of sovereignty and enters the domain of

commerce," it acts "in its proprietary capacity and not in its sovereign capacity."  *Sun Oil Co. v.*

*United States*, 572 F.2d 786, 818 (Ct. Cl. 1978); *see also Cox v. Kurt's Marine Diesel of Tampa,*

*Inc.*, 785 F.2d 935, 936 (11th Cir. 1986) ("in its proprietary capacity the government's activities

are analogous to those of a private concern").

The Government's powers to condemn and regulate private property are uniquely

sovereign.  The "scope of the 'public use' requirement of the Takings Clause is coterminous with

the scope of a sovereign's police powers." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984) (internal quotes omitted).  The Takings Clause of the Fifth Amendment can require compensation when the Government exercises such sovereign powers.  *See, e.g.*, *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005).  Conversely, where the Government "comes down from its position of sovereignty and enters the domain of commerce," the Takings Clause has no role.  *Sun Oil*, 572 F.2d at 818; *see also Alaska Airlines*, 8 F.3d at 798.  Moreover, for purposes of the Takings Clause, the Government acts in its proprietary capacity when it participates in the marketplace, regardless of the public policy objectives underlying its actions.  *See St. Christopher Assocs., LP v. United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008) (HUD acted in proprietary capacity in making loans, notwithstanding objective to provide affordable housing);

The putative class plaintiffs base their takings claim, not on any action taken by Treasury in the exercise of sovereign powers, but instead on Treasury's agreement with FHFA to modify their commercial arrangement, the PSPAs.  Because Treasury's action was undertaken in a proprietary capacity, and indeed was the sort of arrangement that a private party might demand in similar circumstances, that action cannot give rise to a takings claim.  *See St. Christopher Assocs.*, 511 F.3d at 1385  ("takings claims do not arise [where] the government is acting in its proprietary rather than its sovereign capacity."); *Alaska Airlines*, 8 F.3d at 798 (holding that "actions . . . taken in apparent good faith in the government's proprietary capacity, not in its sovereign capacity, . . . did not constitute a taking"); *Sun Oil*, 572 F.2d at 818 (rejecting taking claim where the United States acted "in a proprietary capacity rather than a sovereign capacity").  The takings claim should be dismissed for this reason, as well.

**C.      The Takings Claim Is Not Ripe For Judicial Review**

In any event, the Court should dismiss plaintiffs' takings claims on ripeness grounds, because the claims are contingent on uncertain, future events.  The ripeness doctrine is "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation omitted).  The doctrine recognizes the principle that "federal courts may exercise power only in the last resort, and as a necessity."  *Allen v. Wright*, 468 U.S. 737, 752 (1984) (internal quotation omitted).  Thus, "[r]efusing to involve the courts in ongoing administrative matters both protects judicial resources and comports with the judiciary's role as the governmental branch of last resort."  *In re Aiken County*, 645 F.3d 428, 434 (D.C. Cir. 2011).

A claim is not ripe for judicial review when it is "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all."  *Texas*, 523 U.S. at 300.  In determining whether a case is prudentially ripe, the court looks to two issues:  first, the "'fitness of the issues for judicial decision,'" and, second, "the extent to which withholding a decision will cause 'hardship to the parties.'"  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Labs.*, 387 U.S. at 149).

The plaintiffs contend that the execution by FHFA of the Third Amendment diminished their right to dividends declared by the GSEs.  Class Action Compl., ¶ 188 (asserting property right in "share of the Companies' future earnings").  They also contend that the Third Amendment diminished their right to receive payment in liquidation of the entities.  *Id.*, ¶ 189.  These allegations, however, are premature.  As discussed above, before they entered into the Third Amendment, the GSEs were required to pay a fixed dividend to Treasury, in the amount of 10% of the funds that Treasury had provided to the entities.  After the Third Amendment, Fannie

Mae and Freddie Mac owe nothing to Treasury if they have a net worth deficit.  It is purely conjectural to assume that the GSEs will be profitable over the entire period of the conservatorships.  If one or both of the GSEs were to suffer a setback, Treasury would earn nothing under the Third Amendment, notwithstanding its substantial investment of taxpayer dollars and the possibility that it will face additional outlays.  For this reason, an award of "just compensation" on the terms urged by plaintiffs could result in a substantial and unjust windfall to them.

Indeed, there is no guarantee that the GSEs will not make additional draws from Treasury under the PSPAs, in addition to the more than $187 billion that Treasury has already provided to them.  The question whether the Government has "taken" any money from plaintiffs is thus "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300.  The ultimate effect of the conservatorship and Third Amendment on the enterprises is unknown, and any loss of dividends allegedly stemming from these actions is purely hypothetical and speculative.  *See OMYA, Inc. v. FERC*, 111 F.3d 179, 182 (D.C. Cir. 1997).

Finally, whether and when Fannie Mae and/or Freddie Mac will emerge from conservatorships is unknown.  Additional action will – eventually – determine when and how the conservatorships end.  Congress may take action, or FHFA may ultimately decide to end the conservatorship or place the enterprises into receivership.  The effect of the Third Amendment on the plaintiffs' claim to a dividend, or to a liquidation preference, cannot be known while the conservatorships remain in place.  Thus, at a minimum, the conservatorships must end before the plaintiffs' claims can ripen.  *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652,

658-59 (2003). Accordingly, plaintiffs' takings claim is not ripe for judicial review. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 735 (1997).

## Conclusion

For the foregoing reasons, the complaints should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of jurisdiction, or Rule 12(b)(6) of those Rules for failure to state a claim. In the alternative, summary judgment should be awarded in favor of the Treasury defendants pursuant to Federal Rule of Civil Procedure 56.

Dated: January 17, 2014

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

DIANE KELLEHER
Assistant Branch Director

  /s/ Joel McElvain
JOEL McELVAIN
THOMAS D. ZIMPLEMAN
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
(202) 514-2988
Joel.McElvain@usdoj.gov

*Counsel for the Treasury Defendants*