# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PERRY CAPITAL LLC**,                        )
                                              )
      Plaintiff,                        )
                                              )
      v.                                )     Case No. 1:13-cv-1025-RCL
                                              )
**JACOB J. LEW**, in his official capacity as )
Secretary of the Treasury, *et al.*,          )
                                              )
      Defendants.                       )
_____ )
**FAIRHOLME FUNDS, INC.**, *et al.*,          )
                                              )
      Plaintiffs,                       )
                                              )
      v.                                )     Case No. 1:13-cv-1053-RCL
                                              )
**FEDERAL HOUSING FINANCE AGENCY**,           )
*et al.*,                                     )
                                              )
      Defendants.                       )
_____ )
**ARROWOOD INDEMNITY COMPANY**,               )
*et al.,*                                     )
                                              )
      Plaintiffs,                       )
                                              )
      v.                                )     Case No. 1:13-cv-01439-RCL
                                              )
**FEDERAL NATIONAL MORTGAGE**                 )
**ASSOCIATION**, *et al.*,                    )
                                              )
      Defendants.                       )
_____ )
**In re Fannie Mae/Freddie Mac Senior**       )
**Preferred Stock Purchase Agreement Class**  )
**Action Litigations**                        )     Misc. Action No. 1:13-mc-1288-RCL
_____                       )
                                              )
This document relates to:                     )
ALL CASES                                     )
_____ )

## TREASURY DEFENDANTS' REPLY IN SUPPORT OF THEIR DISPOSITIVE MOTIONS AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTIONS

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................6

I.  The Court Does Not Have Jurisdiction Over the Plaintiffs' Claims....................................6

    A.  Section 4617(f) of HERA Bars the Plaintiffs' APA Claims....................................6

    B.  Section 4617(f) Also Bars the Plaintiffs' Claims Against Treasury......................11

    C.  HERA's Stockholder Rights Provision Precludes the Plaintiffs' Lawsuits ...................................................................................15

        1.  The plaintiffs' claims are derivative ........................................................15

        2.  HERA bars direct claims during the conservatorship of the GSEs...................................................................................20

        3.  There is no conflict of interest exception applicable to the plaintiffs' claims ...................................................................22

    D.  The Plaintiffs Do Not Have Prudential Standing...................................................23

II.  The Plaintiffs' APA and Fiduciary Duty Claims Fail on the Merits ...............................26

    A.  The Third Amendment Was Not a "Purchase" of Securities................................26

        1.  The Third Amendment was an exercise of rights received in connection with the PSPAs...................................................26

        2.  The Third Amendment was not a purchase of securities...........................29

    B.  Treasury Did Not Breach Any Fiduciary Duty to the Plaintiffs ...........................38

    C.  The Third Amendment Was the Result of Reasoned Decision Making................43

        1.  Treasury reasonably addressed the circularity of payments between the GSEs and Treasury, a practice that threatened to exhaust the GSEs' draw capacity and endanger their future viability .........................43

        2.  Treasury did not fail to consider reasonable alternatives to the Third Amendment ...................................................................48

i

III.    The Class Plaintiffs' Takings Claim Should Be Dismissed ............................................... 52

        A.    This Court Lacks Jurisdiction Over the Takings Claim ........................................ 52

        B.    Treasury Did Not Take the Plaintiffs' Property by Entering into
              the Third Amendment ........................................................................................... 53

              1.    The plaintiffs do not have any legally cognizable property
                    interest for purposes of a takings claim ..................................................... 53

              2.    Treasury has not taken any of the plaintiffs' property interests ................ 56

              3.    Treasury cannot be subject to taking liability, because it entered
                    into the Third Amendment as a market participant ................................... 58

        C.    The Takings Claim Is Not Ripe For Judicial Review ........................................... 59

CONCLUSION ..................................................................................................................... 60

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.,*
    38 F.3d 211 (5th Cir. 1994) .............................................................................32

*A & D Auto Sales v. United States,*
    --- F.3d ---, 2014 WL 1345499 (Fed. Cir. Apr. 7, 2014) ............................................56, 59

*Abbott Building Corp. v. United States,*
    951 F.2d 191 (9th Cir. 1991) .............................................................................13

*Agostino v. Hicks,*
    845 A.2d 1110 (Del. Ch. 2004)..........................................................................17

*Alaska Airlines, Inc. v. Johnson,*
    8 F.3d 791 (Fed. Cir. 1993) ..............................................................................58

*Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004) ............................................................................39

*Allard v. Arthur Andersen & Co. (U.S.A.),*
    957 F. Supp. 409 (S.D.N.Y. 1997)......................................................................36

*Am. Airways Charters, Inc. v. Regan,*
    746 F.2d 865 (D.C. Cir. 1984) ..........................................................................26

*Am. Immigration Lawyers Ass'n v. Reno,*
    199 F.3d 1352 (D.C. Cir. 2000) .........................................................................24

*Am. Petroleum Inst. v. EPA,*
    683 F.3d 382 (D.C. Cir. 2012) ..........................................................................59

*Andrews v. Powell,*
    242 S.W.2d 656 (Tex. Civ. App. 1951) ................................................................28

*Arizona v. United States,*
    132 S. Ct. 2492 (2012)...................................................................................41

*Art Metal-U.S.A., Inc. v. United States,*
    753 F.2d 1151 (D.C. Cir. 1985) .........................................................................40

*Bank of Am. Nat. Ass'n v. Colonial Bank,*
    604 F.3d 1239 (11th Cir. 2010) .......................................................................7, 9

*Bruesewitz v. Wyeth,*
    131 S. Ct. 1068 (2011) ........................................................................33

*Bursik v. One Fourth St. N., Ltd.,*
    84 F.3d 1395 (11th Cir. 1996) ...........................................................7

*In re CNX Gas Corp. S'holders Litig.,*
    4 A.3d 397 (Del. Ch. 2010)................................................................42

*Cal. Hous. Sec., Inc. v. United States,*
    959 F.2d 955 (Fed. Cir. 1992).............................................54, 55, 56, 57

*Cede & Co. v. Technicolor, Inc.,*
    634 A.2d. 345 (Del. 1993) ................................................................40

*Childress v. City of Richmond,*
    134 F.3d 1205 (4th Cir. 1998) ........................................................24

*Cnty. of Sonoma v. FHFA,*
    710 F.3d 987 (9th Cir. 2013) .............................................................6

*Courtney v. Halleran,*
    485 F.3d 942 (7th Cir. 2007) ...........................................................8

*Delta Air Lines, Inc. v. Export-Import Bank of United States,*
    718 F.3d 974 (D.C. Cir. 2013)........................................................52

*Delta Savings Bank v. United States,*
    265 F.3d 1017 (9th Cir. 2001) ........................................................22

*Dickson v. Sec'y of Def.,*
    68 F.3d 1396 (D.C. Cir. 1995) ........................................................11

*Dietrich v. Harrer,*
    857 A.2d 1017 (Del. Ch. 2004)........................................................16

*Disability Rights Council of Greater Washington v. WMATA,*
    239 F.R.D. 9 (D.D.C. 2006)...........................................................53

*Dittmer Properties, L.P. v. FDIC,*
    708 F.3d 1011 (8th Cir. 2013) ........................................................12

*Dolan v. U.S. Postal Serv.,*
    546 U.S. 481 (2006).......................................................................40

*ECCO Plains, LLC v. United States,*
    728 F.3d 1190 (10th Cir. 2013) ..............................................................13

*Ebasco Servs., Inc. v. Bajbek,*
    284 P.2d 459 (Ariz. 1955)........................................................................28

*Emery v. Boston Terminal Co.,*
    178 Mass. 172 (1901) .............................................................................28

*Esther Sadowsky Testamentary Trust v. Syron,*
    639 F. Supp. 2d 347 (S.D.N.Y. 2009).....................................................19

*FAIC Sec. Inc. v. United States,*
    768 F.2d 352 (D.C. Cir. 1985) ...........................................................24, 25

*In re Fed. Home Loan Mtge. Corp. Derivative Litig.,*
    643 F. Supp. 2d 790 (E.D. Va. 2009), *aff'd,* 434 F. App'x 188 (4th Cir. 2011)..........12, 19

*First Hartford Corp. Pension Plan & Trust v. United States,*
    194 F.3d 1279 (Fed. Cir. 1999)...............................................................22

*Fleet Nat. Bank v. Trans World Airlines, Inc.,*
    767 F. Supp. 510 (S.D.N.Y. 1991).........................................................28

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985).................................................................................52

*Freeman v. FDIC,*
    56 F.3d 1394 (D.C. Cir. 1995) ..................................................................7

*Furgatch v. Resolution Trust Corp.,*
    No. 93-20304 SW, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993)................9, 13

*GAF Corp. v. United States,*
    818 F.2d 901 (D.C. Cir. 1987) .................................................................40

*Gentile v. Rossette,*
    906 A.2d 91 (Del. 2006) ..........................................................................18

*Gilardi v. U.S. Dep't of Health and Human Res.,*
    733 F.3d 1208 (D.C. Cir. 2013)...............................................................26

*Golden Pac. Bancorp v. United States,*
    15 F.3d 1066 (Fed. Cir. 1994)..................................................54, 55, 56, 57

*Gross v. Bell Sav. Bank PaSa,*
  974 F.2d 403 (3d Cir. 1992) ................................................................ 7, 10

*Grupo Dataflux v. Atlas Global Group, L.P.,*
  541 U.S. 567 (2004) ........................................................................... 53

*Hawkeye Commodity Promotions, Inc. v. Vilsack,*
  486 F.3d 430 (8th Cir. 2007) .............................................................. 56

*Heartland Regional Med. Ctr. v. Sebelius,*
  566 F.3d 193 (D.C. Cir. 2009) ............................................................ 52

*Helmerich & Payne v. Int'l Drilling Co.,*
  No. 11-cv-1735(RLW), 2013 WL 5290126 (D.D.C. Sept. 20, 2013) ......................... 25, 26

*Henrichs v. Valley View Development,*
  474 F.3d 609 (9th Cir. 2007) .............................................................. 14

*Hindes v. FDIC,*
  137 F.3d 148 (3d Cir. 1998) ............................................................... 12

*Hines v. Davidowitz,*
  312 U.S. 52 (19841) ........................................................................ 41

*Houlihan v. Anderson-Stokes, Inc.,*
  434 F. Supp. 1330 (D.D.C. 1977) .......................................................... 33

*Int'l Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983) ............................................................ 44

*Isquith by Isquith v. Caremark Int'l, Inc.,*
  136 F.3d 531 (7th Cir. 1998) .............................................................. 32

*Jacobson v. AEG Capital Corp.,*
  50 F.3d 1493 (9th Cir. 1995) ........................................................... 32, 34

*Jerome Stephen Pharms. Inc. v. FDA,*
  402 F.3d 1249 (D.C. Cir. 2005) ........................................................... 40

*Katz v. Gerardi,*
  655 F.3d 1212 (10th Cir. 2011) ........................................................... 32

*Kellmer v. Raines,*
  674 F.3d 848 (D.C. Cir. 2012) ..................................................... *passim*

*Koontz v. St. Johns River Water Mgt. Dist.*,
133 S.Ct. 2586 (2013)................................................................56

*Koppel v. Wien*,
575 F. Supp. 960 (S.D.N.Y. 1983)...............................................34

*Kuriakose v. Fed. Home Loan Mtge. Corp.*,
674 F. Supp. 2d 483 (S.D.N.Y. 2009)...........................................12

*La. Mun. Police Employees Ret. Sys. v. FHFA*,
434 F. App'x 188 (4th Cir. 2011)..................................................12

*Lee v. Bossung*,
127 Ind. App. 388, 138 N.E.2d 913 (1956) ..................................28

*Leon Cnty. v. FHFA*,
700 F.3d 1273 (11th Cir. 2012) ......................................................6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014)..................................................................25

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992)....................................................................56

*MBIA Ins. Corp. v. FDIC*,
816 F. Supp. 2d 81 (D.D.C. 2011) *aff'd*, 708 F.3d 234 (D.C. Cir. 2013)...........................9

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ......................................................39

*Melcher v. FCC*,
134 F.3d 1143 (D.C. Cir. 1998) ....................................................43

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*,
854 A.2d 121 (Del. Ch. 2004)......................................................17

*Mid-State Products Co. v. Commodity Credit Corp.*,
196 F.2d 416 (7th Cir. 1952) ........................................................28

*Miller v. Kemp*,
160 S.E. 203 (Va. 1931)................................................................28

*Murphey v. Hillwood Villa Associates*,
411 F. Supp. 287 (S.D.N.Y. 1976)................................................32

*Nat'l Cottonseed Products Ass'n v. Brock,*
   825 F.2d 482 (D.C. Cir. 1987) .......................................................................25

*Nat'l Trust for Historic Pres. v. FDIC,*
   995 F.2d 238 (D.C. Cir. 1993), *aff'd and reinstated on reh'g,*
   21 F.3d 469 (D.C. Cir. 1994) ................................................................. *passim*

*Northland Capital Corp. v. Silver,*
   735 F. 2d 1421 (D.C. Cir. 1984) ...................................................................33

*OMYA, Inc. v. FERC,*
   111 F.3d 179 (D.C. Cir. 1997), "[u]ntil ........................................................60

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.,*
   --- S. Ct. ---, 2014 WL 1672251 (Apr. 29, 2014) .........................................30

*Olcott v. Fond du Lac Cnty.,*
   83 U.S. 678 (1872)..........................................................................................28

*PBGC v. LTV Corp.,*
   496 U.S. 633 (1990).........................................................................................39

*Pareto v. FDIC,*
   139 F.3d 696 (9th Cir. 1998) ..........................................................................20

*Penn Central Transportation Co. v. City of New York,*
   438 U.S. 104 (1978)......................................................................................5, 57

*Plaintiffs in All Winstar-Related Cases v. United States,*
   44 Fed. Cl. 3 (1999) ........................................................................................21

*Rawoof v. Texor Petroleum Co., Inc.,*
   521 F.3d 750 (7th Cir. 2008) ..........................................................................24

*Res. Invs., Inc. v. United States,*
   85 Fed. Cl. 447 (2009) ....................................................................................57

*Robotti & Co. v. Liddell,*
   2010 WL 157474 (Del. Ch. Jan. 14, 2010)....................................................17

*Rose Acre Farms, Inc. v. United States,*
   559 F.3d 1260 (Fed. Cir. 2009).......................................................................58

*SEC v. Jakubowski,*
   150 F.3d 675 (7th Cir. 1998) ..........................................................................33

*SEC v. Nat'l Secs., Inc.,*
   393 U.S. 453 (1969)...................................................................................................36

*Sacks v. Reynolds Sec., Inc.,*
   593 F.2d 1234 (D.C. Cir. 1978) .................................................................................33

*In re Sea-Land Corp.,*
   1987 WL 11283 (Del. Ch. 1987) ...............................................................................42

*Simmons v. Miller,*
   544 S.E.2d 666 (Va. 2001)........................................................................................16

*Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel,*
   20 F.3d 1311 (4th Cir. 1994) ....................................................................................24

*St. Christopher Assocs., L.P. v. United States,*
   511 F.3d 1376 (Fed. Cir. 2008)..................................................................................58

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.,*
   742 F.3d 37 (2d Cir. 2014).................................................................................41, 42

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.,*
   906 F. Supp. 2d 202 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014) ........................42

*Stone v. United States,*
   683 F.2d 449 (D.C. Cir. 1982) .............................................................................52, 53

*Superior Vison Servs. v. ReliaStar Life Ins. Co.,*
   2006 WL 2521426 (Del. Ch. 2006) ...........................................................................43

*In re Syncor International Corp. Shareholders Litig.,*
   857 A.2d 994 (Del. Ch. 2004)....................................................................................17

*Telematics Int'l, Inc. v. NEMLC Leasing Corp.,*
   967 F.2d 703 (1st Cir. 1992)......................................................................................12

*Teskey v. M.P. Metal Products, Inc.,*
   795 F.2d 30 (7th Cir. 1986) .......................................................................................31

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) ............................................................................16, 17, 18

*Town of Babylon v. FHFA,*
   699 F.3d 221 (2d Cir. 2012).........................................................................................6

*In re Troutman Enterprises, Inc.,*
    286 F.3d 359 (6th Cir. 2002) ...................................................................................24

*Trusted Integration, Inc. v. United States,*
    679 F. Supp. 2d 70 (D.D.C. 2010) ..........................................................................40

*U.S. v. Anthony Grace & Sons, Inc.,*
    384 U.S. 424 (1966) .................................................................................................28

*Union Nat'l Bank of Chicago v. Weaver,*
    604 F.2d 543 (7th Cir. 1979) ...................................................................................50

*United States v. Petty Motor Co.,*
    327 U.S. 372 (1946) .................................................................................................28

*United States v. Rodgers,*
    461 U.S. 677 (1983) .................................................................................................11

*Venetian Casino Resort, L.L.C. v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) .................................................................................39

*Volges v. Resolution Trust Corp.,*
    32 F.3d 50 (2d Cir. 1994) ......................................................................................7, 8

*Ward v. Resolution Trust Corp.,*
    996 F.2d 99 (5th Cir. 1993) .................................................................................7, 8, 9

*Waters v. Rumsfeld,*
    320 F.3d 265 (D.C. Cir. 2003) .................................................................................52

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007) .....................................................................................................41

*Williamson Cnty. Regional Planning Comm'n v. Hamilton Bank,*
    473 U.S. 172 (1985) .................................................................................................60

*Wis. Real Estate Investment Trust v. Weinstein,*
    781 F.2d 589 (7th Cir. 1986) ...................................................................................31

*Zimmerman v. Crothall,*
    62 A.3d 676 (Del. Ch. 2013) ...................................................................................42

**Statutes:**

5 U.S.C. § 701(a) ...............................................................................................................6
12 U.S.C. § 1455(*l*) .........................................................................................................26

12 U.S.C. § 1464(d) .................................................................................................13

12 U.S.C. § 1719(g) ...........................................................................................*passim*

12 U.S.C. § 1821(d) .................................................................................................21

12 U.S.C. § 1821(j) ............................................................................................*passim*

12 U.S.C. § 4617(a) ...........................................................................................10, 54

12 U.S.C. § 4617(b) ...........................................................................................*passim*

12 U.S.C. § 4617(e) .......................................................................................55, 57, 60

12 U.S.C. § 4617(f) ............................................................................................*passim*

12 U.S.C. § 4617(k) .................................................................................................60

28 U.S.C. § 1346(a) ...........................................................................................39, 52

28 U.S.C. § 1491 ......................................................................................................39

28 U.S.C. § 2675 ......................................................................................................40

28 U.S.C. § 2680 ......................................................................................................40

**Rules and Regulations:**

26 C.F.R. § 1.1001-1(a) ...........................................................................................37

26 C.F.R. § 1.1001-3(a) ...........................................................................................37

**INTRODUCTION**

Providing further proof that no good deed goes unpunished, the plaintiffs in these actions seek judicial relief as a result of the Department of Treasury's and the Federal Housing Finance Agency's ("FHFA") unparalleled actions to rescue and stabilize the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "the GSEs").  In September 2008, Treasury committed massive taxpayer funds to the GSEs, ultimately providing over $187 billion in taxpayer funds (and committing over $258 billion more) to cure their insolvency.  Without this capital infusion, both enterprises would have been placed in mandatory receivership.  Their failure and subsequent liquidation in receivership would have had dire consequences for mortgage markets and the larger economy.

In return for its investment, Treasury received valuable rights, including senior preferred stock, the right to collect dividends equal to ten percent annually of the funds that it had provided, and a periodic commitment fee "determined with reference to the market value of the Commitment as then in effect."  Fannie Mae Senior Preferred Stock Purchase Agreement ("PSPA") § 3.2 (AR 22); Freddie Mac PSPA § 3.2 (AR 56).[1]  Six years later, the GSEs have returned to a stable footing, thanks exclusively to the infusion of government capital since 2008. The plaintiffs, shareholders in the GSEs, appear to have forgotten the unprecedented extent and nature of the record amount of government funds the GSEs received.  They now bring these lawsuits to demand an even better deal for themselves, a windfall at the expense of the taxpayers.

In entering into the Third Amendment, Treasury acted to address a new threat to the GSEs' viability.  Treasury's unprecedented commitment of funds to the GSEs had succeeded in

---

[1] Citations to the administrative record filed by the Treasury defendants are noted as "AR." Citations to the documents filed by the FHFA defendants are noted as "FHFA."

addressing the immediate threat to the GSEs' solvency.  By 2012, however, the dividend structure under the PSPAs posed a new problem; it had become apparent that the GSEs were at great risk of being unable to pay their future dividend obligations to Treasury under the PSPAs, which by that point had grown to $19 billion per year, without taking further draws from the funds that Treasury had committed under the PSPAs.  The potential that the GSEs would exhaust that finite funding capacity posed a serious threat to those entities' viability.  Accordingly, in August 2012, Treasury and FHFA, the conservator of the GSEs, agreed to a "Third Amendment" to the PSPAs, which resolved this threat to the GSE's viability by eliminating the circular arrangement whereby the GSEs drew on Treasury's capital commitment under the PSPAs in order to pay a dividend to Treasury.

The plaintiffs challenge the validity of the Third Amendment, asserting a variety of theories under the APA, state common-law principles, or the Takings Clause.  All four suits should be dismissed on jurisdictional grounds.  The three individual suits (the *Perry*, *Fairholme*, and *Arrowood* actions) run afoul of the anti-injunction provision of the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617(f), which precludes courts from ordering equitable relief that would interfere with FHFA's exercise of its powers as conservator of the GSEs.  The plaintiffs attempt in their opposition briefs to evade this jurisdictional bar by disputing whether FHFA properly exercised its conservatorship powers to reduce the size of the GSEs' operations, but this attempt fails.  Under law that is well-established under HERA and a materially identical provision in the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), the anti-injunction bar does not depend on whether the plaintiffs agree with the manner in which FHFA has exercised its conservatorship powers.  Nor may the plaintiffs evade the anti-injunction bar by suing FHFA's counter-party, Treasury.

2

In addition, all four suits are derivative suits that are precluded under HERA's prohibition against shareholder suits, 12 U.S.C. § 4617(b)(2)(B)(i).  That prohibition has been authoritatively construed by the D.C. Circuit to bar claims like those that the plaintiffs seek to bring here.  The plaintiffs attempt in their opposition briefs to circumvent this independent barrier against their claims by characterizing their shareholder claims as "direct," not "derivative."  This argument is doubly misconceived:  their claims are plainly derivative, in that the plaintiffs do not allege any injury independent of the injury that they claim the GSEs have suffered, and, in any event, the distinction does not matter for the purposes of HERA.  The plaintiffs also attempt to invoke a "manifest conflict of interest" exception to justify a suit against the conservator.  That exception, however, appears nowhere in the text of HERA, and could make no sense in the context of a suit, like this one, in which the plaintiffs challenge a decision of the conservator itself.  All four suits likewise fail on additional threshold grounds, such as improper third-party standing, lack of ripeness, and, as to the putative class action, the jurisdictional limits of the Little Tucker Act.

Even if these suits could clear HERA's barriers against judicial review, the plaintiffs' claims would still fail.  The plaintiffs allege that Treasury violated HERA by engaging in a "purchase" of securities through the Third Amendment after its purchase authority in that statute expired.  But, as the plaintiffs are unable to dispute, Treasury neither committed any additional funds to the GSEs in the Third Amendment nor received any additional securities from the GSEs.  Unable to plausibly allege that the Third Amendment amounted to a "purchase" of securities under any ordinary sense of that term, the plaintiffs seek instead to invoke one side of a circuit split under a disputed, judge-made doctrine, under a separate statute, concerning "fundamental changes" in securities.  There is no reason to believe that Congress had that

inapposite statute in mind, let alone that it endorsed one side or other of the circuit split regarding that statute, when it enacted HERA.

The plaintiffs also invent a fiduciary duty that Treasury purportedly owed to the GSEs' shareholders, and they claim that Treasury violated the APA by failing to consider that duty, or, alternatively, that Treasury should be held directly liable for damages for a breach of that duty. Federal law would preempt the sort of fiduciary obligation that the plaintiffs assert. When Treasury entered into the PSPAs, and when it entered into the Third Amendment, Treasury sought to achieve a number of goals, including the protection of the taxpayers' interest in the government's investment. The plaintiffs contend that it would not be "impossible" for Treasury to perform the functions assigned to it under HERA while at the same time acting as their fiduciary, but this misstates the inquiry. The imposition of a state-law fiduciary obligation on Treasury would upset the balance of policy considerations that Congress took into account when it enacted HERA, and for that reason such an obligation would be preempted by federal law. In any event, state law would not impose any fiduciary obligation on Treasury, as it is not a controlling shareholder, and it does not exercise actual control over the GSEs.

The plaintiffs further question, under the APA, the reasonableness of Treasury's decision to enter into the Third Amendment. But the evidence is plain – and substantial evidence in the record indicates – that the Third Amendment was an appropriate response to the circularity of the dividend structure under the PSPAs, an arrangement that, according to Treasury's financial projections, presented a threat to the long-term solvency of the GSEs. Indeed, even the plaintiffs concede that Treasury's contemporaneous projections showed that the GSEs would exhaust their PSPA funding if they continued to draw on those funds to pay dividends to Treasury. *See* Mem. of Law of Pls. Perry Capital LLC, *et al.*, in Opp'n to Defs.' Mots. to Dismiss and Mots. for S.J.

and in Supp. of Pls.' Cross-Mot. for S.J. on Administrative Procedure Act Claims ("Perry Br.")

75-76.  The plaintiffs' briefs are replete with rhetoric insinuating that Treasury entered into the

Third Amendment to extract profits from the GSEs; that rhetoric is considerably deflated,

however, by the plaintiffs' recognition that Treasury did not expect that the Third Amendment

would produce any greater return for it than that to which it was entitled under the PSPA's

existing dividend structure.  *See* Perry Br. 72.  Far from a "naked money grab," as the plaintiffs

melodramatically put it, the Third Amendment solved a threat to the GSEs' viability.  The

plaintiffs posit several alternative solutions to that threat, all of which would have involved

Treasury voluntarily foregoing its right to dividend payments.  Treasury lacks the authority,

however, to waive the government's vested contractual rights without receipt of a corresponding

benefits.  Treasury was under no obligation, first, to funnel an unprecedented amount of funds to

the GSEs to save those entities from insolvency and mandatory receivership, and then, second, to

forgo the return to which it was entitled under the agreements that had kept those entities afloat.

 The putative class plaintiffs fare no better when they attempt to recast the same claims

under the Takings Clause.  Treasury did not invade any of the plaintiffs' legally cognizable

property interests.  As shareholders in entities that are highly-regulated (indeed, that exist only as

creatures of federal law), the plaintiffs acquired their shares with the recognition that the GSEs'

federal regulator could place (or already had placed) those entities into conservatorship, and

could operate the affairs of the GSEs during the period of conservatorship.  The plaintiffs lacked

any ability to exclude the federal government from exercising these powers, and that fact alone is

dispositive of the takings claim.  In any event, the takings claim fails under the *Penn Central*

balancing test, given, in particular, the absence of any plausible assertion that the plaintiffs are

entitled to impose the costs of their investment decisions on to the federal taxpayer.

## ARGUMENT

## I.      The Court Does Not Have Jurisdiction Over the Plaintiffs' Claims

The plaintiffs seek an extraordinary remedy:  to re-write the agreement between FHFA

and Treasury that has kept the GSEs operational and out of mandatory receivership since the

financial crisis of 2008.  They do not point to a single case in which a court has awarded such

relief against a conservator or its counter-party.   In fact, courts have consistently held that such

relief is precluded under both the anti-injunction provision of HERA and the materially identical

provision of FIRREA.  The anti-injunction provision demands the same result in this case.

Moreover, because the plaintiffs' APA claims are premised on allegations that the Third

Amendment represents an overpayment for the unprecedented taxpayer support provided in

order to rescue the GSEs, they are derivative claims that are barred by both HERA and broader

principles of standing.

### A.      Section 4617(f) of HERA Bars the Plaintiffs' APA Claims

HERA unequivocally provides that "no court may take any action to restrain or affect the

exercise of powers or functions of the Agency as a conservator" of the GSEs.  12 U.S.C.

§ 4617(f).  This section clearly bars review of FHFA's actions as conservator under the APA.

*See* 5 U.S.C. § 701(a) (APA does not apply where "statutes preclude judicial review").   There

are numerous decisions from circuit courts dismissing claims for equitable and declaratory relief

against conservators or receivers, brought under the APA and other federal statutes.  Many of

those decisions were based on the anti-injunction provision of HERA.  *See Cnty. of Sonoma v.

FHFA*, 710 F.3d 987, 993 (9th Cir. 2013) (holding that section 4617(f) barred APA claims

against FHFA); *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278-79 (11th Cir. 2012) (holding that

similar APA claim was barred by anti-injunction provision); *Town of Babylon v. FHFA*, 699

F.3d 221, 227 (2d Cir. 2012) (same).  Others were based on the materially identical provision in

FIRREA.  *See Bank of Am. Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010)

("This provision has been interpreted broadly to bar judicial intervention whenever the FDIC is

acting in its capacity as a receiver or conservator, even if it violates its own procedures or

behaves unlawfully in doing so.");[2] *Bursik v. One Fourth St. N., Ltd.*, 84 F.3d 1395, 1397 (11th

Cir. 1996); *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) ("Section 1821(j) does

indeed effect a sweeping ouster of the court's power to grant equitable remedies"); *Volges v.

Resolution Trust Corp.*, 32 F.3d 50, 52 (2d Cir. 1994); *Ward v. Resolution Trust Corp.*, 996 F.2d

99, 103 (5th Cir. 1993) ("[A]s long as the RTC is 'exercis[ing] judgment under one of its

enumerated powers' such as running the affairs of a troubled financial institution (including

liquidation of receivership assets), the courts may not enjoin the activities of the RTC merely

because someone alleges that it is not 'running [the troubled institution's] affairs in a legal

manner.'") (internal citation omitted); *Nat'l Trust for Historic Pres. v. FDIC*, 995 F.2d 238, 240

(D.C. Cir. 1993), *aff'd and reinstated on reh'g*, 21 F.3d 469 (D.C. Cir. 1994); *Gross v. Bell Sav.

Bank PaSa*, 974 F.2d 403, 408 (3d Cir. 1992) ("Nonetheless, where the RTC performs functions

assigned it under the statute, injunctive relief will be denied even where the RTC acts in

violation of other statutory schemes …").

The sweeping language of section 4617(f) mirrors that in the FDIC's conservatorship

statute, 12 U.S.C. § 1821(j), which "bar[s] a court from acting in virtually all circumstances."

*Nat'l Trust for Historic Pres.*, 21 F.3d at 472 (Wald and Silberman , JJ., concurring).  The

plaintiffs incorrectly believe that they can simply plead their way around the statutory anti-

---

[2] The plaintiffs cite *Bank of America* for the proposition that their claims may go forward, Perry
Br. 29, but that case held precisely the opposite.  *See* 604 F.3d at 1243.

injunction provision.  Perry Br. 31-32.  In their view, disagreeing with the *use* of a

conservatorship power suffices to allow their case to proceed.  This is hardly a novel strategy in

litigation against a conservator or receiver, and the plaintiffs' adjective-laden assault on the Third

Amendment does not allow their claim to succeed where numerous others have failed.  In *Ward*,

for example, the plaintiff had bid on a receivership asset held by the Resolution Trust

Corporation and petitioned the district court for an injunction to prevent the sale to a third party

and, when the injunction was denied, sought an order rescinding the sale.  *Ward*, 996 F.2d at

101.  Ward cast his objection in much the same terms as the plaintiffs here, claiming that the

RTC had exceeded its statutory powers as a receiver by selling the asset at a lower price than he

had offered; by failing to take the asset out of a portfolio sale and agreeing to sell it to him at a

higher price; and by requiring an "all cash" offer instead of financing, which discriminated

against him as a purchaser.  *Id*. at 102.  The Fifth Circuit rejected this attempt to second-guess

the receiver.  Like the plaintiff in *Ward*, the plaintiffs here "fail[] (or refuse[]) to recognize the

difference between the exercise of a function or power that is clearly outside the statutory

authority of the RTC on the one hand, and improperly or even unlawfully exercising a function

or power that is clearly authorized by statute on the other."  *Ward*, 996 F.2d at 103; *see also*

*Courtney v. Halleran*, 485 F.3d 942, 948-49 (7th Cir. 2007) ("The plaintiffs try to avoid this

significant obstacle to their suit by arguing that § 1821(j) cannot apply to actions of the FDIC

that are *ultra vires* …. Here, the FDIC had specific statutory authorization for its actions.  It has

the power, under § 1821(d)(2)(G), to direct where funds should go."); *Volges*, 32 F.3d at 53.

    At bottom, the plaintiffs seek to challenge the Third Amendment by alleging that it

dissipates the assets of the GSEs, thereby (under their argument) making it less likely that they

will receive dividend payments, or a liquidation preference in the event of a liquidation of the

GSEs.  Perry Br. 15-17.  Similar allegations have not succeeded in overcoming FIRREA's anti-injunction provision.  In *MBIA Insurance Corp. v. FDIC*, 816 F. Supp. 2d 81, 103 (D.D.C. 2011) *aff'd,* 708 F.3d 234 (D.C. Cir. 2013), the plaintiffs challenged the FDIC's disposition of the proceeds of an asset sale from an insolvent bank, claiming that the FDIC was misusing funds that could otherwise be used to pay their administrative claim.  The court held that this allegation was insufficient to overcome the bar to equitable relief in § 1821(j), as it amounted to no more than a claim that, from the plaintiff's perspective, the FDIC was misusing its receivership powers.  *See id*. (citing *Ward*).  The same result holds here.

HERA's anti-injunction provision is not a jurisdictional hurdle that a plaintiff can clear simply by presenting every disagreement with the conservator as a claim that the conservator is acting "beyond, or contrary to" its statutory powers.  *Nat'l Trust for Historic Pres.*, 995 F.2d at 240.  The "jurisdictional inquiry" under these statutes is "quite narrow."  *Bank of America*, 604 F.3d at 1243.  "[T]he only relevant question" is "whether the conservator or receiver is carrying out a statutory function or power.  If so, no injunction may issue."  *Furgatch v. Resolution Trust Corp.*, No. 93-20304 SW, 1993 WL 149084, at *2 (N.D. Cal. Apr. 30, 1993).

FHFA, as conservator of the GSEs, had the statutory authority to raise capital on their behalf, including obtaining unprecedented taxpayer support through the PSPAs with Treasury.  *See* 12 U.S.C. § 4617(b)(2)(D) (empowering FHFA as conservator to "carry on the business" of the GSEs and "put the [GSEs] in a sound and solvent condition.").  Further, the same provision empowers the FHFA to amend the PSPAs, particularly where doing so would resolve a threat to their solvency that could trigger mandatory receivership.  *See id.*  In addition, FHFA had the power to compensate the taxpayers for their PSPA support, given HERA's authorization to "transfer or sell any asset" of the GSEs "without any approval, assignment, or consent."  12

9

U.S.C. § 4617(b)(2)(G).  FHFA exercised these powers to reasonably determine, along with Treasury, that the Third Amendment would preserve the availability of PSPA funding to cover future net worth deficits, by ensuring that the enterprises would never have to take a draw from Treasury in order to pay a dividend to Treasury.  The plaintiffs question FHFA's decision to exercise its conservatorship powers in this fashion, but second-guessing FHFA's exercise of its conservatorship powers does not provide the plaintiffs with grounds for injunctive relief.  *See Gross*, 974 F.2d at 408 ("We find here that the availability of injunctive relief does not hinge on our view of the proper exercise of otherwise-legitimate powers.").

The plaintiffs' challenge ultimately depends, then, on their puzzling claim that FHFA as conservator lacks the statutory authority to shrink the operations of the GSEs – as though HERA forces the conservator to reconstitute the entities back into the unsound, unsafe structure that led to conservatorship in the first place.  Perry Br. 52-55.  HERA does no such thing, and the plaintiffs are thus reduced to re-writing the statute in order to support their claim that FHFA somehow violated HERA by being insufficiently "optimistic."  Pls.' Br. 54.

Section 4617(a)(2) of HERA states that FHFA "may, at the discretion of the Director, be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."  12 U.S.C. § 4617(a)(2).  The statute includes no distinction between the type of appointment ("conservator or receiver") and the purpose of such an appointment ("reorganizing, rehabilitating, or winding up the affairs of a regulated entity"). From day one of the conservatorships, Treasury and FHFA have made it clear that, in light of the extraordinary commitment of taxpayer funds required to save those entities from sustained insolvency and mandatory receivership, the GSEs "will no longer be managed with a strategy to maximize common shareholder returns."  Statement by Secretary Henry M. Paulson, Jr. on

Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and

Taxpayers (FHFA 023); *see also* Fannie Mae 2008 10K at 50 (FHFA 0312).  The plaintiffs, as

shareholders in the GSEs, dislike this arrangement, and they ask the Court to reverse it.  Their

request is irreconcilable with the conservatorship statute.  It is FHFA, not the plaintiffs, that is

entrusted by statute with the responsibility to carry on the business of the GSEs in

conservatorship.  *See* 12 U.S.C. § 4617(b)(2)(B)(i) (conservator may "operate the regulated

entity with all the powers of the shareholders, the directors, and the officers of the regulated

entity and conduct all business of the regulated entity").  It is FHFA, not the plaintiffs, that is

empowered by statute to take such actions as are necessary to "put the regulated entity in a sound

and solvent condition," including by simplifying its operations.  *Id.* § 4617(b)(2)(D)(i).[3]  And it

is the taxpayers, not the plaintiffs, who provided over $187 billion of funds to the GSEs to cover

their operating losses and fund their operations throughout and after the financial crisis.  The

Court should reject the plaintiffs' efforts to re-write the agreement that has kept, and will keep,

the GSEs operational and out of mandatory receivership.

### B.      Section 4617(f) Also Bars the Plaintiffs' Claims Against Treasury

The plaintiffs are further incorrect in contending that they can evade the anti-injunction

bar of § 4617(f) by directing their claims at Treasury as a counter-party.  As Treasury explained

---

[3] Treasury has explained that these provisions, which use the term "may" rather than "shall," confer on FHFA a measure of discretion when it operates as conservator that is clearly incompatible with the  plaintiffs' request for injunctive relief – a straightforward point that the plaintiffs claim to find "puzzling[]."  Perry Br. 55 n.20.  Ample case law confirms the conclusion that "[t]he word 'may,' when used in a statute, usually implies some degree of discretion." *United States v. Rodgers*, 461 U.S. 677, 706 (1983); *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401-02 (D.C. Cir. 1995) ("When a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show deference to the agency's determination.").

in its initial brief, the statute's limitation on judicial actions that would "restrain or *affect*" the

FHFA's powers as conservator prevents such a result.  12 U.S.C. § 4617(f) (emphasis added);

Treasury Br. 25.  Numerous courts have held that HERA's anti-injunction provision and

FIRREA's similar anti-injunction provision bar equitable relief directed at a counter-party, as

such relief is simply another way of restraining the conservator.  *See Dittmer Properties, L.P. v.*

*FDIC*, 708 F.3d 1011 (8th Cir. 2013) ("Dittmer's request for injunctive relief is barred by

§ 1821(j), even though the FDIC is no longer the holder of the note, because the relief requested

– a declaration that the note is void as to Dittmer – affects the FDIC's ability to function as a

receiver in this case."); *see also Hindes v. FDIC*, 137 F.3d 148, 160 (3d Cir. 1998) ("[A]n action

can 'affect' the exercise of powers by an agency without being aimed directly at [the agency].");

*Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir. 1992) ("Permitting

Telematics to attach the certificate of deposit, if that attachment were effective against the FDIC,

would have the same effect, from the FDIC's perspective, as directly enjoining the FDIC from

attaching the asset.  In either event, the district court would restrain or affect the FDIC in the

exercise of its powers as receiver.  Section 1821(j) prohibits such a result."); *Kuriakose v. Fed.*

*Home Loan Mtge. Corp.*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009) ("By moving to declare

unenforceable the non-participation clause in Freddie Mac severance agreements, in essence

Plaintiffs are seeking an order which restrains the FHFA from enforcing this contractual

provision in the future . . .  HERA clearly provides that this Court does not have the jurisdiction

to interfere with such authority."); *In re Fed. Home Loan Mtge. Corp. Derivative Litig.* ("*In re*

*Freddie Mac*"), 643 F. Supp. 2d 790, 799 (E.D. Va. 2009), *aff'd sub nom. La. Mun. Police*

*Employees Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011) ("A court action can 'affect' a

conservator even if, as in the cases at bar, the litigation is not directly aimed at the conservator

itself."); *Furgatch*, 1993 WL 149084, at *2 ("Plaintiff contends that section 1821(j) is inapplicable in this case because he is attempting to enjoin HomeFed and the trustee who is conducting the sale, not RTC.  However, enjoining these parties indirectly enjoins RTC, which a district court has no power to do.").

The plaintiffs cite three cases supposedly reaching a contrary result, none of which supports their position.  Perry Br. 30-31.  First, in *Abbott Building Corporation v. United States*, 951 F.2d 191 (9th Cir. 1991), the court construed 12 U.S.C. § 1464(d)(6)(C), an anti-injunction provision applicable to the Federal Savings and Loan Insurance Corporation ("FSLIC") when it acted as a receiver.  The plaintiff in that case challenged a credit bid at a foreclosure sale, claiming that the sale was not conducted in accordance with state law, and sued to set the sale aside.  The Ninth Circuit held that the suit did not seek to "restrain or affect" the FSLIC's powers as a receiver, but "simply leaves the determination of third party rights in the hands of others." 951 F.2d at 195.  The Ninth Circuit expressly limited its holding to situations in which the FSLIC, acting as a receiver, had acquired property in an invalid foreclosure sale, a far different context from this case.  *Id.*  The court further noted the limited nature of its holding, emphasizing that "[t]his case, of course, does not involve the right of a seized institution against FSLIC itself." *Id.* at 195 n.6.  Indeed, the court concluded that the statute would still immunize the FSLIC from claims that it had acted in an "improper manner." *Id.*  The D.C. Circuit gave a pointed take on *Abbott Building Corporation* in its opinion in *National Trust for Historic Preservation*: "Given the limited scope of this holding, in a situation far removed from this case, we see no need to discuss whether we agree with it." *Nat'l Trust for Historic Pres.*, 21 F.3d at 471 n.1.  The second case cited by the plaintiffs, *ECCO Plains, LLC v. United States*, 728 F.3d 1190 (10th Cir. 2013), did not consider the scope of § 1821(j) (the FIRREA anti-injunction

13

provision) at all because "this case seeks money from the United States" rather than equitable relief, and "[i]n any event, reliance on the statute is unnecessary as jurisdiction is otherwise defeated." *Id.* at 1202 n.17.  Finally, *Henrichs v. Valley View Development*, 474 F.3d 609, 614 (9th Cir. 2007), involved a private party's attempt to invoke FIRREA's anti-injunction provision against other private parties in a case where the FDIC was never joined.  *Id.*  It says nothing about the plaintiffs' efforts to circumvent the limitations of § 4617(f) by suing both FHFA and Treasury as counter-parties.[4]

The plaintiffs make a last-ditch effort to evade the statute by urging the Court to create an exception to § 4617(f)'s plain meaning in order to avoid unspecified "absurdities."  Perry Br. 31.  The only "absurdity" that the plaintiffs can point to, however, is the dismissal of their cases.  Effectuating the intent of Congress that a conservator or receiver be free to operate without "outside second-guessing," *Nat'l Trust for Historic Pres.*, 995 F.2d at 240, is not an absurd result.  Because HERA plainly forbids this sort of a claim, there is no need for the Court to engage the parade of horribles envisioned by the plaintiffs.  *See* Perry Br. 34 (fearing that FHFA could "dump toxic waste into the Potomac River").  It suffices to note that the D.C. Circuit has already considered and rejected precisely the same rhetorical exercise when ruling on the scope of § 1821(j)'s limitation on equitable relief.  *See Nat'l Trust for Historic Pres.*, 21 F.3d at 472 (Wald and Silberman, JJ., concurring) ("Congress undoubtedly did not contemplate anything like the parade of possible violations of existing laws—civil and criminal—that creative judges can conjure up, but given the breadth of the statutory language, untempered by any persuasive

---

[4] Contrary to the plaintiffs' claim, Perry Br. 31 n.13, Treasury moved to dismiss their APA claims pursuant to 12 U.S.C. § 4617(f).  *See* Treasury Br. 22-29.  The submission of an administrative record to support Treasury's *alternative* motion for summary judgment does not waive this argument.

legislative history pointing in a different direction, the statute would appear to bar a court from acting in virtually all circumstances.").

### C.       HERA's Shareholder Rights Provision Precludes the Plaintiffs' Lawsuits

The plaintiffs' suits should also be dismissed under a second, independent bar in HERA; that statute transferred their ability to bring such claims to FHFA upon its appointment as conservator of the GSEs.  12 U.S.C. § 4617(b)(2)(A) provides that FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity."  In *Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012), the D.C. Circuit held that this language "plainly transfers shareholders' ability to bring derivative suits – a 'right[], title[], power[], [or] privilege[]' – to FHFA."  *Id.* at 850.  This statutory provision thus "bars shareholder derivative actions."  *Id.*

The plaintiffs made two arguments in their cross-motion in an effort to show that their suit was not barred by this provision.  First, they claim, without elaboration, that their APA claims are not derivative.  Second, they claim that even if their suits are derivative, the Court should create an exception to the plain meaning of the statute for derivative actions where the conservator faces a conflict of interest.   Neither argument overcomes binding circuit court precedent requiring the dismissal of their cases.

#### 1.   *The plaintiffs' claims are derivative*

The plaintiffs' complaints alleged that they were injured by the Third Amendment in two ways.  First, the plaintiffs claimed that the Third Amendment prevented the GSEs from paying them dividends on their common and preferred stock.  *E.g.*, Perry Compl., ¶ 23.  (In the memorandum in support of their cross-motion, this alleged injury is re-cast as an injury to the

market value of their stockholdings.  *See* Perry Br. 23.)  Second, the plaintiffs allege that

dividends paid to Treasury under the Third Amendment could otherwise be retained by the

GSEs, and eventually used to pay a liquidation preference to the plaintiffs in the event of the

GSEs' liquidation.  *Id.* at 21-22 ("[B]y prohibiting the Companies from accumulating any

capital, the Sweep Amendment eliminates the possibility of any recovery under the liquidation

preference of Plaintiffs' preferred stock.").  Likewise, in their cross-motion, they assert that the

bar on derivative suits does not apply to "shareholders' rights that are personal to shareholders,

such as the right to receive dividends or a liquidation preference …."  Perry Br. 26.

To distinguish between a derivative and direct claim, "[t]he proper analysis has been and

should remain that … a court should look to the nature of the wrong and to whom the relief

should go.  The stockholder's claimed direct injury must be *independent* of any alleged injury to

the corporation.  The stockholder must demonstrate that the duty breached was owed to the

stockholder and that he or she can prevail *without showing an injury to the corporation*."  *Tooley*

*v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (emphasis added).[5]  The

particular label that the plaintiffs choose to attach to their claim is irrelevant.  *See, e.g., Dietrich*

*v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004) ("Even after *Tooley*, a claim is not 'direct'

simply because it is pleaded that way, and mentioning a merger does not talismanically create a

direct action.  Instead, the court must look to all the facts of the complaint and determine for

---

[5] Fannie Mae is a federally-chartered corporation that regularly executes agreements under
Delaware law, and thus it may be presumed that federal common law would look to the
Delaware Supreme Court's decision in *Tooley* for the applicable law for distinguishing between
derivative and direct claims.  Freddie Mac, which is also a federally-chartered corporation,
regularly executes agreements under Virginia law.  The Virginia Supreme Court has not adopted
the *Tooley* test, but agrees with "[t]he overwhelming majority rule [] that an action for injuries to
a corporation cannot be maintained by a shareholder on an individual basis and must be brought
derivatively."  *Simmons v. Miller*, 544 S.E.2d 666, 674 (Va. 2001).

itself whether a direct claim exists."); *In re Syncor International Corp. Shareholders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004) ("[U]nder *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint.").

The plaintiffs assert that their APA claims are direct, rather than derivative. Perry Br. 27. Their claims are not direct, because they are not predicated upon immediate injuries to the plaintiffs, and the plaintiffs cannot prevail on their claims "without showing an injury to the corporation." *Tooley*, 845 A.2d at 1039. The APA claims challenge an agreement between Treasury and FHFA concerning the GSEs to which the plaintiffs were not a party. The alleged injury to the plaintiffs' dividend payments and liquidation preferences resulting from this agreement is premised on an alleged injury to the GSEs themselves through an alleged waste of corporate assets, in the form of an agreement that the plaintiffs allege to be arbitrary or beyond Treasury's statutory authority to invest in the GSEs. Because the harm that the plaintiffs allege will befall them is "dependent on a prior injury to the corporation," it is derivative in nature. *Agostino v. Hicks*, 845 A.2d 1110, 1122 (Del. Ch. 2004). To the extent the plaintiffs claim a current injury based on the allegedly impaired market value of their stockholdings, *see* Perry Br. 23, that is a quintessentially derivative claim. *See, e.g.*, *Robotti & Co. v. Liddell*, 2010 WL 157474, at *6 (Del. Ch. Jan. 14, 2010); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*, 854 A.2d 121, 168 (Del. Ch. 2004); *accord Tooley*, 845 A.2d at 1037 (where the injury is diminution in value of stock, "the indirect injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings").

The plaintiffs contend that their claims are direct because they are alleging harm to "rights that are personal to shareholders." Perry Br. 26. This argument hinges on the "special injury" rule, which the Delaware Supreme Court has rejected as "not helpful to a proper

analytical distinction between derivative and direct actions." *Tooley,* 845 A.2d at 1035.  Merely

asserting that the depletion of corporate assets – a classically derivative injury – could eventually

affect the payment of a liquidation preference does not transform the claim from derivative to

direct.  (This is so even if the Court could set aside the separate Article III ripeness problems

with this claim.)

The plaintiffs also cite to *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), and claim that

because they challenge "conduct that benefits one class of shareholders at the expense of

another," they have pleaded a direct claim.  Perry Br. 25.  The plaintiffs misapprehend the

holding of that case.  That case involved a suit by public shareholders against a corporation's

directors and CEO alleging that the corporation had overpaid in a transaction where the CEO

agreed to forgive debt owed to him by the corporation in return for stock which made him the

controlling shareholder.  906 A.2d at 95-96.  The Delaware Supreme Court recognized in *Gentile*

that "[n]ormally, claims of corporate overpayment are treated as causing harm solely to the

corporation and, thus, are regarded as derivative."  *Id.*

*Gentile* also discussed a separate injury where "the shares representing the 'overpayment'

embody both economic value and voting power  …."  *Id.*  In such cases, "[a] separate harm also

results: an extraction from the public shareholders, and redistribution to the controlling

shareholder, of a portion of the economic value and voting power embodied in the minority

interest."  *Id.*  The Third Amendment was not such a transaction, however.  The alleged

"overpayment" of dividends on Treasury's senior preferred stock is in the form of cash, not

additional stock.  The Third Amendment had no effect on the "voting power" of any shareholder.

Treasury does not hold any voting rights, and the voting rights of public shareholders were

suspended on day one of the conservatorship, before the PSPAs were entered into.  Nor did it

18

affect the "economic value" of the plaintiffs' shares.  Dividend payments also had been

suspended since the beginning of the conservatorships, and the plaintiffs' liquidation preference

(in the event of receivership) was fixed by HERA's maximum liability provision.

The plaintiffs' APA claims are based on an alleged injury to the GSEs, and are derivative

in nature.  That is sufficient to dismiss them under *Kellmer*.  The language of § 4617(b) is much

broader, however, providing that FHFA as conservator shall "by operation of law, immediately

succeed to – all rights, titles, powers, and privileges … of any stockholder … of such regulated

entity with respect to the regulated entity and the assets of the regulated entity."  The plain

language of HERA "clearly demonstrates Congressional intent to transfer as much control of [the

GSEs] as possible to the FHFA …."  *In re Freddie Mac*, 643 F. Supp. 2d at 797.

The plaintiffs insist, however, that despite the plain language of HERA they retain some

residual rights in the GSEs, including the right to bring claims predicated on their status as

shareholders.  Perry Br. 26.  They cite another provision of HERA, § 4617(b)(2)(K)(i), which

provides that the appointment of FHFA as receiver "shall terminate all rights and claims that the

stockholders and creditors of the regulated entity may have against the assets or charter of the

regulated entity or the Agency arising as a result of their status as stockholders or creditors."  On

the basis of nothing more than a negative implication that only they perceive, the plaintiffs

believe that this means that outside of receivership "the Companies' shareholders retain an array

of rights."  Perry Br. 26.  That is not what the statute means.  Pursuant to § 4617(b)(2)(A)(i),

FHFA has succeeded to, and currently holds, "all rights, titles, powers, and privileges" of the

shareholders, and will hold those rights while the conservatorships last.  *See Esther Sadowsky

Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 350 (S.D.N.Y. 2009) ("The Court finds that

under the plain language of HERA, 'all rights, titles, powers, and privileges' of Freddie Mac's

shareholders are now vested in the FHFA.").  The appointment of a conservator "transfers" those rights, but only for the duration of the conservatorship.  *See Kellmer*, 674 F.3d at 850.  Should the entity exit conservatorship, those "rights, titles, powers, and privileges" would transfer back. In contrast, the appointment of a receiver expressly "terminates" those rights, save for the right to a resolution payment in the claims administration process.  *See* 12 U.S.C. § 4617(b)(2)(K)(i). The GSEs are still in conservatorship, so FHFA holds all of the "rights, titles, powers, and privileges" of the shareholders until the conservatorship ends.

### 2.  *HERA bars direct claims during the conservatorship of the GSEs*

In any event, even if the plaintiffs' claims were direct, they provide no basis to conclude that direct claims could be brought during the conservatorships.  The ability to bring a direct action predicated on their status as shareholders in the GSEs is also a "right[], title, power, or privilege[]" that was transferred to FHFA upon its appointment as conservator.  *See* 12 U.S.C. § 4617(b)(2)(A)(i).  The D.C. Circuit's opinion in *Kellmer* did not hold that the transfer of rights was limited to the right to bring derivative actions.  Rather, the Court of Appeals held that, because "a shareholder's ability to sue derivatively … is fairly described as a 'right[]' or 'power[]' of owning stock," it transferred to FHFA upon its appointment as conservator. *Kellmer*, 674 F.3d at 851.  The logic of *Kellmer*'s holding applies equally to direct and derivative claims.  *See also Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) ("Congress also included privileges just to be sure that nothing was missed . . . Congress has transferred everything it could to the [conservator], and that *includes* a stockholder's right, power, or privilege to demand corporate action or to sue directors or others when action is not forthcoming.") (emphasis added).

The plaintiffs cite only a single case in support of their contention that HERA does not deprive them of the ability to bring direct claims.  But in *Plaintiffs in All Winstar-Related Cases*

*v. United States*, 44 Fed. Cl. 3 (1999), the Court of Federal Claims was considering claims brought by shareholders of companies that were in liquidation.  "The critical factor here is that the corporation, the thrift, has been or will be liquidated.  Here, the shareholders of each failed thrift will be solely entitled to any surplus remaining after the thrift's creditors and the expenses of administration have been paid.  Thus, the shareholders have a direct, vested interest in such excess portion of any recovery."  *Id.* at 10 (citing 12 U.S.C. § 1821(d)(11)(A)).  The Court of Federal Claims' "holding … is limited to the liquidation context in which any surplus, as a matter of law, must be distributed to the shareholders."  *Id.* at 11-12.  By its own terms, then, the *Winstar* case is inapplicable; neither GSE is in liquidation, thanks entirely to the billions of dollars in taxpayer support that kept them afloat after the 2008 financial crisis.

In fact, "direct" claims based on a shareholder's "right to payment, resolution, or other satisfaction of their claims" can be presented only in receivership, and only then if the claims have been properly exhausted under the claims administration process.  *See* 12 U.S.C. § 4617(b)(2)(K)(i).  Congress has also expressly provided that such a claim shall be subject to the priority of claims and maximum liability provisions of HERA.  *See id.* ("right to payment, resolution, or other satisfaction of their claims, as permitted under subsections (b)(9), (c), and (e)."); *see also Nat'l Trust for Historic Pres.*, 21 F.3d at 472 ("a private person genuinely aggrieved by [] unlawful FDIC action could generally bring a suit for damages, or seek administrative redress through the § 1821(d) monetary claims procedure which ultimately includes judicial review.").  By bringing a "direct" action concerning their liquidation preferences now, when all "rights, titles, powers, and privileges" of shareholders are vested in FHFA, the plaintiffs are simply trying to ignore the process that Congress established to determine their claims in the event of liquidation.

21

3.   *There is no conflict of interest exception applicable to the plaintiffs' claims*

Alternatively, the plaintiffs contend that the Court should create a conflict of interest exception to HERA's bar on derivative lawsuits that would allow their derivative claims to proceed.  Perry Br. 27-28.  The putative class action plaintiffs, who assert an explicitly derivative claim against Treasury on behalf of Fannie Mae, oppose Treasury's motion to dismiss solely by asserting a conflict of interest exception to the rule in *Kellmer.  See* Omnibus Opp. to Defs.' Mots. to Dismiss, or in the Alternative, for S.J. ("Class Pls.' Br.") 32-35.  As Treasury has explained, however, the D.C. Circuit did not adopt a judicially-created conflict of interest exception to HERA's bar on derivative lawsuits, and the text of HERA forecloses such an exception.  *See Kellmer*, 674 F.3d at 850 ("[T]o resolve this issue, we need only heed Professor Frankfurter's timeless advice: '(1) Read the statute; (2) read the statute; (3) read the statute!'").

Nevertheless, the plaintiffs urge the Court to adopt a version of the "manifest conflict of interest" exception adopted by the Ninth Circuit in *Delta Savings Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001), and the Federal Circuit in *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999).  Both cases concerned derivative suits over pre-receivership claims against federal agencies.[6]  Neither case supports the proposition that

---

[6] In *Delta Savings Bank*, a shareholder of a state-licensed savings bank under the conservatorship of the FDIC brought a derivative action against the Office of Thrift Supervision ("OTS") because of OTS's alleged failure to prevent a racially-motivated conspiracy against the bank.  Despite the existence of a statute similar to § 4617(b)(2)(A)(i), the shareholder was held to have standing to maintain the action because FDIC and OTS were so "interrelated[]" that FDIC could not be "expected to objectively pursue lawsuits against the OTS, even when it is in the best interest of the failing bank to do so."  265 F.3d at 1022, 1023.   In *First Hartford*, a shareholder in a bank placed into receivership by the FDIC sought to bring a derivative action against the FDIC for the pre-receivership breach of an agreement concerning the bank's capital ratio.  194 F.3d at 1284.  The Federal Circuit held that the derivative action could proceed on behalf of the failed bank because of "the conflict of interest faced by the FDIC in determining whether to bring suit."  *Id.* at 1295.   "[I]n the circumstances presented in this case, the FDIC was asked to decide on behalf

shareholders can bring a derivative suit against the conservator itself, or the counter-party to a conservatorship action, based on conduct that occurred after the conservatorship began.  Indeed, the plaintiffs cannot cite any case that stands for the proposition that such a suit may be brought against the conservator or its counter-party.

If the plaintiffs' proposed "manifest conflict of interest" exception could apply to such claims, the exception would have no discernible limits.  It would cure *any* otherwise defective shareholder derivative action by a simple matter of pleading: For example, a claim against the former directors and officers of the GSEs over alleged accounting irregularities could not, under 12 U.S.C. § 4617(b)(2)(A)(i), be maintained as a shareholder derivative action.  *See Kellmer*, 674 F.3d at 850.  However, add a claim that FHFA is improperly exercising its conservatorship power by not pursuing such a claim on behalf of the GSEs, and suddenly, under the plaintiffs' theory, an adequate shareholder derivative action has been pled because, after all, FHFA cannot be expected to dispassionately pursue litigation against itself.  Such a result is inconsistent with the limitations on judicial review and the transfer of shareholder rights that Congress created in HERA.  There is no basis for the plaintiff to ask this Court to judicially create a conflict of interest exception that Congress did not see fit to include in the statute.

### D.        The Plaintiffs Do Not Have Prudential Standing

HERA statutorily bars the plaintiffs from bringing their derivative claims against FHFA and Treasury.  The plaintiffs also lack standing to bring their APA claims under broader

---

of the depository institution in receivership whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC itself." *Id.*  The Federal Circuit explicitly limited its holding to "the situation here in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency, as is the case in the receivership context.   We neither infer nor express an opinion on the standing of derivative plaintiffs in other circumstances." *Id.*

jurisdictional principles.  Because the plaintiffs assert injuries – non-payment of dividends and the speculative loss of their liquidation preference – that are derivative of injuries to the GSEs, they lack standing to pursue their APA claims under the shareholder standing rule.   "While this rule, which recognizes that corporations are entities separate from their shareholders in contradistinction with partnerships or other unincorporated associations, is regularly encountered in traditional business litigation, it also has been uniformly applied on the infrequent occasions it has arisen in suits against the state for statutory or constitutional violations."  *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994).

The plaintiffs contend that "there are good reasons to conclude" that the shareholder standing rule does not apply in APA cases.  Perry Br. 24.  In so contending,  the plaintiffs cite to a single case, *FAIC Sec. Inc. v. United States*, 768 F.2d 352 (D.C. Cir. 1985), discussing, not the shareholder standing rule, but the "zone of interests" test.  *Id.* at 357.  The "zone of interests" test is "an aspect of prudential standing distinct from third party standing."  *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000); *see also Childress v. City of Richmond*, 134 F.3d 1205, 1208 (4th Cir. 1998) (Luttig, J., concurring) ("Among the prudential limits on standing is not only the 'zone of interests' requirement, but also, of course, the general prohibition against third-party standing.").  The shareholder standing rule is an aspect of third party standing, not the zone of interests test.  *See Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 757 (7th Cir. 2008) (discussing "a particular subset of third-party standing doctrine known as the shareholder-standing rule."); *In re Troutman Enterprises, Inc.*, 286 F.3d 359, 364 (6th Cir. 2002) (same).  *FAIC Securities* itself treated third party standing and the "zone of interests" inquiry as distinct:  "The only remaining questions pertinent to standing, therefore, are whether the *depositors* are within the zone of interests protected or regulated by the relevant statutory

provisions; *and whether the brokers are entitled to assert the depositors' rights.*"  *FAIC Sec., Inc.*, 768 F.2d at 358 (first emphasis in original; second emphasis added).  The case does not stand for the proposition that the "zone of interests" test under the APA abrogated the third party standing inquiry.  Instead, the holding of the case concerns whether a plaintiff can satisfy the "zone of interests" by asserting the interests of third parties, when the plaintiff has appropriate third party standing with respect to those absent parties.  *Id.* at 360-61; *see also Nat'l Cottonseed Products Ass'n v. Brock*, 825 F.2d 482, 490 (D.C. Cir. 1987) (discussing *FAIC Securities*).[7]

Then, as with their argument that *Kellmer* does not foreclose their claims, the plaintiffs argue that they can satisfy the shareholder standing rule because they allege an injury to their right to share in profits and the liquidation of the GSEs.  Perry Br. 25.  The case that the plaintiffs cite, *Helmerich & Payne v. Int'l Drilling Co.*, No. 11-cv-1735(RLW), 2013 WL 5290126 (D.D.C. Sept. 20, 2013), involved a claim of a "complete physical seizure of a parent company's wholly-owned subsidiary."  *Id.* at *20.  This seizure allegedly "deprived H & P–IDC, individually, of its essential and unique rights as sole shareholder of H & P–V by dismantling its voting power, destroying its ownership, and frustrating its control over the company."  *Id.*  The plaintiffs are not sole shareholders, however.  And in their efforts to analogize their case to *Helmerich & Payne*, the plaintiffs are conflating several events that have nothing to do with the

---

[7] The Supreme Court recently clarified that "[a]lthough we admittedly have placed [the zone of interests] test under the 'prudential' rubric in the past, it does not belong there . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).  Rather, "[w]hether a plaintiff comes within "the 'zone of interests'" is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Id.*  Contrary to the plaintiffs' claims that the zone of interests test displaces all other parts of the standing inquiry, in *Lexmark* the Court specifically separated discussion of the third-party standing and zone of interests tests, and acknowledged that "[t]his case does not present any issue of third-party standing," and thus "consideration of that doctrine's proper place in the standing firmament can await another day." *Id.* at 1387 n.3.

Third Amendment.  FHFA's decision to place the GSEs in conservatorship led to the suspension

of the shareholders' voting power and the payment of dividends to shareholders.  By operation of

law, FHFA as conservator also succeeded to shareholders' rights of control in the corporation.

*See* 12 U.S.C. § 4617(b)(2)(A).  Instead, the plaintiffs allege that the Third Amendment has

caused the GSEs to overpay for the taxpayers' financial support, and that these overpayments

may threaten the plaintiffs' liquidation preference.  Overpayment is a derivative injury that the

plaintiffs cannot present.  *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 n.14 (D.C.

Cir. 1984) ("No shareholder—not even a sole shareholder—has standing in the usual case to

bring suit in his individual capacity on a claim that belongs to the corporation.").[8]

## II.     The Plaintiffs' APA and Fiduciary Duty Claims Fail on the Merits

### A.     The Third Amendment Was Not a "Purchase" of Securities

#### 1.   The Third Amendment was an exercise of rights received in connection with the PSPAs

HERA granted Treasury the authority to "to purchase any obligations and other securities

issued by the corporation under any section of this chapter, on such terms and conditions as the

Secretary may determine and in such amounts as the Secretary may determine."  12 U.S.C.

§ 1719(g)(1)(A).[9]  The statute also provides that "[t]he Secretary of the Treasury may, at any

---

[8] The plaintiffs also cite *Gilardi v. U.S. Dep't of Health and Human Res.*, 733 F.3d 1208 (D.C. Cir. 2013), but that case is of no help to them.  In *Gilardi*, the Court of Appeals held that because a private, for-profit corporation cannot engage in religious exercise, a controlling shareholder who alleges that a government regulation substantially burdens his religious exercise alleges a separate harm.  *Id.* at 1216.  A corporation can most certainly allege an *economic* injury, however, and shareholders (like the plaintiffs) do not have personal standing to assert that claim on behalf of the corporation.

[9] HERA amended the charter statutes for both Fannie Mae and Freddie Mac.  Treasury's citations are to the Fannie Mae charter, but the identical language appears in Freddie Mac's charter at 12 U.S.C. § 1455(l).

time, exercise any rights received in connection with such purchases," and "may, at any time, subject to the terms of the security or otherwise upon terms and conditions and at prices determined by the Secretary, sell any obligation or security acquired by the Secretary under this subsection."  12 U.S.C. § 1719(g)(2)(A)-(B).  The purchase authority is subject to a "sunset provision," 12 U.S.C. § 1719(g)(4), but both the sunset provision and another provision of paragraph 2 of subsection (g) state that the sunset provision does not apply to the exercise of rights or sale of securities.  *See* 12 U.S.C. § 1719(g)(4) ("The authority under this subsection (g), with the exception of paragraphs (2) and (3) of this subsection, shall expire December 31, 2009."); 12 U.S.C. § 1719(g)(2)(D) ("The authority of the Secretary of the Treasury to hold, exercise any rights received in connection with, or sell, any obligations or securities purchased is not subject to the provisions of paragraph (4).").

Both the PSPAs and the senior preferred stock certificates contain provisions allowing the parties to amend them.  *See* Fannie Mae PSPA § 6.3 (AR 27-28); Fannie Mae Preferred Stock Certificate § 10(g) (AR 38); Freddie Mac PSPA § 6.3 (AR 61-62); Freddie Mac Preferred Stock Certificate § 10(g) (AR 73).  The Third Amendment was, accordingly, an exercise of rights "received in connection with" the purchase of senior preferred stock in 2008.  The plaintiffs argue otherwise, insisting that amending the terms of the agreement is not an exercise of rights because it cannot be accomplished unilaterally.

First, the plaintiffs' cramped view of the meaning of a "right" is inconsistent with the ordinary use of the term.  Not all rights are unilateral; parties can possess "rights" that are exercised mutually.  Courts refer to a "right to contract," for instance, even though by definition this right can only be exercised through an agreement.  *See, e.g.*, *U.S. v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 429 (1966) ("Pre-eminently, this policy is grounded on a respect for the

parties' rights to contract and to provide for their own remedies."); *Olcott v. Fond du Lac Cnty.*, 83 U.S. 678, 690 (1872) ("Parties have a right to contract, and they do contract in view of the law as declared to them when their engagements are formed.").  Courts also refer to the parties to a contract as possessing the right to amend it.  *See, e.g.*, *Mid-State Products Co. v. Commodity Credit Corp.*, 196 F.2d 416, 420 (7th Cir. 1952) ("There can be no doubt of the right of the parties to an executory contract to amend its provisions."); *Fleet Nat. Bank v. Trans World Airlines, Inc.*, 767 F. Supp. 510, 518 (S.D.N.Y. 1991) ("if the parties to the contract . . . expressly reserve the right to amend the contract").[10]  The relevant provision of HERA applies to such rights, as it broadly encompasses "*any* rights received *in connection with*" purchases of obligations or securities of the GSEs.  12 U.S.C. § 1719(g)(2)(A) (emphasis added).[11]

Further, the plaintiffs concede that contracts typically include provisions allowing the parties to amend them by mutual consent.  Perry Br. 39.  Such amendments are authorized by the original agreements, but the plaintiffs assert that utilizing those provisions cannot be

---

[10] *See also Lee v. Bossung*, 138 N.E.2d 913, 917 (Ind. Ct. App. 1956) (concurring opinion) ("Certainly the parties had a right to amend their original contract . . ."); *Ebasco Servs., Inc. v. Bajbek*, 284 P.2d 459, 462 (Ariz. 1955) ("the parties to the contract through their representatives having been expressly given the right to amend such agreement . . ."); *Miller v. Kemp*, 160 S.E. 203, 206 (Va. 1931) ("the original parties had the right and power to rescind, abrogate, amend, or change, the contract by parol …"); *Andrews v. Powell*, 242 S.W.2d 656, 660 (Tex. Civ. App. 1951) ("The parties, of course, had the right to alter, amend or modify the original contract, or to cancel it, or to substitute another for it, whether wholly or partly executory.").

[11] The plaintiffs cite *United States v. Petty Motor Co.*, 327 U.S. 372 (1946), for the proposition that "an agreement that depends on a subsequent 'mutual consent' of the parties 'does not add to their rights.'"  Perry Br. 38 (citing *Petty Motor Co.*, 327 U.S. at 380 n.9).  That passage was discussing the respondents' property rights for purposes of a takings claim, and making the point that under common law a long-standing leasehold interest in land was not an additional ownership interest.  *See id.* ("Changeable intentions are not an interest in land, and although no doubt such intentions may have added practically to the value of the petitioners' holding, they could not be taken into account in determining what the respondent should pay.") (quoting *Emery v. Boston Terminal Co.*, 178 Mass. 172, 185 (1901)).  Amending the terms of a contract is not such a "changeable" right.

characterized as an exercise of rights.  *Id.*  In this case, however, regardless of whether the Court

accepts that the Third Amendment was an "exercise of rights received in connection with"

Treasury's purchase of the senior preferred stock in 2008, or the utilization of a standard

contractual provision, the agreement was not a "purchase" of securities affected by the sunset

date of HERA.  Indeed, the only conclusion that the Court needs to reach in order to reject the

plaintiffs' claim that Treasury did not have the authority to enter into the Third Amendment is to

conclude that the agreement was not a "purchase" within the plain meaning of the term.

### 2.  *The Third Amendment was not a purchase of securities*

Treasury discussed the plain meaning of the term "purchase" in its opening brief.  The

plaintiffs accuse Treasury of presenting a "cherry picked," Perry Br. 45, definition of the word as

"[t]o acquire in exchange for payment in money or an equivalent; to buy."  Treasury Defs.'

Mem. in Supp. of Their Mot. to Dismiss, or in the Alternative, for S.J. ("Treasury Br.") 38

(citing Oxford English Dictionary (3d ed. Sept. 2007) (viewed online)).  Far from being

selective, the definition cited in Treasury's motion is "the usual sense" of the word, and

consistent with multiple other sources.  *Id.* (citing Black's Law Dictionary 1359 (9th ed. 2009);

Random House Dictionary of the English Language 1568 (2d ed. 1987)).

Treasury did not commit any additional funds to the GSEs under the Third Amendment,

and FHFA did not grant Treasury any additional shares of stock in the GSEs.[12]  With no funds or

stock being exchanged, there was no "purchase" under any ordinary sense of that term.  That fact

disposes of the plaintiffs' argument.  *See Octane Fitness, LLC v. Icon Health & Fitness, Inc*., ---

---

[12] Plaintiffs acknowledged as much in their own complaints, which staked their entire argument
that the Third Amendment was a "purchase" on the applicability of the fundamental change
doctrine.  *See* Fairholme Compl. ¶ 10 ("The companies received no investment by Treasury" in
return for the Third Amendment); Arrowood Compl. ¶ 80 (Fannie Mae and Freddie Mac did not
"receive[] any consideration" in return for the Third Amendment).

S. Ct. ---, 2014 WL 1672251, at *5 (Apr. 29, 2014) ("unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning") (internal quotation and alteration omitted).  The plaintiffs nonetheless claim that Treasury "purchased" senior preferred stock by entering into the Third Amendment, because it could have sold its right to collect fixed ten-percent dividends or the right to collect the periodic commitment fee on the open market for cash, thus agreeing to suspend those provisions was the equivalent of paying cash.  Perry Br. 45.  This claim misses the mark for several reasons.  First, the dividend and the periodic commitment fee were themselves the subject of the agreement, not separate assets pledged in exchange for some different change to the PSPAs.  Fannie Mae PSPA § 3.2 (AR 22); Fannie Mae Preferred Stock Certificate § 2 (AR 32); Freddie Mac PSPA § 3.2 (AR 56); Freddie Mac Preferred Stock Certificate § 2 (AR 66).  Further, the Third Amendment does not terminate Treasury's right to collect the periodic commitment fee, but rather suspends it while the Third Amendment is in effect.  *See* Third Amendment to Fannie Mae PSPA § 4 (AR 4338); Third Amendment to Freddie Mac PSPA § 4 (AR 4346).[13]

---

[13] The plaintiffs dispute the relevance of the periodic commitment fee, arguing that a net worth sweep would not reflect the "market value" of the commitment because payments under a net worth sweep are variable.  Perry Br. 71.  Given that the GSEs' profits are *entirely* the result of Treasury's PSPA commitments, however, a variable dividend would reflect the incalculably large market value of Treasury's investment.  The plaintiffs misread the Congressional Budget Office (CBO) analysis, which they mistakenly cite for the proposition that the commitment fee is worth $19 billion.  CBO treats the GSEs as part of the federal government, and it calculates the "net cost" of the PSPAs to the government as a whole at $19 billion.  This is not the cost of the PSPA commitment to Treasury, or the value of the commitment to the GSEs.  In other words, CBO projects that, when *all* of the costs of the GSEs are accounted for, the GSEs will *still* cost the taxpayers $19 billion.  CBO, *The Budget and Economic Outlook* 64 (2014), http://www.cbo.gov/publication/45010 (last visited May 1, 2014).  *See also* Larry D. Wall, *Notes from the Vault: Have the Government-Sponsored Enterprises Fully Repaid the Treasury?* (Fed. Reserve Bank of Atlanta, March 2014), http://www.frbatlanta.org/cenfis/pubscf/nftv_1403.cfm (last visited May 1, 2014) ("as an economic matter, the post-conservatorship dividends paid to the Treasury did not arise from risks being borne by private shareholders.  Rather, … the

Second, the plaintiffs point to nothing in either PSPA that allows Treasury to sell off its entitlement to various forms of compensation under the agreements.  Nor were the contractual provisions readily marketable assets equivalent to cash.  *See Teskey v. M.P. Metal Products, Inc.*, 795 F.2d 30, 33 (7th Cir. 1986) ("widely traded" bonds "are almost as liquid as cash."); *Wis. Real Estate Inves. Trust v. Weinstein*, 781 F.2d 589, 596 (7th Cir. 1986) (traded securities are equivalent to cash in liquidity).  The agreement itself makes plain that Treasury had to be involved in setting the fee.  *See* Fannie Mae PSPA § 3.2; Freddie Mac PSPA § 3.2.  Nor is there a market of buyers who can pay the net present value of a commitment fee on a $445 billion capital facility,[14] particularly where that fee is intended to "fully compensate," *see* Fannie Mae PSPA § 3.2, Treasury for the hundreds of billions of dollars needed to maintain the solvency of the GSEs, making it an "incalculably large" number.  *See* Declaration of Mario Uggoletti ¶ 9 (FHFA 005).  Such a market certainly did not exist in 2012, when the market worried about the future solvency of the GSEs, even with Treasury's support.

Unable to demonstrate that the Third Amendment was a "purchase" within the ordinary meaning of the term, the plaintiffs argue that the Court should:  (1) interpret the word "purchase" in HERA by means of the "fundamental change" exception to the purchaser-seller standing requirement for the implied right of action under § 10b of the Securities Exchange Act of 1934; and (2) determine that the Third Amendment was a "fundamental change" to Treasury's senior preferred stock.

---

payments came from – and can reasonably be considered a return on – the risks being borne solely by the Treasury (and taxpayers)").

[14] This figure includes unused draw capacity ($140.74 billion for Freddie Mac, and $117.58 billion for Fannie Mae) as well as combined cumulative draws of $187.49 billion.  *See* Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities (AR 4351).

There are several problems with this argument.  First, when courts discuss the "fundamental change" doctrine, they are not discussing the meaning of the word "purchase." They are instead propounding on the meaning of an *exception* to the judicially-created "purchaser-seller" limitation to the implied cause of action under § 10b of the Securities Exchange Act.  *See Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1498 (9th Cir. 1995) ("The forced sale doctrine *relaxes* the requirement that only traditional purchasers or sellers of securities have standing to bring a Section 10(b) claim") (emphasis added); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 226 (5th Cir. 1994) ("Standing under these provisions requires that a plaintiff be an actual 'purchaser' or 'seller' of securities who has been injured by deception or fraud 'in connection with' the purchase or sale[.] … The federal courts have created an exception to this rule when [an] investor's interest in a company is fundamentally altered through a merger, acquisition, or liquidation.") (internal citation omitted); *Murphey v. Hillwood Villa Assocs.*, 411 F. Supp. 287, 292 (S.D.N.Y. 1976) ("The 'forced seller' principle … has been applied in other cases to give standing to plaintiffs suing under Section 10(b), where such standing would be otherwise unavailable under stricter interpretations of the purchaser/seller requirement.").  Thus, those courts that recognize this doctrine do not consider a "fundamental change" to be a "purchase" for purposes of the Securities Exchange Act.

Second, courts do not even consistently recognize the existence of a "forced sale" or "fundamental change" exception to the "purchase/seller" requirement for an implied cause of action under § 10(b).  *See Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 535-36 (7th Cir. 1998) (describing the "esoteric and dubious judge-made doctrine, called the 'fundamental change' doctrine" and admitting "very much doubt that the doctrine retains any validity in any class of case, even in squeeze-out cases"); *see also Katz v. Gerardi*, 655 F.3d 1212, 1221 (10th

Cir. 2011); *SEC v. Jakubowski*, 150 F.3d 675, 680 (7th Cir. 1998).  The plaintiffs claim that the

D.C. Circuit has adopted the "forced seller" doctrine, but cite to two cases that merely refer to

decisions in other circuits applying the exception.  *See Northland Capital Corp. v. Silver*, 735 F.

2d 1421, 1430-31 (D.C. Cir. 1984) (discussing the reliance on the "forced seller" exception by

the *dissenting opinion*); *Sacks v. Reynolds Sec., Inc.*, 593 F.2d 1234, 1240 (D.C. Cir. 1978)

(discussing "lower federal court interpretations of purchase and sale, although encompassing

many transactions that bear little overt resemblance to conventional cash sales, require some

surrendering of control, change in ownership, or change in the fundamental nature of an

investment before a transfer will be deemed within the ambit of Rule 10b-5.").   As to courts in

this district that have actually applied the doctrine, the plaintiffs cite only to a single, 37-year old

case.  *See Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1330, 1337-39 (D.D.C. 1977).[15]

    This Court need not decide which side of this split of authority under an inapposite

statute is correct.  The existence of this debate is sufficient to establish that the Court should not

use a contested judge-made doctrine as an interpretive tool for HERA.  *See Bruesewitz v. Wyeth*,

131 S. Ct. 1068, 1082 (2011) ("When 'all (or nearly all) of the' relevant judicial decisions have

given a term or concept a consistent judicial gloss, we presume Congress intended the term or

concept to have that meaning when it incorporated it into a later-enacted statute ….  We cannot

make the same assumption when widespread disagreement exists among the lower courts.  We

must make do with giving the term its most plausible meaning using the traditional tools of

statutory interpretation.").  That is particularly true because the "forced seller" or "fundamental

---

[15] Aside from *Houlihan*, it appears that no other court in this district has applied the doctrine in a § 10(b) case.  *See* Eric C. Chafee, *Standing Under Section 10(b) and Rule 10b-5: The Continued Validity of the Forced Seller Exception to the Purchaser-Seller Requirement*, 11 U. Pa. J. Bus. L. 843, 874-75 nn. 186-187 (2009).

change" doctrine does not concern the meaning of the word "purchase," but rather the standing requirements when a plaintiff is *not* a purchaser or seller.

Third, the plaintiffs ignore the very different contexts of the § 10(b) and the sunset provision of HERA.  Courts apply the "fundamental change" doctrine in order to protect the investor on the other end of that involuntary change.  *See Jacobson*, 50 F.3d at 1498 ("The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their shares for money or other consideration, or forced to fundamentally change the nature of plaintiffs investments as the result of a fraudulent scheme."); *Koppel v. Wien*, 575 F. Supp. 960, 970 (S.D.N.Y. 1983) ("The purchase or sale requirement can be met when a security holder is 'forced' after a merger or similar corporate transaction to convert his or her security to cash at a fixed price.").  The plaintiffs propose to use the doctrine as a source of liability *against* the investor.  The doctrine is also meant to protect investors against fraud.  *See, e.g.*, *Jacobson*, 50 F.3d at 1499 ("The forced seller doctrine is a narrow exception which provides a cause of action to shareholders who, without any say, find themselves fraudulently forced-out of their securities.").  It has no application to an amendment to a contract to which both parties consented and where there is no allegation of fraud by either party.

There is simply no basis in the statute for the plaintiffs' argument that the Third Amendment was a "purchase" under HERA's sunset provision.  The purpose of that provision was to limit the time under which Treasury could obligate funds to the GSEs.  *See* Treasury Br. 38 (citing legislative history).  Nothing in the text of the statute indicates that the "emergency determination" requirement or the list of considerations was designed to serve any purpose other than protecting taxpayers and the broader mortgage markets.  *See* 12 U.S.C. § 1719(g)(1)(B) ("In connection with any use of this authority, the Secretary must determine that such actions are

necessary to – (i) provide stability to the financial markets; (ii) prevent disruptions in the

availability of mortgage finance; and (iii) protect the taxpayer.").  The plaintiffs rest their

argument on Congress' inclusion of "[t]he need to maintain the corporation's status as a private

shareholder-owned company" on the list of considerations, but those considerations are explicitly

designed "to protect the *taxpayers*," not to protect the shareholders in the GSEs.  *Id.*

§ 1719(g)(1)(C) (emphasis added).[16]  Indeed, the other considerations on that make clear that the

purpose is to protect the taxpayers only.  *See id.* ("(i) The need for preferences or priorities

regarding payments to the Government … (iv) The probability of the corporation fulfilling the

terms of any such obligation or other security, including repayment … (vi) Restrictions on the

use of corporation resources, including limitations on the payment of dividends and executive

compensation and any such other terms and conditions as appropriate for those purposes.").  This

suffices to answer the plaintiffs' claim that allowing Treasury and FHFA to amend the terms of

the PSPAs and stock certificates – in accordance with the express terms of those agreements –

would "nullif[y]" the limitations on Treasury's purchase authority.  Perry Br. 39.  The limitation

on purchase authority continues to serve its purpose – setting an expiration date on Treasury's

authority to pledge further funds to the GSEs.

Finally, even if the "forced sale" or "fundamental change" doctrine *could* be applied to

HERA, it would not apply in this case.  The Third Amendment changed the dividend payments

on the senior preferred stock from a fixed ten-percent dividend to a floating net worth sweep

---

[16] Treasury and FHFA have complied with the sunset provision when allocating PSPA funding to the GSEs.  The First and Second Amendments to the PSPAs, which did obligate additional funds to the GSEs by raising the cap on Treasury's PSPA funding, were all executed prior to the December 31, 2009 sunset date.  *See* 12 U.S.C. § 1719(g)(3) ("Any funds expended for the purchase of, or modifications to, obligations and securities, or the exercise of any rights received in connection with such purchases under this subsection shall be deemed appropriated at the time of such purchase, modification, or exercise.").

dividend; the liquidation preference and right of priority held by the taxpayers remained as before, and the change in dividend terms was designed to eliminate a glaring circularity problem. The "fundamental change" doctrine does not apply to these circumstances.  The limited circumstances in which it has applied include "a merger, when shareholders are left with an investment in a new entity" and "an exchange of common stock for bonds, where 'the nature of the security has been changed in the sense that an interest in an ongoing concern is converted exclusively into a right to cash.'"  *Allard v. Arthur Andersen & Co. (U.S.A.)*, 957 F. Supp. 409, 420-21 (S.D.N.Y. 1997); *see also SEC v. Nat'l Secs., Inc.*, 393 U.S. 453, 467 (1969) ("The deception furthered a scheme which resulted in their losing their status as shareholders in Producers and becoming shareholders in a new company.").[17]  The plaintiffs characterize the Third Amendment as a fundamental change because it "transformed Treasury's stock from a fixed-rate dividend to a variable dividend."  Perry Br. 44.  This ignores all of the features of the original PSPAs, which also included a periodic commitment fee "determined with reference to the market value of the Commitment as then in effect."  Fannie Mae PSPA § 3.2(b) (AR 22). The market had always acknowledged that the periodic commitment fee "could be substantial." Freddie Mac 2010 Form 10K at 8 (AR 651).  The "transformation" that the plaintiffs describe, then, was a feature of the PSPAs from the date of their execution in September 2008.

The plaintiffs make two additional arguments in an effort to characterize the Third Amendment as a "purchase."  Both can be dispensed with quickly.  First, the plaintiffs cite tax

---

[17] Nor was Treasury "literally issued new securities" as a result of the Third Amendment.  Perry Br. 43.  The Third Amendment resulted in the issuance of "replacement Senior Preferred Stock Certificate[s]."  Third Amendment to Fannie Mae PSPA § 2 (AR 4335); Third Amendment to Freddie Mac PSPA § 2 (AR 4343).  The original senior preferred stock certificates allowed for such an amendment.  Fannie Mae Preferred Stock Certificate § 10(g) (AR 38); Freddie Mac Preferred Stock Certificate § 10(g) (AR 73).

regulations concerning when a change to the terms of a debt security is considered an "exchange of property."  Perry Br. 43.  But the relevant term in those regulations is "exchange," not "purchase," and the question is whether such an exchange can be considered income or loss for tax purposes.  *See* 26 C.F.R. § 1.1001-1(a) ("the gain or loss realized … from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained."); 26 C.F.R. § 1.1001-3(a)(1) ("This section provides rules for determining whether a modification of the terms of a debt instrument results in an exchange for purposes of § 1.1001–1(a).").  There is no comparable regulation for equity securities, such as the senior preferred stock in the GSEs.  Moreover, the significance of any modification is based on the terms of the modification itself.  *See* 26 C.F.R. § 1.1001-3(a).  The Third Amendment provides no fixed return for Treasury, and was entered into to address a new threat to the GSEs' viability by preventing the circularity of dividends, not to increase returns.  *See infra,* pp. 43-48.  The plaintiffs' arguments that the Amendment constituted a significant change based on the dividend payments in 2013 are offered in hindsight, and disregard the substantial evidence in the record concerning Treasury and FHFA's expectations at the time of the Third Amendment.

Finally, the plaintiffs reason that, because Treasury made HERA determinations before entering into the First and Second Amendments to the PSPAs, it must have viewed any amendment to the PSPAs as a purchase of securities.  Perry Br. 45.  To the contrary, in both cases, Treasury made HERA determinations because it was pledging additional taxpayer funds to the GSEs.  *See* Determination for First Amendment (AR 164) (First Amendment increased the funding commitment to the GSEs "*to provide them with additional funding* in amounts not to exceed the increased maximum amounts specified therein, are necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the

taxpayer.") (emphasis added); Determination for Second Amendment (AR 188) (Second Amendment "modif[ies] the Treasury's funding commitment to each of Fannie Mae and Freddie Mac *to provide them with additional funding* in amounts not to exceed the new formulaic maximum amounts specified therein") (emphasis added).   The Third Amendment, by contrast, did not provide additional funding to the GSEs, and thus was not a "purchase" of securities under HERA.[18]   And because HERA only requires Treasury to make the specified determinations "in connection with exercising" the purchase authority, 12 U.S.C. § 1719(g)(1)(C), Treasury did not need to make those findings before amending the agreements.

### B.        Treasury Did Not Breach Any Fiduciary Duty to the Plaintiffs

As Treasury noted in its initial brief, the plaintiffs offer two variants on a breach-of-fiduciary-duty claim.  The individual plaintiffs assert that Treasury acted arbitrarily and capriciously, in violation of the APA, by failing to consider whether it owed fiduciary duties to the GSEs' shareholders.  The plaintiffs in the putative class action, for their part, attempt to directly assert a common law breach of fiduciary duty claim against Treasury.  Either version of this argument fails, for three reasons.  First, no matter how the plaintiffs choose to characterize their claim, that claim arises (if at all) under the Tucker Act, and this Court lacks jurisdiction over the claim.  Second, the state-law obligations that the plaintiffs attempt to impose on Treasury conflict with Treasury's duties under federal law, and thus any such obligations are preempted.  Third, in any event, Treasury is not a controlling shareholder, and thus would not owe any fiduciary duties under state law, even if state law could supply the rule of decision here.

---

[18] Treasury's consistency in making the HERA determinations only when additional taxpayer funds are pledged also belies the plaintiffs' characterization of Treasury's position as "litigation-inspired."  Perry Br. 40.

First, under the Tucker Act, a claim founded on contractual relationships must be brought in the Court of Federal Claims if the plaintiff seeks more than $10,000.  28 U.S.C. §§ 1346(a)(2), 1491.  The plaintiffs base their fiduciary claims on the argument that Treasury assumed fiduciary obligation when it entered into the PSPAs.   As Treasury showed in its motion to dismiss, because that contractual relationship, rather than any statute, is the source of the alleged rights that the plaintiffs assert, their "breach of fiduciary duty claim is essentially a contract action" within the exclusive jurisdiction of the Court of Federal Claims.  *Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 68-69 (D.C. Cir. 2004). (There is no dispute in this case that the breach of fiduciary claim, if it could survive, would be valued at more than $10,000, so there is no Little Tucker Act jurisdiction here.)

The individual plaintiffs protest that they have brought an APA claim, not a breach of contract claim.  Perry Br. 88 n.32.  But under controlling circuit authority (which goes undiscussed in the plaintiffs' papers), this does not matter.  This Court looks to the substance of the claim, not the format in which the plaintiffs have pled it, and if the source of rights is an asserted contractual relationship, the plaintiffs must proceed under the Tucker Act.  *See, e.g., Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982).  (In any event, Treasury also showed that any APA claim based on asserted fiduciary duties would fail on the merits, because the APA does not require Treasury to consider policies embodied in sources of law other than HERA, the federal statute under which Treasury was operating.  *See PBGC v. LTV Corp.*, 496 U.S. 633, 645-46 (1990); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934 (D.C. Cir. 2008).  The plaintiffs have not offered any response to this point, either.)

The putative class plaintiffs try a different approach, arguing that their claim arises under neither the APA, nor the Tucker Act, but instead the Federal Tort Claims Act ("FTCA"), because

39

such a claim "sounds in tort."  Class Pls.' Br. 51.  This is incorrect; regardless of how state law

would characterize a claim, for the purpose of federal jurisdiction, if the claim is premised on a

contractual relationship, it is subject to the Tucker Act.  *See Trusted Integration, Inc. v. United

Sta*tes, 679 F. Supp. 2d 70, 83-84 (D.D.C. 2010).  In any event, the plaintiffs could not prevail on

a tort claim.  The FTCA requires a claimant to exhaust administrative remedies before the

agency before bringing suit, a jurisdictional requirement with which the plaintiffs have not

complied.  28 U.S.C. § 2675; *GAF Corp. v. United States*, 818 F.2d 901, 917-20 (D.C. Cir.

1987).  Moreover, the FTCA does not waive the government's sovereign immunity from the kind

of tort claims that the plaintiffs now attempt to assert.  *See* 28 U.S.C. § 2680(a), (h), (i); *Jerome

Stephen Pharms. Inc. v. FDA*, 402 F.3d 1249, 1252 (D.C. Cir. 2005) (discretionary function

exception under Section 2680(a) protects actions that involve "an element of judgment or

choice"); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1154 (D.C. Cir. 1985)

(exception under Section 2680(h) for claims "arising out of … interference with contract rights"

precludes claims for alleged breach of "duty not to interfere with [plaintiff's] economic

relationship with third parties"); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 490 (2006) (exception

under Section 2680(i) for claims for "damages caused by the fiscal operations of the Treasury"

uses "sweeping language" and paints with a "broad[] brush" to preserve Treasury's immunity).

Second, any fiduciary duty claim of the sort that the plaintiffs attempt to assert would be

inconsistent with federal law, and therefore would be preempted.  If Treasury were the fiduciary

of the GSEs' shareholders, it would owe an "unyielding" duty "to act in the best interests of the

shareholders."  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993).  But HERA

does not permit Treasury to place the interest of shareholders above all other considerations.

Instead, HERA directed Treasury to consider the public interest when it made investment

decisions with respect to the GSEs, such as its decision to enter into the PSPAs. *See* 12 U.S.C. § 1719(g)(1)(C) (directing Treasury to consider several factors "to protect the taxpayers" before exercising its purchase authority, including "[t]he need for preferences or priorities regarding payments to the Government"). A state law obligation that would require Treasury to maximize the return for shareholders, to the exclusion of any other considerations, "would present a significant and direct conflict with [Treasury's] obligation to act in the public interest," *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 42 (2d Cir. 2014), and thus is preempted.

The plaintiffs protest that it would not be *impossible* for Treasury to act as a fiduciary and to comply with HERA. Perry Br. 86-87; Supp'l Mem. of Law of Pls. Fairholme Funds, Inc., *et al.*, in Opp. to Defs.' Mots. to Dismiss and Mots. for S.J. and in Supp. of Pls.' Cross-Mot. for S.J. on Administrative Procedure Act Claims ("Fairholme Br.") 18. But "impossibility" preemption is only one of the forms of conflict preemption analysis, and the plaintiffs' fiduciary duty claims are instead barred under principles of "obstacle preemption." *See Hines v. Davidowitz*, 312 U.S. 52, 67 (19841) (state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). Where, as here, federal law contemplates that Treasury will take into account a number of considerations (including the protection of taxpayers) in formulating policy and in making investment decisions, a state law obligation that would elevate one consideration (*i.e.*, maximizing returns for shareholders) above all others "would interfere with the careful balance struck by Congress," and thus would stand as an obstacle to the accomplishment of Congress's objectives. *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012). *See also Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007) ("[W]hen state prescriptions significantly impair the exercise of authority, enumerated or incidental under [the federal statute], the State's regulations must give way.");

41

*Starr Int'l Co.*, 742 F.3d at 41-42.   When it used its HERA authority to enter into the PSPAs,

then, Treasury did not incur any duty to use taxpayer funds to bail out the GSEs' shareholders.

Third, even as a matter of state law, Treasury is not the plaintiffs' fiduciary.  The

plaintiffs assert that Treasury assumed fiduciary duties as the GSEs' "controlling shareholder,"

Perry Br. 86-87, Class Pls.' Br. 43, but they have not alleged that Treasury exercises any

"control" of the sort that could trigger those duties under Delaware's or any other state's law.

Treasury does not have voting rights in the GSEs, and its rights as a senior preferred shareholder

are entirely contractual.  Treasury is neither a majority shareholder, nor a minority shareholder

who exercises "actual control" over the company's board of directors, and thus it is not a

fiduciary.  *See, e.g., Zimmerman v. Crothall*, 62 A.3d 676, 699-700 (Del. Ch. 2013).  The

plaintiffs assert that Treasury exercised "actual control" because it holds warrants to purchase

common stock (which remain unexercised), and holds contractual rights of refusal over the

issuance of stock or debt, or over the termination of the conservatorships (which have not been

invoked).  The mere "*potential* ability to exercise control" does not suffice to create a fiduciary

duty; the plaintiff must instead adequately plead, and show, "the actual *exercise* of that ability."

*In re Sea-Land Corp.*, 1987 WL 11283, at *5 (Del. Ch. 1987) (emphasis in original).  Moreover,

even "a significant shareholder, who exercises a duly-obtained contractual right that somehow

limits or restricts the actions that a corporation otherwise would take, does not become, without

more, a controlling shareholder for that particular purpose."  *Superior Vison Servs. v. ReliaStar

Life Ins. Co.*, 2006 WL 2521426, at *5 (Del. Ch. 2006); *see also In re CNX Gas Corp. S'holders

Litig.*, 4 A.3d 397, 409 (Del. Ch. 2010); *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F.

Supp. 2d 202, 221-25 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014).  The plaintiffs allege,

at most, that Treasury has the potential to exercise control over the GSEs; that allegation is not enough to show that Treasury has incurred fiduciary obligations.

### C.       The Third Amendment Was the Result of Reasoned Decision Making

> 1.   *Treasury reasonably addressed the circularity of payments between the GSEs and Treasury, a practice that threatened to exhaust the GSEs' draw capacity and endanger their future viability*

The plaintiffs assert that Treasury acted arbitrarily when it entered into the Third Amendment, in violation of the APA.  The plaintiffs face a heavy burden in asserting this claim, as this Court's review under the APA is exceedingly narrow.  A reviewing court "must affirm the decision if we find that it is not contrary to law, that it is supported by substantial evidence and based upon a consideration of the relevant factors, and if we determine that the conclusions reached have a rational connection to the facts found."  *Melcher v. FCC*, 134 F.3d 1143, 1152 (D.C. Cir. 1998) (citations and quotation marks omitted).

The decision to enter into the Third Amendment easily meets this standard.  The amendment eliminated the vicious circle of the GSEs paying dividends to Treasury, drawing funds from Treasury, and paying further dividends on those draws.  This vicious circle was a highly relevant concern at the time; absent the Third Amendment, a sizable and growing portion of the GSEs' projected future draws on available Treasury funding would have been used to pay dividend payments to Treasury.  *See* GSE Preferred Stock Purchase Agreements Summary Review and Key Considerations, Presentation to the Office of Management and Budget ("OMB Presentation") at 10-14 (May 23, 2012) (AR 3784-3788); FHFA, Projections of the Enterprises' Financial Performance (Oct. 27, 2011) (AR 1898-1912).  Even assuming that they would have positive net income after 2012, the GSEs were still expected to be unable to pay their $19 billion dividend obligation to Treasury without incurring a net worth deficit (resulting in further draws

from Treasury), given the sheer size of that obligation, and the continued contraction of their

retained mortgage portfolios. *See* Treasury's Capital Support for the GSEs: Summary Review

and Key Considerations at 4 (Aug. 8, 2012) (AR 3899); Illustrative Financial Forecasts – Fannie

Mae: Base Case and Stress Scenarios at 6-11 (July 2012) (AR 3889-3894). It was widely

recognized that the GSEs did not expect to generate enough earnings to be able to consistently

pay the ten-percent dividend and maintain a positive net worth. *See* Fannie Mae 2011 Form 10K

at 21 (AR 2416); Freddie Mac 2011 Form 10K at 2 (AR 2772); *see also* Moody's Issuer

Comment: Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting (Aug. 13, 2012)

(FHFA 4028). Treasury thus recognized the need to maintain investor confidence in the GSEs

by minimizing those entities' draws on the finite Treasury funds available to them under the

PSPAs. *See* Action Memorandum: Third Amendments to the Senior Preferred Stock Purchase

Agreements with Fannie Mae and Freddie Mac (Aug. 15, 2012) (AR 4332).

Treasury's predictive judgment that the Third Amendment would assist in ensuring a

stable financial footing for the GSEs is thus well supported in the record, and that judgment is

entitled to special deference. *See, e.g., Int'l Ladies' Garment Workers' Union v. Donovan*, 722

F.2d 795, 821 (D.C. Cir. 1983) ("predictive judgments about areas that are within the agency's

field of discretion and expertise" are entitled to "particularly deferential" treatment). In an

attempt to overcome the deference that is owed to Treasury on this score, the plaintiffs deny that

the GSEs faced any funding shortfalls at all. Substantial evidence in the record, however, easily

supports Treasury's determination to the contrary.

The plaintiffs acknowledge, as they must, that Grant Thornton projections upon which

Treasury relied "showed that the [GSEs'] future revenues would be insufficient to cover

Treasury's 10 percent cash dividend." Perry Br. 75-76. But they argue that Treasury should

have relied on more recent projections, asserting in particular that Treasury should have referenced an August 2012 report by Fitch, which, they assert, projected that the GSEs would no longer need to take draws from Treasury.  Perry Br. 15 (citing Fitch, *Improved GSEs Results May Ease Push for Immediate Reform* (Aug. 13, 2012)).  That report, in fact, projected that: "The sustainability of the nascent U.S. home price recovery remains uncertain, and we believe GSE results could be volatile over coming quarters.  While both agencies are now funding preferred dividends to the Treasury ($11.7 billion annually for Fannie and $7.2 billion for Freddie), both GSEs will be limited in their ability to build reserves to consistently fund dividends if solid profitability is not sustained." *Id.*[19]  This conclusion was consistent with the views offered throughout 2012 by commercial forecasters.  *See* Moody's Issuer Comment: Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting (Aug. 13, 2012) (FHFA 4028); Barclays Interest Rates Research: Update: Treasury Changes the PSPAs: Initial Thoughts (Aug. 17, 2012) (FHFA 4049); Deutsche Bank Outlook at 4-6 (Mar. 14, 2012) (AR 3251-53).

The question, again, is not whether the GSEs had reported positive earnings in 2012; they had.  The question instead was whether, looking forward in 2012, the GSEs would consistently be able to earn enough to pay $19 billion in annual dividends to Treasury without drawing on the finite backstop of funds available to them under the PSPAs.  The plaintiffs assert that Treasury knew that the GSEs would have been able to do so, *see* Perry Br. 78-79 (quoting Action Memorandum for Secretary Geithner 2 (Dec. 21, 2011) (AR 2359)), but they misquote the cited material, which found precisely the opposite of the point for which the plaintiffs cite it; that memorandum instead recited that "[o]ver the longer term, the GSEs are *not* expected to generate enough net income to cover required dividend payments and forecasted losses," and that "*[e]ven*

---

[19]  The report is available at http://in.reuters.com/article/2012/08/13/idNWNA330420120813.

*if* the GSEs generated positive net income after dividends in the near term, that income could be used to offset potential draws in future quarters." *Id.* (emphasis added). The plaintiffs' contrary claims notwithstanding, the projections available in 2012 showed consistently that the GSEs, even if they were otherwise profitable, would not be able to pay dividends without incurring the need to take further draws from Treasury, and that an amendment to those agreements would therefore be required to maintain the GSEs' viability. *See, e.g.,* Treasury's Capital Support for the GSEs: Summary Review and Key Considerations (AR 3900).

The plaintiffs also attempt to poke holes in Treasury's projections, reciting what they (incorrectly) describe as inconsistencies between June 2012 and July 2012 presentations that Treasury prepared while the Third Amendment was under consideration. *See* Perry Br. 76-77 (discussing GSE Preferred Stock Purchase Agreements (PSPA) Overview and Key Considerations (June 13, 2012) (AR 3833-3862), and Illustrative Financial Forecasts - Fannie Mae Base Case & Stress Scenarios (July 2012) (AR 3884-3903)). This argument is a red herring.[20] The relevant point is that, under the analysis described in either presentation – and under any of the "base case," "downside case," or "stress case" scenarios employed in any of the

---

[20] The argument is also inaccurate. As Treasury has explained in its opposition to the motion to supplement the record filed by Fairholme Funds, the two presentations each employed different assumptions as to the rate at which the balance of the GSEs' retained portfolios would decline, and whether single-family guarantee fees would increase. The June 2012 presentation also presented data by fiscal year, while the July 2012 presentation presented data by calendar year, and the July 2012 presentation incorporated data from Fannie Mae's subsequent financial statements. The plaintiffs quibble with these points, but they are mistaken. They assert, in particular, that there is no reason why a change in the annual reduction in the GSEs' retained mortgage portfolios from 10% to 15% would "more than halve" the entities' profits. Perry Br. 77. But market analysts understood that those portfolios were the "primary driver of profitability" for the GSEs, which "could not be counted on [as] a sustainable source of revenues." Barclays Interest Rates Research: Update: Treasury Changes the PSPAs: Initial Thoughts (Aug. 17, 2012) (FHFA 4049). The plaintiffs also question whether the July 2012 presentation incorporated Fannie Mae's subsequent results; they did. *See* AR 3889 n.2.

analyses – the result was the same.  Absent the Third Amendment, the GSEs' payment of dividends to Treasury would lead to further draws of funds from Treasury, and that practice, if left unaddressed, would lead to the exhaustion of the GSEs' remaining draw capacity, threatening the future solvency of the GSEs.  The fact that Treasury engaged in different analyses, employing a variety of different assumptions, and that each of those analyses arrived at the same conclusion is a sign of the *strength* of Treasury's decision-making process, not a sign that Treasury acted in any way arbitrarily.

The plaintiffs also fault Treasury for not taking into account the possibility that the GSEs could recognize deferred tax assets.  Perry Br. 72-73.  However, the GSEs could recognize the deferred tax assets, if at all, only on a "one-time" basis, and only upon a determination that the GSEs would generate sufficient taxable income to utilize the deferred tax assets.  FHFA Office of Inspector General, Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements 16-17 (Mar. 20, 2013) (cited in Perry Br. 73).  Moreover, following the recognition of deferred tax assets, forecasts of the GSEs' comprehensive income would be lower going forward, given that this recognition would trigger the recording of income tax expense on the GSEs' positive earnings, decreasing each GSE's net worth accordingly.  The possibility of that one-time gain, the timing of which could not be predicted, simply was not material to the problem that Treasury and FHFA sought to address by entering into the Third Amendment.  Once again, Treasury's and FHFA's concern was that market investors would lose confidence in the GSEs, given the unsustainable path that those entities were on, and the speculative possibility of a future one-time recognition of an asset would not have addressed the market's concerns.

Accusations of a supposedly secret decision to wind down the GSEs do nothing to advance the plaintiffs' APA claim.  They cite to what they characterize as a "policy" "not

announced to the public," Perry Br. 13, referring to a memorandum that recommended that

Treasury waive the periodic commitment fee that it was otherwise be entitled to receive under

the PSPAs.  The plaintiffs quote from a portion of the memorandum advancing arguments in

favor of *setting* the fee – an alternative recommendation that was rejected.  *See* Action

Memorandum for Secretary Geithner at 2 (Dec. 20, 2010) (AR 202).  One sentence offered in

support of a rejected recommendation is hardly evidence of a secret "policy" decision, especially

given that in 2010 any "positive earnings" of the GSEs were purely hypothetical.  In any event,

the plaintiffs need not hunt for any secret decision to wind down the GSEs, because from the

outset of the conservatorships, FHFA has made clear that its goal is to "[g]radually contract the

Enterprises' dominant presence in the marketplace while simplifying and shrinking their

operations."  FHFA, A Strategic Plan for Enterprise Conservatorships: The Next Chapter in a

Story that Needs an Ending at 2 (Feb. 21, 2012) (AR 2371); *see* Fannie Mae PSPA § 5.7 (AR

25); Freddie Mac PSPA § 5.7 (AR 59).  Treasury, likewise, has consistently stated that it aims to

"responsibly reduce the role of [the GSEs] in the mortgage market and, ultimately, wind down

both institutions," but that "it should be clear that the government is committed to ensuring that

Fannie Mae and Freddie Mac have sufficient capital to perform under any guarantees issued now

or in the future and the ability to meet any of their debt obligations."  Reforming America's

Housing Finance Market, A Report to Congress 2 (AR 207).  The Third Amendment, which

preserves the PSPA funding to cover the GSEs' future net worth deficits, provides the support

that allows the GSEs to carry on their business while FHFA works to simplify their operations.

> 2. *Treasury did not fail to consider reasonable alternatives to the Third Amendment*

Treasury reasonably determined, then, that the GSEs faced the danger of a continuous

cycle of drawing funds from Treasury and paying dividends to Treasury, and that this cycle

threatened to lead to the exhaustion of the funding capacity available to the GSEs under the

PSPAs.  The Third Amendment addressed this danger by ensuring that the GSEs would draw on

their funding capacity only to cover their net worth deficits, not to pay billions of dollars in

dividends to Treasury.[21]  The plaintiffs are unable to dispute that substantial evidence in the

record supports this determination, and so argue that Treasury (of FHFA) should instead have

adopted an alternative solution to address the circularity problem.

The plaintiffs assert, in particular, that FHFA should have foregone the annual cash

dividend to Treasury, thereby incurring the penalty of a twelve-percent-per-year increase in the

liquidation preference on Treasury's preferred stock.  Perry Br. 66-67; *see also* Fairholme Br. 4-

5.  The plaintiffs ignore the nature of the penalty provision.  *See* Fannie Mae Preferred Stock

Certificate § 2(c) (AR 33); Freddie Mac Preferred Stock Certificate § 2(c) (AR 67-68) (addition

to liquidation preference is incurred when "the Company shall have for any reason *failed* to pay

dividends in cash in a timely manner *as required* by this Certificate") (emphasis added).  The

penalty rate applies "immediately following such *failure*," *id.* (emphasis added), until the GSE

pays in cash all of the accumulated accrued dividends.  It is, therefore, no answer for the

plaintiffs to assert that FHFA should have incurred these penalties under the PSPAs.  The

purpose of the Third Amendment, after all, was to bolster market confidence in the long-term

solvency of the GSEs, since market observers had already written publicly about their concerns

on that score.  *See* Action Memorandum for Secretary Geithner at 3 (Aug. 15, 2012) (AR 4332)

---

[21]  Fairholme, in particular, betrays its misunderstanding of the Third Amendment when it asserts that the GSEs "are today just one unprofitable quarter away from insolvency."  Fairholme Br. 7. The point of the Third Amendment is that the funding capacity from Treasury will be available to cover all of the GSEs' net losses, and that the funding capacity will no longer need to be used for any other purpose.  The Third Amendment thus protects the GSEs from the mandatory receivership that would follow upon the GSEs' experiencing a net worth deficit (*i.e.*, insolvency) after their funding capacity is exhausted.

(noting need to reassure investors who were concerned about long-term viability of the GSEs). At the time of the Third Amendment, neither GSE expected to be able to pay even the *ten-percent* dividend to Treasury, on a consistent basis, solely out of their net income.  Fannie Mae Second Quarter 2012 Form 10-Q at 12 (Aug. 8, 2012) (AR 3919); Freddie Mac Second Quarter Form 10-Q at 10 (Aug. 8, 2012) (AR 4096).  There would have been no reason for the market to expect, then, that the GSEs would have been able to ever fully pay off the accrued *twelve-percent* dividend, if FHFA had incurred that penalty.  In sum, it defies credulity to posit that investors in the GSEs' debt and mortgage-backed securities would have reacted positively if FHFA had used the desperate measure of an open breach of its payment obligation to Treasury.

The plaintiffs also suggest that Treasury could have foregone some of its claim to payment under the PSPAs, by amending the PSPAs either to limit the dividends to which Treasury was entitled, or to permit the GSEs to pay down Treasury's liquidation preference. Perry Br. 80.  But "no officer or agent of the Government has the authority to waive contractual rights that have accrued to the [United States] or to modify existing contracts to the detriment of the Government without adequate legal consideration or a compensating benefit flowing to the Government." *Union Nat'l Bank of Chicago v. Weaver*, 604 F.2d 543, 545 (7th Cir. 1979). When it committed in September 2008 to provide unprecedented sums of money to the GSEs – amounting to $189 billion to date – Treasury did so in exchange for certain rights, including the right to receive a dividend, the right to commitment fees, and protection for its liquidation preference so long as its commitment remained in effect.  Treasury made this commitment to the GSEs on the premise that these terms would protect the taxpayer's investment in the GSEs.  *See* 12 U.S.C. § 1719(g)(1)(B) (HERA authority is designed to "protect the taxpayer").  Treasury in no way acted arbitrarily by declining to exercise a power that it did not have to forego its right to

payment under the PSPAs.  It instead acted reasonably by entering into the Third Amendment,

with an expected return to Treasury that would be "materially equivalent" to the return expected

under the prior agreement.  OMB Presentation at 27-28 (AR 3801-02).[22]

Finally, the plaintiffs dispute the need for the Third Amendment at all, given that

Treasury did not take similar measures when it and FHFA reached the Second Amendment in

December 2009, when the GSEs were experiencing "outsized losses."  Perry Br. 78.  But in fact

Treasury and FHFA took even more drastic measures in December 2009, reaching an agreement

whereby Treasury committed funds to cover *any* net worth deficit that the GSEs would

experience through 2012, so as to address the severe threat to the GSEs' viability at that time.

Second Amendment to Fannie Mae PSPA (AR 189); Second Amendment to Freddie Mac PSPA

(AR 195).  By 2012, however, the same course of action was no longer available to Treasury and

FHFA.  The amount of funds available to the GSEs under the Second Amendment would

become fixed at the end of 2012, *see id.*, and Treasury's purchase authority under HERA had

expired, preventing it from committing further funds to maintain the GSEs' viability.  *See* 12

U.S.C. § 1719(g).  Because Treasury could no longer increase the PSPAs' funding capacity, the

threat that the capacity would be extinguished by the GSEs' circular practice of paying funds to,

---

[22] The plaintiffs dispute this point, asserting that Treasury could receive *precisely* the same amounts under the Third Amendment as it otherwise would have received absent that amendment "only if the [GSEs] performed *exactly* as predicted."  Perry Br. 72 (emphasis in original). Of course this is true.  The point is that Treasury was charged with using its predictive judgment to assess possible results with and without the Third Amendment.  It is no answer for the plaintiffs to assert that predictions may sometimes be wrong.  In any event, the plaintiffs are wrong to assert that Treasury anticipated greater returns under the Third Amendment in its "stress scenarios," and none of the materials that they cite for this proposition even remotely supports that point.  *See* Perry Br. 72.  Treasury anticipated a "materially equivalent" return under any scenario, although it also anticipated that the Third Amendment made the stress scenarios far less likely, as "investor confidence in the GSEs should improve, which will decrease funding costs and improve profitability."  GSE Preferred Stock Purchase Agreements (PSPA) Overview and Key Considerations (June 13, 2012) (AR 3862).

and taking draws from, Treasury posed a pressing challenge to their sustained viability.  Treasury acted reasonably to address that threat by entering into the Third Amendment.[23]

## III.    The Class Plaintiffs' Takings Claim Should Be Dismissed

As Treasury showed in its initial brief, the putative class plaintiffs' takings claim suffers from multiple defects.  As an initial matter, under the Tucker Act, this claim is subject to the exclusive jurisdiction of the Court of Federal Claims, where many of the same plaintiffs are already pursuing precisely the same claim.  Second, the claim fails as a matter of law, given, in particular, that the plaintiffs lack any reasonable expectation in any recovery from the Treasury's largesse.  Third, even if such an expectation could be reasonable, any such claim is not ripe.

### A.    This Court Lacks Jurisdiction Over the Takings Claim

The "Little Tucker Act" permits monetary claims in district courts against the United States "not exceeding $10,000 in amount."  28 U.S.C. § 1346(a)(2).  The plaintiffs, however, have not expressly waived the right to a greater award, and so do not meet this jurisdictional cap.  Only Mary Meiya Liao even tries to show that this Court has jurisdiction over her takings claim.  Even with respect to Ms. Liao, however, the plaintiffs assert only that it is not "plausible" that she would recover more than $10,000, Class Pls.' Br. 53, and that assertion falls well short of the requirement to "expressly disclaim" any greater recovery.  *Stone v. United States*, 683 F.2d 449, 454 n.8 (D.C. Cir. 1982); *see also Waters v. Rumsfeld*, 320 F.3d 265, 271 (D.C. Cir. 2003).

---

[23]  Even if the plaintiffs were to prevail on their claim that Treasury acted arbitrarily and capriciously, the proper course of action would be to remand the matter to the agency to consider the matter for an additional explanation.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Any such remand should be without vacatur of the Third Amendment, given that, at a minimum "it is conceivable" that the agency may correct the alleged errors on remand, and the vacatur of the Third Amendment would be highly disruptive for the housing market. *Delta Air Lines, Inc. v. Export-Import Bank of United States*, 718 F.3d 974, 978 (D.C. Cir. 2013); *see also Heartland Regional Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009).

Even if Ms. Liao's claim could survive, however, it is clear that the remaining plaintiffs' takings claims must be dismissed, as those plaintiffs have not attempted to disclaim any greater recovery at all (and, indeed, many of them are simultaneously seeking larger recoveries on their takings claims before the Court of Federal Claims, *see* Treasury Br. 57).  The plaintiffs assert that it would be "premature" for them to waive any greater recovery now.  Class Pls.' Br. 53.  This is plainly wrong; it is "hornbook law" that "the jurisdiction of the court depends on the state of things at the time of the action brought."  *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570-71 (2004); *see also Stone*, 683 F.2d at 454 n.8 (waiver "should be set forth in the initial pleadings").  The reason for this hornbook rule is obvious; jurisdictional rules are not meant to be a tool of gamesmanship, whereby plaintiffs may first test whether a forum will be favorable before deciding whether to submit themselves to that forum's jurisdiction.

The plaintiffs also argue that they need not satisfy the jurisdictional cap of the Little Tucker Act because they have filed a putative class action.  Class Pls.' Br. 53.  But no class has yet been certified, and the only claims before the Court now are those of the named plaintiffs.  Those plaintiffs must first show that this Court has jurisdiction over their individual claims before this case proceeds to questions of class certification.  *See Disability Rights Council of Greater Washington v. WMATA*, 239 F.R.D. 9, 15-16 (D.D.C. 2006).  Without an unequivocal waiver of a recovery greater than $10,000, no such jurisdiction exists.

## B.     Treasury Did Not Take the Plaintiffs' Property by Entering into the Third Amendment

### 1.   The plaintiffs do not have any legally cognizable property interest for purposes of a takings claim

The putative class plaintiffs assert that Treasury has taken property from them by entering into the Third Amendment, either because it deprived them of the expectation that they

would receive dividends from the GSEs, or because it deprived them of the expectation that they would receive payment upon the GSEs' liquidation.  The plaintiffs do not have any legally cognizable property interest, for the purpose of the Takings Clause, in either expectation.  As shareholders in the GSEs, the plaintiffs acquired their shares with the understanding that FHFA (or that agency's predecessor, OFHEO) had the authority to place the GSEs into conservatorship and to manage the GSEs' assets as conservator.  The existence of this power necessarily limited the plaintiffs' rights as shareholders, and prevents them from asserting a legally cognizable property interest in the GSEs' profits or assets when in conservatorship.

As Treasury showed in its initial brief, shareholders in highly-regulated entities, such as the GSEs, lack any property interest cognizable under the Takings Clause in shares of entities that are in conservatorship or receivership, because the laws authorizing conservatorship and receivership actions inhere in the plaintiffs' rights in those shares.  *See, e.g., Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994); *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 (Fed. Cir. 1992).  This is because the regulated financial institutions lack "the fundamental right to exclude the government from [their] property;" therefore, shareholders in those institutions "held less than the full bundle of property rights."  *See Golden Pacific*, 15 F.3d at 1073-74 (internal quotation omitted).

The plaintiffs, then, lack any claim under the Takings Clause that would limit the FHFA's authority to appoint a conservator, with or without the GSEs' consent, "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity," 12 U.S.C. § 4617(a)(2), or to exercise its conservatorship authority to take over the assets and conduct the business of the GSEs.  *Golden Pacific* and *California Housing Securities* therefore require the dismissal of the plaintiffs' takings claims.  Like the regulators in those cases, FHFA had the

54

power to place the GSEs into conservatorships and to manage the entities' assets, and the plaintiffs lack the right to exclude the federal regulator from doing so.  *See Golden Pacific*, 15 F.3d at 1073-74; *Cal. Housing*, 959 F.2d at 958.

The plaintiffs attempt to distinguish *Golden Pacific* and *California Housing Securities* by arguing that those cases "all involved the normal application of established regulations," Class Pls.' Br. 63 n.4, and by asserting that Treasury and FHFA have not acted "normally" here.  This misses the point.  The relevant question is not the plaintiffs' subjective characterization of the agencies' behavior, but instead whether, as a matter of law, the plaintiff had the right to exclude the federal regulators from taking action.  Under HERA, the plaintiffs lacked any such right, and thus no Takings Clause claim arises.

In particular, the plaintiffs lacked any unfettered right to a dividend; the PSPAs explicitly prohibited the payment of dividends absent Treasury's approval.  The plaintiffs concede this point, and instead assert a property right in their claim to liquidation proceeds upon the termination of the GSEs.  Class Pls.' Br. 65 (citing 12 U.S.C. § 4617(b)(2)K)(i)).  This claim depends on the plaintiffs' assertion that their claim on liquidation proceeds has been "extinguished," Class Pls.' Br. 66, but that is incorrect; the plaintiffs retain the same claim to the same extent as they did before the Third Amendment.  Any such claim would be limited by HERA's maximum liability provision, *see* 12 U.S.C. § 4617(e) (limiting liability to amount that claimant would have received in a hypothetical liquidation at the time that a GSE was first in default or in danger of default), a limitation that existed both before and after the Third Amendment.   The plaintiffs, then, did not have any legally cognizable property interest in either a right to dividends or a right to a liquidation preference that Treasury has taken in any sense.

### 2.   *Treasury has not taken any of the plaintiffs' property interests*

The plaintiffs, in any event, fail to explain how Treasury's actions constitute a taking under the Fifth Amendment.  The plaintiffs do not allege a physical taking of their property, nor could they.  *See Cal. Housing Sec.*, 959 F.2d at 958; *Golden Pacific*, 15 F.3d at 1073-74.  Their attempt to assert a "per se" taking, Class Pls.' Br. 67, also fails.  Treasury has not in any sense "command[ed] the relinquishment of funds linked to a specific, identifiable property interest" from the plaintiffs.  *Koontz v. St. Johns River Water Mgt. Dist.*, 133 S.Ct. 2586, 2600 (2013).  The plaintiffs' claim, instead, is that the value of their expectation of dividends or a liquidation preference has been diminished – a far cry from the sort of claim of a direct regulatory command that could support a "per se" takings claim.

The plaintiffs may proceed, then, if at all, only on a claim that the Third Amendment amounted to a regulatory taking.  Their claim of a regulatory taking fails as well.  As Treasury noted in its initial brief, there are two types of regulatory takings claims, but the plaintiffs cannot succeed under either.  First, under a categorical theory, a taking may be established by showing that a "regulation denies all economically beneficial or productive use of land."  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992).  Such a claim may proceed only in the "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  *Id.* at 1017-18.  The categorical rule applies only to claims regarding real property. *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007). Although, as the plaintiffs protest, Class Pls.' Br. 67-68, the Federal Circuit has on occasion applied the categorical rule to claims involving personal property, it has never extended the rule to claims of "takings of intangible property."  *A & D Auto Sales, Inc.*, --- F.3d ---, 2014 WL 1345499, at *4 (Fed. Cir. Apr. 7, 2014).  There is no occasion to do so here.  In any event,

contrary to the plaintiffs' claim, the categorical rule has no application here, because there has been no "total wipeout" of the value of the plaintiffs' shares:  the plaintiffs still own their preferred shares, which retain value as traded equities.

Nor may the plaintiffs prevail under the balancing test of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).  This inquiry looks to three factors: (1) the economic impact of the regulation, (2) the extent to which the regulation interferes with investment-backed expectations, and (3) the nature or character of the governmental action, and failure to meet any one of the three factors is usually fatal to the takings claim.  *See Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 511 (2009).  The plaintiffs fail all three.

First, the plaintiffs have not shown any economic impact of the Third Amendment upon their dividend or liquidation rights.  As noted, the plaintiffs lacked any right to a dividend under the PSPAs, either before or after the Third Amendment.  And their claim to a liquidation preference was limited, before and after the Third Amendment, by HERA's provision limiting that claim to what they would have received had the GSEs been liquidated in 2008.  *See* 12 U.S.C. § 4617(e).  The plaintiffs' argument, again, assumes that the Third Amendment extinguished their claim to a liquidation preference, *see* Class Pls.' Br. 68-69, but that assumption is mistaken.  Without a plausible claim of an economic injury, the takings claim fails.

Second, for the reasons already discussed, the shareholders lack any reasonable investment-backed expectations that the GSEs would not be placed into conservatorship, or that FHFA would take action as it saw fit to manage those entities' affairs.  *See Golden Pacific*, 15 F.3d at 1074-75; *Cal. Hous. Sec.*, 959 F.2d at 958-59.  Given the prohibition in the PSPAs against the distribution of dividends to junior shareholders, and the statutory limit on the junior shareholders' liquidation preference, the plaintiffs cannot credibly contend that they possessed

any expectations to receive these payments while the GSEs are in conservatorship, or that any

such expectation could have been reasonable.

Third, the character of the governmental action does not support takings liability here.

The relevant question is whether the plaintiffs are being forced to bear a financial burden that

should properly fall on the greater public. *See Rose Acre Farms, Inc. v. United States*, 559 F.3d

1260, 1282 (Fed. Cir. 2009).  It should be obvious that the general public should not bear the

burden here.  Shareholders in the GSEs, like the plaintiffs, have benefitted for years from the

GSEs' unique relationship with the government.  Shareholders ordinarily would absorb the

losses of their investments; in this instance, however, Treasury, and U.S. taxpayers, have borne

their costs.  The plaintiffs, in fact, have benefitted from the extraordinary commitment of funds

from Treasury, and they cannot plausibly claim that the Fifth Amendment demands that Treasury

provide them with a further recovery.  All of the *Penn Central* factors, then, undermine the

plaintiffs' takings claim.

> 3. *Treasury cannot be subject to takings liability, because it entered into the Third Amendment as a market participant*

In any event, the plaintiffs may not proceed on a takings theory, because they do not

challenge Treasury's actions as a regulator.  They instead assert a takings claim on the basis of

Treasury's actions as a market participant when it entered into the Third Amendment to its stock

purchase agreements with FHFA.  No takings liability can lie when the government acts in the

market*. See, e g., St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1385-86 (Fed.

Cir. 2008); *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 792-93 (Fed. Cir. 1993).  The plaintiffs

argue that the commercial actor exception does not apply here, because Treasury acted to

"provide stability to the financial markets, prevent disruptions in mortgage financing, and protect

the taxpayer."  Class Pls.' Br. 55.  Treasury indisputably had these public policy goals in mind,

but this does not defeat the application of the commercial actor exception: "Proprietary government action typically involves bargaining with private actors for the provision or procurement of goods and services; the action is deemed proprietary even though the government may enter into the contractual relationship in pursuit of a larger governmental objective." *A & D Auto Sales*, 2014 WL 1345499, at *9.

The Federal Circuit declined to apply the commercial-actor exception in *A & D Auto Sales*, as the plaintiffs there had not contracted with the government, and thus had "no ordinary commercial remedy against the government." *Id.* Here, the plaintiffs do have an alternative remedy; their claim to the liquidation preference survives, and the plaintiffs could pursue it in a liquidation proceeding to the same extent (and subject to the same limitations) as they could have before the Third Amendment. Moreover, the Federal Circuit noted that, in the commercial context, the government may legitimately act "like a commercial lender" to ensure a return on its investment. *Id.* The plaintiffs, then, may not convert their commercial-law disputes with Treasury into takings claims; any liability on Treasury's part must instead be based on some source of law other than the Takings Clause. As shown above, no such liability exists.

## C.  The Takings Claim Is Not Ripe For Judicial Review

Finally, the takings claim should be dismissed on ripeness grounds, because the claims are contingent on uncertain, future events. The claim is neither fit for decision, nor would withholding a decision cause any undue hardship to the parties. *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). First, as to fitness, it is premature for the plaintiffs to claim that they have suffered any economic loss. "In order to establish a regulatory taking, a plaintiff must show that his property suffered a diminution in value or a deprivation of economically beneficial use." *A & D Auto Sales*, 2014 WL 1345499, at *10. Whether the plaintiffs will

suffer any economic loss, however, is unknown, and unknowable, at this time; they would do so, even under their own theory, only if the GSEs remain consistently profitable.  On the other hand, if the GSEs experience losses, Treasury will provide funds to the GSEs to cover those losses. The plaintiff may not bring a premature takings claim to convert the Third Amendment into a "heads we win, tails you lose" proposition.   As was the case in *OMYA, Inc. v. FERC*, 111 F.3d 179, 182 (D.C. Cir. 1997), "[u]ntil these figures are set, any economic assessment of the [Third Amendment] would be speculative and premature," and the claim is not ripe.

Nor would the plaintiffs suffer hardship from the deferral of review.  The plaintiffs, again, retain their right to pursue a claim upon liquidation, 12 U.S.C. § 4617(k), subject to the maximum limits on their recovery under 12 U.S.C. § 4617(e) (which limits applied in the same form both before and after the Third Amendment).  The plaintiffs, then, are simply wrong in their assertion that "[t]his is not a case where the government has provided some other process through which shareholders might be compensated, rendering their claims unripe."  Class Pls.' Br. 74.  Congress has done so in enacting HERA, and the plaintiffs may not use the vehicle of a takings claim to short-circuit the claims process that Congress envisioned.  *See Williamson Cnty. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985).

## CONCLUSION

For the foregoing reasons, the complaints should be dismissed, or, in the alternative, summary judgment should be awarded to the Treasury defendants.

Dated: May 2, 2014                                Respectfully submitted,

                                                  STUART F. DELERY
                                                  Assistant Attorney General

                                                  RONALD C. MACHEN, JR.
                                                  United States Attorney

                                                  DIANE KELLEHER
                                                  Assistant Branch Director

                                                    /s/ Joel McElvain
                                                  JOEL McELVAIN
                                                  THOMAS D. ZIMPLEMAN
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  20 Massachusetts Avenue, NW
                                                  Washington, D.C. 20530
                                                  (202) 514-2988
                                                  Joel.McElvain@usdoj.gov

                                                  *Counsel for the Treasury Defendants*